# 13-3565-cv(L)

### 13-3636-cv(CON), 15-432-cv(CON), 15-441-cv(CON), 15-454-cv(CON), 15-477-cv(CON), 15-494-cv(CON), 15-498-cv(CON), 15-524-cv(CON), 15-537-cv(CON), 15-547-cv(CON), 15-551-cv(CON), 15-611-cv(CON), 15-620-cv(CON), 15-627-cv(CON), 15-733-cv(CON), 15-744-cv(CON), 15-778-cv(CON), 15-825-cv(CON), 15-830-cv(CON)

## United States Court of Appeals
### *for the*
## Second Circuit

ELLEN GELBOIM, on behalf of herself and all others similarly situated,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT BRIEF FOR DEFENDANTS-APPELLEES

DARYL A. LIBOW
CHRISTOPHER M. VIAPIANO
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW, Suite 700
Washington, DC 20006
(202) 956-7500

*Attorneys for Defendant-Appellee*
  *The Bank of Tokyo-Mitsubishi*
  *UFJ, Ltd.*

ROBERT F. WISE, JR.
ARTHUR J. BURKE
PAUL S. MISHKIN
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Defendants-Appellees*
  *Bank of America Corporation, Bank*
  *of America, N.A. and Merrill Lynch,*
  *Pierce, Fenner & Smith, Inc. (f/k/a*
  *Banc of America Securities LLC)*

*(For Continuation of Appearances See Inside Cover)*

LINDA ZACHER, SCHWAB SHORT-TERM BOND MARKET FUND,
SCHWAB TOTAL BOND MARKET FUND, SCHWAB U.S. DOLLAR
LIQUID ASSETS FUND, SCHWAB MONEY MARKET FUND, SCHWAB
VALUE ADVANTAGE MONEY FUND, SCHWAB RETIREMENT
ADVANTAGE MONEY FUND, SCHWAB INVESTOR MONEY FUND,
SCHWAB CASH RESERVES, SCHWAB ADVISOR CASH RESERVES,
CHARLES SCHWAB BANK, N.A., CHARLES SCHWAB & CO., INC.,
CHARLES SCHWAB CORPORATION, SCHWAB YIELDPLUS FUND,
SCHWAB YIELDPLUS FUND LIQUIDATION TRUST, 33-35 GREEN POND
ROAD ASSOCIATES, LLC, on behalf of itself and all others similarly situated,
FTC FUTURES FUND PCC LTD, on behalf of themselves and all others
similarly situated, FTC FUTURES FUND SICAV, on behalf of themselves and
all others similarly situated, METZLER INVESTMENT GMBH, on behalf of
itself and all others similarly situated, 303030 TRADING LLC, ATLANTIC
TRADING USA, LLC, GARY FRANCIS, NATHANIEL HAYNES,
COURTYARD AT AMWELL II, LLC, GREENWICH COMMONS II, LLC,
JILL COURT ASSOCIATES II, LLC, MAIDENCREEK VENTURES II LP,
RARITAN COMMONS, LLC, LAWRENCE W. GARDNER, on behalf of
themselves and all others similarly situated, MAYOR AND CITY COUNCIL OF
BALTIMORE, CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE
BENEFIT FUND, on behalf of itself and all others similarly situated, TEXAS
COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, GUARANTY
BANK & TRUST COMPANY, Individually and on behalf of all others similarly
situated, NATIONAL CREDIT UNION ADMINISTRATION BOARD, as
Liquidating Agent of U.S. Central Federal Credit Union, WESTERN
CORPORATE FEDERAL CREDIT UNION, MEMBERS UNITED
CORPORATE FEDERAL CREDIT UNION, SOUTHWEST CORPORATE
FEDERAL CREDIT UNION, AND CONSTITUTION CORPORATE
FEDERAL CREDIT UNION, CITY OF PHILADELPHIA, PENNSYLVANIA
INTERGOVERNMENTAL COOPERATION AUTHORITY, DARBY
FINANCIAL PRODUCTS, CAPITAL VENTURES INTERNATIONAL, SALIX
CAPITAL US INC., PRUDENTIAL INVESTMENT PORTFOLIOS 2, FKA
DRYDEN CORE INVESTMENT FUND, on behalf of Prudential Core Short-
Term Bond Fund, PRUDENTIAL CORE TAXABLE MONEY MARKET
FUND, CITY OF RIVERSIDE, RIVERSIDE PUBLIC FINANCING
AUTHORITY, EAST BAY MUNICIPAL UTILITY DISTRICT, COUNTY OF
SAN MATEO, SAN MATEO COUNTY JOINT POWERS FINANCING
AUTHORITY, CITY OF RICHMOND, RICHMOND JOINT POWERS
FINANCING AUTHORITY, Successor Agency to the Richmond Community
Redevelopment Agency, COUNTY OF SAN DIEGO, COUNTY OF SONOMA,
DAVID E. SUNDSTROM, in his official capacity as Treasurer of the County of
Sonoma for and on behalf of the Sonoma County Treasury Pool Investment,
REGENTS OF THE UNIVERSITY OF CALIFORNIA, SAN DIEGO
ASSOCIATION OF GOVERNMENTS, COUNTY OF SACRAMENTO, THE
COUNTY OF MENDOCINO, CITY OF HOUSTON, BAY AREA TOLL
AUTHORITY, JOSEPH AMABILE, LOUIE AMABILE, individually & on
behalf of Lue Trading, Inc., NORMAN BYSTER, MICHAEL CAHILL,
RICHARD DEOGRACIAS, individually on behalf of RCD Trading, Inc., MARC
FEDERIGHI, individually on behalf of MCO Trading, SCOTT FEDERIGHI,

individually on behalf of Katsco, Inc., ROBERT FURLONG, individually on behalf of XCOP, Inc., DAVID COUGH, BRIAN HAGGERTY, individually on behalf of BJH Futures, Inc., DAVID KLUSENDORF, RONALD KRUG, CHRISTOPHER LANG, JOHN MONCKTON, PHILIP OLSON, BRETT PANKAU, DAVID VECCHIONE, individually on behalf of Vecchione & Associates, RANDALL WILLIAMS, JOHN HENDERSON, 303 PROPRIETARY TRADING LLC, MARGERY TELLER, NICHOLAS PESA, EDUARDO RESTANI, VITO SPILLONE, PRUDENTIAL INVESTMENT PORTFOLIOS 2, FKA DRYDEN CORE INVESTMENT FUND, on behalf of Prudential Core Short-Term Bond Fund, PRUDENTIAL CORE TAXABLE MONEY MARKET FUND, SALIX CAPITAL US INC., DARBY FINANCIAL PRODUCTS, CAPITAL VENTURES INTERNATIONAL, CITY OF PHILADELPHIA, PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY, FTC FUTURES FUND PCC LTD., on behalf of themselves and all others similarly situated, FTC FUTURES FUND SICAV, on behalf of themselves and all others similarly situated, METZLER INVESTMENT GMBH, on behalf of itself and all others similarly situated, 303030 TRADING LLC, ATLANTIC TRADING USA, LLC, GARY FRANCIS, NATHANIEL HAYNES, CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, on behalf of itself and all others similarly situated, MAYOR AND CITY COUNCIL OF BALTIMORE, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, REGENTS OF THE UNIVERSITY OF CALIFORNIA, EAST BAY MUNICIPAL UTILITY DISTRICT, SAN DIEGO ASSOCIATION OF GOVERNMENTS, CITY OF RICHMOND, RICHMOND JOINT POWERS FINANCING AUTHORITY, Successor Agency to the Richmond Community Redevelopment Agency, CITY OF RIVERSIDE, RIVERSIDE PUBLIC FINANCING AUTHORITY, COUNTY OF SACRAMENTO, COUNTY OF SAN DIEGO, COUNTY OF SAN MATEO, COUNTY OF SONOMA, DAVID E. SUNDSTROM, in his official capacity as Treasurer of the County of Sonoma for and on behalf of Sonoma County Treasury Pool Investment, CITY OF HOUSTON,

*Plaintiffs-Appellants,*

FTC CAPITAL GMBH, on behalf of themselves and all others similarly situated, FTC FUTURES FUND PCC LTD, on behalf of themselves and all others similarly situated, FTC FUTURES FUND SICAV, on behalf of themselves and all others similarly situated, CARPENTERS PENSION FUND OF WEST VIRGINIA, CITY OF DANIA BEACH POLICE & FIREFIGHTERS' RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated, RAVAN INVESTMENTS, LLC, MAYOR AND CITY COUNCIL OF BALTIMORE, RICHARD HERSHEY, JEFFREY LAYDON, on behalf of himself and all others similarly situated, METZLER INVESTMENT GMBH, on behalf of itself and all others similarly situated, ROBERTO E. CALLE GRACEY, CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, on behalf of itself and all others similarly situated, AVP PROPERTIES, LLC, 303030 TRADING LLC, ATLANTIC TRADING USA, LLC, COMMUNITY BANK & TRUST, BERKSHIRE BANK, Individually and On Behalf of All Others Similarly Situated, 33-35 GREEN POND ROAD ASSOCIATES, LLC, on behalf of itself and all others similarly situated, ELIZABETH LIEBERMAN, on behalf of themselves and all others similarly situated, TODD AUGENBAUM, on behalf of themselves and all others similarly situated, GARY FRANCIS,

NATHANIEL HAYNES, COURTYARD AT AMWELL II, LLC, GREENWICH
COMMONS II, LLC, JILL COURT ASSOCIATES II, LLC, MAIDENCREEK
VENTURES II LP, RARITAN COMMONS, LLC, LAWRENCE W.
GARDNER, on behalf of themselves and all others similarly situated, ANNIE
BELL ADAMS, on behalf of herself and all others similarly situated, DENNIS
PAUL FOBES, on behalf of himself and all others similarly situated, LEIGH E.
FOBES, on behalf of herself and all others similarly situated, MARGARET
LAMBERT, on behalf of herself and all others similarly situated, BETTY L.
GUNTER, on behalf of herself and all others similarly situated, GOVERNMENT
DEVELOPMENT BANK FOR PUERTO RICO, CARL A. PAYNE, individually
and on behalf of other members of the general public similarly situated,
KENNETH W. COKER, individually and on behalf of other members of the
general public similarly situated, CITY OF RIVERSIDE, RIVERSIDE PUBLIC
FINANCING AUTHORITY, EAST BAY MUNICIPAL UTILITY DISTRICT,
COUNTY OF SAN MATEO, SAN MATEO COUNTY JOINT POWERS
FINANCING AUTHORITY, CITY OF RICHMOND, RICHMOND JOINT
POWERS FINANCING AUTHORITY, Successor Agency to the Richmond
Community Redevelopment Agency, COUNTY OF SAN DIEGO, GUARANTY
BANK & TRUST COMPANY, Individually and on behalf of all others similarly
situated, HEATHER M. EARLE, on behalf of themselves and all others similarly
situated, HENRYK MALINOWSKI, on behalf of themselves and all others
similarly situated, LINDA CARR, on behalf of themselves and all others similarly
situated, ERIC FRIEDMAN, on behalf of themselves and all others similarly
situated, COUNTY OF RIVERSIDE, JERRY WEGLARZ, NATHAN
WEGLARZ, on behalf of plaintiffs and a class, DIRECTORS FINANCIAL
GROUP, individually and on behalf of all others similarly situated, SEIU
PENSION PLANS MASTER TRUST, individually and on behalf of all others
similarly situated, HIGHLANDER REALTY, LLC, JEFFREY D. BUCKLEY,
FEDERAL HOME LOAN MORTGAGE CORPORATION, COUNTY OF
SONOMA, DAVID E. SUNDSTROM, in his official capacity as Treasurer of the
county of Sonoma for and on behalf of the Sonoma County Treasury Pool
Investment, REGENTS OF THE UNIVERSITY OF CALIFORNIA,
SAN DIEGO ASSOCIATION OF GOVERNMENTS, CEMA JOINT
VENTURE, COUNTY OF SACRAMENTO, CITY OF PHILADELPHIA,
PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY,
PRINCIPAL FUNDS, INC., PFI BOND & MORTGAGE SECURITIES FUND,
PFI BOND MARKET INDEX FUND, PFI CORE PLUS BOND I FUND, PFI
DIVERSIFIED REAL ASSET FUND, PFI EQUITY INCOME FUND, PFI
GLOBAL DIVERSIFIED INCOME FUND, PFI GOVERNMENT & HIGH
QUALITY BOND FUND, PFI HIGH YIELD FUND, PFI HIGH YIELD FUND
I, PFI INCOME FUND, PFI INFLATION PROTECTION FUND, PFI SHORT-
TERM INCOME FUND, PFI MONEY MARKET FUND, PFI PREFERRED
SECURITIES FUND, PRINCIPAL VARIABLE CONTRACTS FUNDS, INC.,
PVC ASSET ALLOCATION ACCOUNT, PVC MONEY MARKET
ACCOUNT, PVC BALANCED ACCOUNT, PVC BOND & MORTGAGE
SECURITIES ACCOUNT, PVC EQUITY INCOME ACCOUNT, PVC
GOVERNMENT & HIGH QUALITY BOND ACCOUNT, PVC INCOME
ACCOUNT, PVC SHORT-TERM INCOME ACCOUNT, PRINCIPAL
FINANCIAL GROUP, INC., PRINCIPAL FINANCIAL SERVICES, INC.,
PRINCIPAL LIFE INSURANCE COMPANY, PRINCIPAL CAPITAL
INTEREST ONLY I, LLC, PRINCIPAL COMMERCIAL FUNDING, LLC,
PRINCIPAL COMMERCIAL FUNDING II, LLC, PRINCIPAL REAL ESTATE

INVESTORS, LLC, TEXAS COMPETITIVE ELECTRIC HOLDINGS
COMPANY LLC, SALIX CAPITAL LTD.,

*Plaintiffs,*

– v. –

BANK OF AMERICA CORPORATION, BARCLAYS BANK PLC.,
CITIBANK NA, CREDIT SUISSE GROUP AG, DEUTSCHE BANK AG,
HSBC HOLDINGS PLC., J.P. MORGAN CHASE & CO., NORINCHUKIN
BANK, UBS AG, WESTLB AG, RABOBANK GROUP, DOES 1-10, HBOS
PLC, BANK OF TOKYO-MITSUBISHI UFJ, LTD, ROYAL BANK OF
CANADA, SOCIETE GENERALE, DEUTSCHE BANK FINANCIAL LLC,
DEUTSCHE BANK SECURITIES INC., BANK OF AMERICA, N.A.,
NATIONAL ASSOCIATION, JPMORGAN CHASE & CO., HSBC BANK PLC,
WESTDEUTSCHE IMMOBILIENBANK AG, CITIGROUP INC.,
COOPERATIEVE CENTRALE RAIFFEISENBOERENLEENBANK B.A.,
JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, JPMORGAN
CHASE BANK, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLS,
HSBC HOLDING PLC, LLOYDS BANKING GROUP PLS, JPMORGAN
CHASE BANK N.A., CITIGROUP, INC., CITIBANK N.A., BANK OF
TOKYO-MITSUBISHI UFJ, LTD., COOPERATIVE CENTRALE-
RAIFFEISENBOERNLEENBANK B.A., JPMORGAN CHASE BANK N.A.,
ROYAL BANK OF SCOTLAND, PLC, STEPHANIE NAGEL, BRITISH
BANKERS' ASSOCIATION, BBA ENTERPRISES, LTD, BBA LIBOR, LTD,
PORTIGON AG, JOHN DOES #1-#5, LLOYDS TSB BANK PLC, NATIONAL
COLLEGIATE TRUST, CHASE BANK USA, N.A., CREDIT SUISSE GROUP,
AG, CITIBANK, N.A., UBS SECURITIES LLC, J.P. MORGAN CLEARING
CORP., BANK OF AMERICA SECURITIES LLC, BANK OF TOKYO-
MITSUBISHI UFJ, JPMORGAN & CO., BANK OF AMERICA N.A.,
CENTRALE RAIFFEISEN-BERENLEENBANK B.A., UBS AG, ROYAL
BANK OF SCOTLAND GROUP PLC, SOCIETE GENERAL, ROYAL BANK
OF CANADA, BANK OF NOVA SCOTIA, BANK OF TOKYO MITSUBISHI
UFJ LTD., CHASE BANK USA, NA, ROYAL BANK OF SCOTLAND,
JPMORGAN CHASE BANK NATIONAL ASSOCIATION,
ROYAL BANK OF SCOTLAND GROUP PLC.,

*Defendants-Appellees,*

LLOYDS BANKING GROUP PLC, CREDIT AGRICOLE, S.A., ROYAL
BANK OF SCOTLAND GROUP PLC, CREDIT SUISSE GROUP, NA,
BARCLAYS CAPITAL INC., BARCLAYS U.S. FUNDING LLC, CREDIT
SUISSE SECURITIES (USA) LLC, BARCLAYS PLC, CITIZENS BANK OF
MASSACHUSETTS, agent of RBS Citizens Bank, NA, RBS CITIZENS, N.A.,
FKA CITIZENS BANK OF MASSACHUSETTS, RBS CITIZENS, N.A.,
incorrectly sued as other Charter One Bank NA, BNP PARIBAS S.A.,
SUMITOMO MITSUI BANKING CORP., CITIGROUP GLOBAL
MARKETS INC., HSBC SECURITIES (USA) INC.,

*Defendants.*

DAVID H. BRAFF
YVONNE S. QUINN
JEFFREY T. SCOTT
MATTHEW J. PORPORA
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

– and –

JONATHAN D. SCHILLER
LEIGH M. NATHANSON
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
(212) 446-2300

– and –

MICHAEL BRILLE
5301 Wisconsin Avenue, NW
Washington, DC 20015
(202) 237-2727

*Attorneys for Defendants-Appellees*
*Barclays Bank PLC, Barclays plc*
*and Barclays Capital Inc.*

DAVID R. GELFAND
SEAN M. MURPHY
MILBANK TWEED HADLEY & McCLOY LLP
28 Liberty Street
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant-Appellee*
*Coöperatieve Centrale Raiffeisen-*
*Boerenleenbank B.A.*

MOSES SILVERMAN
ANDREW C. FINCH
PAUL, WEISS, RIFKIND, WHARTON
   & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000

*Attorneys for Defendants-Appellees*
*Deutsche Bank AG and Deutsche*
*Bank Securities Inc.*

ANDREW A. RUFFINO
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000

– and –

ALAN M. WISEMAN
One City Center
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000

*Attorneys for Defendants-Appellees*
*Citibank, N.A., Citigroup Inc.,*
*Citigroup Funding, Inc., Citigroup*
*Global Markets Inc., Citigroup*
*Global Markets Limited, Citi*
*Swapco Inc. and Citigroup*
*Financial Products, Inc.*

HERBERT S. WASHER
ELAI KATZ
JOEL KURTZBERG
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Defendants-Appellees*
*Credit Suisse Group AG, Credit*
*Suisse International, Credit Suisse*
*AG, Credit Suisse Securities (USA)*
*LLC and Credit Suisse (USA), Inc.*

DONALD R. LITTLEFIELD
JACK D. BALLARD
BALLARD & LITTLEFIELD, LLP
3700 Buffalo Speedway, Suite 250
Houston, Texas 77098
(713) 403-6400

*Attorneys for Defendants-Appellees HSBC
Holdings plc and HSBC Bank plc* in
*City of Houston v. Bank of America
Corp., et al.,* S.D.N.Y. Case No. 1:13-
cv-05616

THOMAS C. RICE
PAUL C. GLUCKOW
SHANNON P. TORRES
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

*Attorneys for Defendants-Appellees
JPMorgan Chase & Co., JPMorgan
Chase Bank, N.A., J.P. Morgan
Securities LLC (f/k/a J.P. Morgan
Securities Inc.) and J.P. Morgan Dublin
plc (f/k/a JPMorgan Bank Dublin plc)
(f/k/a Bear Stearns Bank plc)*

ALAN M. UNGER
ANDREW W. STERN
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorneys for Defendant-Appellee
The Norinchukin Bank*

CHRISTOPHER M. PAPARELLA
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Attorneys for Defendants-Appellees
Portigon AG (f/k/a WestLB AG) and
Westdeutsche ImmobilienBank AG*

ED DEYOUNG
GREGORY T. CASAMENTO
LOCKE LORD LLP
Three World Financial Center
New York, New York 10281
(212) 812-8325

– and –

ROGER B. COWIE
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
(214) 740-8614

– and –

J. MATTHEW GOODIN
JULIE C. WEBB
111 South Wacker Drive
Chicago, Illinois 60606
(312) 443-0472

*Attorneys for Defendants-Appellees
HSBC Holdings plc, HSBC Bank
plc, HSBC Securities (USA) Inc.,
HSBC Bank USA, N.A., HSBC USA,
Inc. and HSBC Finance
Corporation* (except with regard to
*City of Houston v. Bank of America
Corp., et al.,* S.D.N.Y. Case No.
1:13-cv-05616)

MARC J. GOTTRIDGE
LISA J. FRIED
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
(212) 918-3000

– and –

NEAL KUMAR KATYAL
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, DC 20004
(202) 637-5600

*Attorneys for Defendants-Appellees
Lloyds Banking Group plc, Lloyds
Bank plc (f/k/a Lloyds TSB Bank
plc) and HBOS plc*

CHRISTIAN T. KEMNITZ
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661
(312) 902-5200

*Attorneys for Defendants-Appellees*
    *Royal Bank of Canada*

STEVEN WOLOWITZ
HENNINGER S. BULLOCK
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 506-2500

*Attorneys for Defendant-Appellee*
    *Société Générale*

PETER SULLIVAN
LAWRENCE J. ZWEIFACH
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

– and –

JOEL SANDERS
555 Mission Street, Suite 3000
San Francisco, California 94105
(415) 393-8200

– and –

THOMAS G. HUNGAR
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

*Attorneys for Defendants-Appellees*
    *UBS AG, UBS Securities LLC*
    *and UBS Limited*

FRASER L. HUNTER, JR.
DAVID S. LESSER
ALAN E. SCHOENFELD
JAMIE S. DYCUS
WILMER CUTLER PICKERING HALE
    AND DORR LLP
250 Greenwich Street
New York, New York 10007
(212) 230-8800

*Attorneys for Defendants-Appellees*
    *The Royal Bank of Scotland Group*
    *plc and The Royal Bank of Scotland*
    *plc except as to Prudential*
    *Investment Portfolios 2*

ROBERT G. HOUCK
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
(212) 878-8000

*Attorneys for Defendants-Appellees*
    *The Royal Bank of Scotland Group*
    *plc, The Royal Bank of Scotland plc*
    *and RBS Securities Inc. (f/k/a*
    *Greenwich Capital Markets Inc.)*
    *except as to Yale University and the*
    *Federal Home Loan Mortgage*
    *Corporation*

RICHARD D. OWENS
JEFF G. HAMMEL
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
(212) 906-1200

*Attorneys for Defendants-Appellees*
    *British Bankers' Association, BBA*
    *Enterprises Ltd. and BBA LIBOR*
    *Ltd.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned Defendants-Appellees respectively make the following disclosures:

### <u>Bank of America Entities</u>

Defendant-Appellee Bank of America Corporation is a publicly held company, does not have any parent corporation, and no publicly held company has an ownership interest of 10% or more in Bank of America Corporation.

Defendant-Appellee Bank of America, N.A. is a National Association and is 100% owned by BANA Holding Corporation. BANA Holding Corporation is 100% owned by BAC North America Holding Company. BAC North America Holding Company is 100% owned by NB Holdings Corporation. NB Holdings Corporation is 100% owned by Bank of America Corporation.

Defendant-Appellee Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is 100% owned by NB Holdings Corporation. NB Holdings Corporation is 100% owned by Bank of America Corporation. Effective November 1, 2010, Banc of America Securities LLC merged with and into MLPFS.

## The Bank of Tokyo-Mitsubishi UFJ, Ltd.

Defendant-Appellee The Bank of Tokyo-Mitsubishi UFJ, Ltd. is a wholly owned subsidiary of Mitsubishi UFJ Financial Group, Inc., which is a publicly held corporation, and no other publicly traded company owns 10% or more of The Bank of Tokyo-Mitsubishi UFJ, Ltd.'s stock.

## Barclays Entities

Defendant-Appellee Barclays PLC, a publicly held corporation, has no parent corporation and no publicly held corporation owns 10% or more of its stock;

Defendant-Appellee Barclays Bank PLC is a wholly owned subsidiary of Barclays PLC, which is a publicly held corporation, and no other publicly traded company owns 10% or more of Barclays Bank PLC's stock; and

Defendant-Appellee Barclays Capital Inc. identifies the following as parent corporations or publicly held corporations that own 10% or more of any class of its equity interests: Barclays PLC, Barclays Bank PLC and Barclays Group US Inc.

### British Bankers' Association, BBA LIBOR Ltd., and BBA Enterprises Ltd.

Defendant-Appellee British Bankers' Association has no corporate parent and no publicly held corporations own 10% or more of its stock.

Defendant-Appellee BBA LIBOR, Ltd.[1] has no corporate parent and no publicly held corporations own 10% or more of its stock.

Defendant-Appellee BBA Enterprises, Ltd. has no corporate parent and no publicly held corporations own 10% or more of its stock.

### Citibank Entities

Defendant-Appellee Citigroup Inc. is a publicly held corporation, has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Defendant-Appellee Citibank, N.A. is wholly owned by Citicorp, which in turn is wholly owned by Citigroup Inc. Citigroup Inc., a publicly held corporation, therefore indirectly owns 10 percent or more of the stock of Citibank, N.A.

Defendant-Appellee Citigroup Funding Inc. was wholly owned by Citigroup Inc. before it merged into Citigroup Inc. in 2012. Citigroup Inc., a publicly-held corporation, therefore directly owned 10 percent or more of the stock of Citigroup Funding Inc.

---

[1] On or about September 25, 2014, BBA LIBOR Ltd. changed its name to BBA Trent Ltd.

Defendant-Appellee Citigroup Global Markets Inc. is wholly owned by Citigroup Inc. Citigroup Inc., a publicly held corporation, therefore indirectly owns 10 percent or more of the stock of Citigroup Global Markets Inc.

Defendant-Appellee Citigroup Global Markets Limited is a subsidiary of Citigroup Global Markets Europe Ltd., which in turn is a subsidiary of Citigroup Global Markets Holdings Inc. which in turn is wholly owned by Citigroup Inc. Citigroup Inc., a publicly-held corporation, therefore indirectly owns 10 percent or more of the stock of Citigroup Global Markets Limited.

Defendant-Appellee Citi Swapco Inc. is a subsidiary of Citigroup Financial Products Inc., which in turn is wholly owned by Citigroup Global Markets Holdings Inc., which in turn is wholly owned by Citigroup Inc. Citigroup Inc., a publicly-held corporation, therefore indirectly owns 10 percent or more of the stock of Citi Swapco Inc.

Defendant-Appellee Citigroup Financial Products Inc. is wholly owned by Citigroup Global Markets Holdings Inc., which in turn is wholly owned by Citigroup Inc. Citigroup Inc., a publicly-held corporation, therefore indirectly owns 10 percent or more of the stock of Citigroup Financial Products Inc.

iv

## Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.

Defendant-Appellee Coöperatieve Centrale Raiffeisen- Boerenleenbank B.A. ("Rabobank") has no parent corporation and no publicly held corporation owns 10% or more of Rabobank.

## Credit Suisse Entities

Defendant-Appellee Credit Suisse Group AG ("CSGAG") is a corporation organized under the laws of the Country of Switzerland, and its shares are publicly traded on the SIX Swiss Exchange and are also listed on the New York Stock Exchange. CSGAG has no parent company, and no publicly held corporation owns 10 percent or more of its stock.

Defendant-Appellee Credit Suisse AG ("CSAG") is a wholly owned subsidiary of Defendant-Appellee CSGAG, which has publicly registered debt securities and warrants in the United States and elsewhere.

Defendant-Appellee Credit Suisse Securities (USA) LLC ("CSSU") is a wholly owned subsidiary of Defendant-Appellee Credit Suisse (USA), Inc. ("CSUI"), which is a wholly owned subsidiary of Credit Suisse Holdings (USA), Inc., which is jointly owned by Defendant-Appellees CSAG and CSGAG.

Defendant-Appellee Credit Suisse International ("CSI") is principally owned by Defendant-Appellees CSAG and CSGAG, and no other publicly traded company owns 10 percent or more of CSI's stock.

**Deutsche Bank AG and Deutsche Bank Securities Inc.**

Defendant-Appellee Deutsche Bank AG is a publicly held corporation organized under the laws of Germany that has no parent corporation, and no publicly held corporation owns 10 percent or more of Deutsche Bank AG's stock.

Defendant-Appellee Deutsche Bank Securities Inc. is a wholly owned subsidiary of Deutsche Bank AG.

**HSBC Entities**

Defendants-Appellees HSBC Holdings plc and HSBC Bank plc state that HSBC Bank plc is a wholly owned subsidiary of HSBC Holdings plc, which is a publicly held corporation, and no other publicly traded company owns 10% or more of HSBC Holdings plc's stock.

Defendant-Appellee HSBC Securities (USA) Inc.'s ultimate parent company is HSBC Holdings plc.

Defendant-Appellee HSBC Bank USA, N.A.'s ultimate parent company is HSBC Holdings plc.

Defendant-Appellee HSBC USA Inc.'s ultimate parent company is HSBC Holdings plc.

Defendant-Appellee HSBC Finance Corp.'s ultimate parent company is HSBC Holdings plc.

## <u>JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Dublin plc, and J.P. Morgan Securities LLC</u>

Defendant-Appellee JPMorgan Chase & Co. is a publicly held corporation. JPMorgan Chase & Co. does not have a parent corporation and no publicly held corporation owns 10% or more of JPMorgan Chase & Co.'s stock.

Defendant-Appellee JPMorgan Chase Bank, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co., a publicly held corporation. No other publicly held corporation owns 10% or more of JPMorgan Chase Bank, N.A.'s stock.

Defendant-Appellee J.P. Morgan Dublin plc (f/k/a J.P. Morgan Bank Dublin plc) (f/k/a/ Bear Stearns Bank plc) is a wholly-owned subsidiary of JPMorgan Chase & Co., a publicly held corporation. No other publicly held corporation owns 10 percent or more of J.P. Morgan Dublin plc's stock.

Defendant-Appellee J.P. Morgan Securities LLC is a wholly-owned subsidiary of JPMorgan Broker-Dealer Holdings, Inc., which, in turn, is a wholly-owned subsidiary of JPMorgan Chase & Co. No other publicly held corporation owns 10 percent or more of J.P. Morgan Securities LLC's stock.

## Lloyds Banking Group plc and HBOS plc

Defendant-Appellee Lloyds Banking Group plc is a publicly held corporation, and no other publicly traded company owns 10% or more of Lloyds Banking Group plc's stock.

Defendants-Appellees Lloyds Bank plc and HBOS plc are subsidiaries of Defendant-Appellee Lloyds Banking Group plc, which is a publicly held corporation, and no other publicly traded company owns 10% or more of HBOS plc's stock.

## The Norinchukin Bank

Defendant-Appellee The Norinchukin Bank has no parent corporation, and no publicly held company owns 10% or more of The Norinchukin Bank's stock.

## Portigon AG (f/k/a WestLB AG)

Defendant-Appellee Portigon AG (f/k/a WestLB AG) has no parent corporation, and no other publicly traded company owns 10% or more of Portigon AG's stock.

## Westdeutsche ImmobilienBank AG

Defendant-Appellee Westdeutsche ImmobilienBank AG ("WestImmo") states that it is a wholly-owned subsidiary of Erste Abwicklungsanstalt, ("EAA"),

an unincorporated company established under German law.  No publicly held corporation owns 10% or more of WestImmo's stock.

### Royal Bank of Canada Entities

Defendant-Appellee Royal Bank of Canada has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

### Royal Bank of Scotland Entities

Defendant-Appellee The Royal Bank of Scotland Group plc ("RBS Group") is a publicly traded company organized under the laws of Scotland.  No publicly held entity owns more than ten percent of the shares of RBS Group.

Defendant-Appellee The Royal Bank of Scotland plc is a wholly owned subsidiary of Appellee RBS Group.  Appellee RBS Securities Inc. is a wholly owned indirect subsidiary of Appellee RBS Group.

### Société Générale

Defendant-Appellee Société Générale has no parent company, and no publicly-held corporation holds 10% or more of its stock.

### UBS Entities

Defendant-Appellee UBS AG is a publicly traded entity.  Over 90% of UBS AG stock is held by UBS Group AG, a publicly traded corporation.  There is no publicly held corporation that holds 10% or more of UBS Group AG stock.

Defendant-Appellee UBS Limited is a wholly owned subsidiary of UBS AG.

Defendant-Appellee UBS Securities LLC's corporate parents are UBS AG and UBS Americas Inc., the latter of which is wholly owned by UBS AG.

# TABLE OF CONTENTS

P<small>AGE</small>

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................. xiii

PRELIMINARY STATEMENT ................................................................1

QUESTIONS PRESENTED.................................................................3

STATEMENT OF FACTS .................................................................3

 A. USD LIBOR .................................................................3
 B. The Conspiracy Allegations .................................................5
  1. Motive Allegations.................................................6
  2. Government Investigations and Regulatory Settlements..............7
  3. Statistical Analyses .................................................9

SUMMARY OF ARGUMENT .................................................................10

ARGUMENT .................................................................12

I. PLAINTIFFS FAIL TO ALLEGE A RESTRAINT OF TRADE
AND ANTITRUST INJURY ........................................................12

 A. Plaintiffs Fail to Allege a Restraint of Trade .......................12
  1. The Alleged Agreement Did Not Restrain Competition in
the USD LIBOR-Setting Process or the Market for USD
LIBOR-Based Financial Instruments............................14
  2. Because There Was No Restraint of Competition, Plaintiffs
Cannot Satisfy the Strict Requirements for Pleading
Horizontal Price Fixing .................................................18
   a) Benchmark Cases .................................................20
   b) Base or List Price Cases.................................................25
   c) Component Price Cases .................................................26
   d) Exclusion Cases .................................................27
 B. Plaintiffs Did Not Suffer Antitrust Injury ..........................30

II. PLAINTIFFS FAIL TO STATE A PLAUSIBLE
CONSPIRACY CLAIM.................................................................35

A.    Regulatory Settlements and Investigations Not Only Fail
      to Support But *Undermine* an Inference of Conspiracy......................39

B.    Plaintiffs' Motive Allegations Do Not Support an
      Inference of Conspiracy ....................................................................44

C.    The "Studies" Cited by Plaintiffs Do Not Raise an
      Inference of Conspiracy ....................................................................52

III.  THE DISTRICT COURT CORRECTLY DENIED LEAVE TO
      AMEND.................................................................................................53

CONCLUSION ..................................................................................................56

CERTIFICATE OF COMPLIANCE...................................................................65

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*7 W. 57th Street Realty Co. v. Citigroup, Inc.*,
  No. 13 Civ. 981 (PGG), 2015 WL 1514539
  (S.D.N.Y. Mar. 31, 2015) ..................................................................14, 22, 30

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988)..........................................................................27, 28

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 13-md-2481, 2015 WL 1378946 (S.D.N.Y. Mar. 26, 2015) ......................27

*Am. Column & Lumber Co. v. United States*,
  257 U.S. 377 (1921).........................................................................24

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982).........................................................................28

*Ambook Enters. v. Time, Inc.*,
  612 F.2d 604 (2d Cir. 1979) ............................................................46

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ............................................................36

*Apex Hosiery Co. v. Leader*,
  310 U.S. 469 (1940)..........................................................................13

*Arizona v. Maricopa Cnty. Med. Soc'y*,
  457 U.S. 332 (1982)........................................................................12, 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................36

*Atl. Richfield Co. v. USA Petroleum Co. (ARCO)*,
  495 U.S. 328 (1990)................................................................30, 32, 33, 34, 35

*Bay Area Toll Auth. v. Bank of Am.*,
  No. 14-CV-3094-NRB (S.D.N.Y. 2014) ................................................................1

*Bd. of Trade of City of Chi. v. United States*,
  246 U.S. 231 (1918) ...........................................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .....................................................................................*passim*

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982) ...........................................................................................32

*Bogan v. Hodgkins*,
  166 F.3d 509 (2d Cir. 1999) ..............................................................................18

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993) ...........................................................................................18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977) ......................................................................30, 33, 34, 35

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ...........................................................................................18

*California ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) ..........................................................................20

*Catalano, Inc. v. Target Sales, Inc.*,
  446 U.S. 643 (1980) .....................................................................................26, 27

*City of Pittsburgh v. West Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998) .........................................................................31, 33

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ...............................................................................24

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014) ...................................................................................38, 39

xiv

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
　871 F. Supp. 2d 143 (E.D.N.Y. 2012) ...............................................40

*DuPont Glore Forgan Inc. v. AT&T Co.*,
　437 F. Supp. 1104 (S.D.N.Y. 1977),
　*aff'd*, 578 F.2d 1367 (2d Cir. 1978) ..........................................14, 20

*In re Elevator Antitrust Litig.*,
　502 F.3d 47 (2d Cir. 2007) ...............................................36, 43, 47

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
　702 F.3d 860 (6th Cir. 2012) ............................................................18

*In re Flat Glass Antitrust Litig.*,
　385 F.3d 350 (3d Cir. 2004) .............................................................26

*In re Foreign Exch. Benchmark Rates Antitrust Litig. (FOREX)*,
　2015 WL 363894 (S.D.N.Y. Jan. 28, 2015) ........................21, 22, 25, 34, 44

*FTC v. Cement Inst.*,
　333 U.S. 683 (1948) ..........................................................................28

*FTC v. Pac. States Paper Trade Ass'n*,
　273 U.S. 52 (1927) ............................................................................26

*Goldfarb v. Va. State Bar*,
　421 U.S. 773 (1975) ..........................................................................26

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
　17 F. Supp. 2d 275 (S.D.N.Y. 1998) ...............................................20

*In re High Fructose Corn Syrup Antitrust Litig.*,
　295 F.3d 651 (7th Cir. 2002) ...........................................................26

*Hinds Cnty., Miss. v. Wachovia Bank, N.A.*,
　620 F. Supp. 2d 499 (S.D.N.Y. 2009) ..............................................37

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
　790 F. Supp. 2d 106 (S.D.N.Y. 2011) ..............................................40

*Hunt v. Crumboch*,
   325 U.S. 821 (1945)..................................................................................18

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*,
   253 F. Supp. 2d 262 (D. Conn. 2003)....................................................24

*In re Indus. Diamonds Antitrust Litig.*,
   167 F.R.D. 374 (S.D.N.Y. 1996) ............................................................26

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ...................................................................47

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) .............................................................21, 25

*Kropelnicki v. Siegel*,
   290 F.3d 118 (2d Cir. 2002) ...................................................................53

*Laydon v. Mizuho Bank, Ltd.*,
   No. 12-cv-3419 (GDB), 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ......14, 31

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)................................................................................19

*In re LIBOR-Based Fin. Instruments Antitrust Litig. (LIBOR III)*,
   27 F. Supp. 3d 447 (S.D.N.Y. 2014) ......................................................49

*Loeb Indus., Inc. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) ..................................................................24

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ..............................................................19, 24

*Maple Flooring Mfrs.' Ass'n v. United States*,
   268 U.S. 563 (1925)................................................................................26

*Mayfield v. British Bankers' Ass'n*,
   No. 14-cv-4735-LAP, slip op. (S.D.N.Y. July 22, 2014)........................31

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) ...................................................................*passim*

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007) ............................................................53, 54

*Nat'l Macaroni Mfrs. Ass'n v. FTC*,
345 F.2d 421 (7th Cir. 1965) ...................................................................28

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978).................................................................................24

*Nw. Fruit Co. v. A. Levy & J. Zentner Co.*,
665 F. Supp. 869 (E.D. Cal. 1986) ..........................................................27

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
472 U.S. 284 (1985).................................................................................19

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998).................................................................................18

*In re Optical Disk Drive Antitrust Litig.*,
No. 3:10-md-2143 RS, 2011 U.S. Dist. LEXIS 101763
(N.D. Cal. Aug. 3, 2011).........................................................................44

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
467 F.3d 283 (2d Cir. 2006) ....................................................................30

*Plymouth Dealers' Ass'n of N. Cal. v. United States*,
279 F.2d 128 (9th Cir. 1960) ...................................................................25

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
587 F. Supp. 2d 27 (D.D.C. 2008).................................................23, 24, 25

*Ruffolo v. Oppenheimer & Co.*,
987 F.2d 129 (2d Cir. 1993) ....................................................................56

*Sanner v. Bd. of Trade of City of Chicago*,
62 F.3d 918 (7th Cir. 1995) .....................................................................28

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
   870 F.2d 397 (7th Cir. 1989) ........................................................18

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010) ...................................................24, 40

*Stockbridge-Munsee Cmty. v. New York*,
   756 F.3d 163 (2d Cir. 2014) .......................................................39

*Sugar Inst. v. United States*,
   297 U.S. 553 (1936)...................................................................24

*In re Sulfuric Acid Antitrust Litig.*,
   703 F.3d 1004 (7th Cir. 2012) ....................................................20

*Texaco, Inc. v. Dagher*,
   547 U.S. 1 (2006)................................................................18, 19

*Thyroff v. Nationwide Mut. Ins. Co.*,
   460 F.3d 400 (2d Cir. 2006) .......................................................36

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) .......................................................24

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ......................................................36

*Twombly v. Bell Atl. Corp*,
   425 F.3d 99 (2d Cir. 2005), *rev'd on other grounds*,
   550 U.S. 544 (2007)...................................................................39

*United States v. Apple Inc.*,
   Nos. 13-3741-cv, 133748-cv, 13-3783-cv, 13-3857-cv, 13-3864-cv, 13-3867-
   cv, 2015 WL 3953243 (2d Cir. June 30, 2015) .................................13

*United States v. Joint-Traffic Ass'n*,
   171 U.S. 505 (1898)...................................................................12

*United States v. Nat'l Ass'n of Real Estate Bds.*,
   339 U.S. 485 (1950)...................................................................26

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)........................................................................ 20, 21, 25

*United States v. Trenton Potteries Co.*,
   273 U.S. 392 (1927)........................................................................12

*U.S. Gypsum Co. v. Ind. Gas Co.*,
   350 F.3d 623 (7th Cir. 2003) ........................................................24

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965)........................................................................29

*Williams v. Citigroup Inc.*,
   659 F.3d 208 (2d Cir. 2011) ........................................................54

*Woods Exploration & Producing Co. v. ALCOA*,
   438 F.2d 1286 (5th Cir. 1971) ................................................22, 23, 25

*In re Yarn Processing Patent Validity Litig.*,
   541 F.2d 1127 (5th Cir. 1976) ....................................................27

## Statutes & Rules

15 U.S.C. § 4 ....................................................................................34

15 U.S.C. § 15 ..................................................................................34

Fed. R. Civ. P. 12(b)(6)....................................................................39

Section 1 of the Sherman Act ....................................................1, 35, 52

## PRELIMINARY STATEMENT

The antitrust laws were enacted to protect competition. Section 1 of the Sherman Act thus prohibits *agreements* in *restraint of trade*. Plaintiffs-Appellants ("Plaintiffs") seek to assert a section 1 claim without adequately alleging either a restraint of trade or an agreement.

Plaintiffs claim that Defendants-Appellees (the "Panel Banks")[2] violated the Sherman Act by agreeing to submit artificially low estimates of their borrowing costs used in calculating the U.S. Dollar London Interbank Offered Rate ("USD LIBOR"), thereby allegedly lowering the rate of return on Plaintiffs' investments referencing USD LIBOR. Plaintiffs' theory suffers from three fatal flaws.

First, Plaintiffs claim that the alleged agreement constitutes horizontal price fixing, a type of *per se* violation of the antitrust laws narrowly reserve for only those restraints that are plainly anticompetitive. The alleged agreement here, however, is not a restraint and does not displace competition at all, much less plainly so. As the district court recognized—and Plaintiffs conceded—the process of setting USD LIBOR was not, nor was it ever intended to be, competitive. No one, in any market, competes over USD LIBOR itself. Rather, companies compete

---

[2] For simplicity, this brief refers to Defendants-Appellees as the "Panel Banks," even though the British Bankers' Association, BBA LIBOR Ltd., and BBA Enterprises Ltd. (collectively, the "BBA") are not panel banks (or banks at all) and have been named in one of the actions on appeal, *Bay Area Toll Auth. v. Bank of Am. Corp.*, 14-CV-3094-NRB (S.D.N.Y. 2014).

to transact in variable-rate instruments, and over the terms of such instruments, including the "spread" against USD LIBOR for instruments that use it as a benchmark, and whether to use USD LIBOR as a benchmark at all. The free play of market forces continued unabated as to those areas of competition, regardless of the level of USD LIBOR. In the absence of any restraint on competition there can be no horizontal price fixing, or indeed any other antitrust violation.

Second, recovery of damages in an antitrust case requires *antitrust* injury: injury that results from a restraint on competition—the conduct the antitrust laws were designed to remedy. Notwithstanding precedent in both the Supreme Court and in this Circuit holding that plaintiffs must demonstrate they have been harmed by anticompetitive effects even in *per se* cases, Plaintiffs contend that the absence of any demonstrable restraint on competition is not fatal to their antitrust claim. Their position would divorce antitrust law from its concern with competition and convert it into a general anti-fraud provision.

Third, Plaintiffs have not alleged facts sufficient to raise a plausible inference of conspiracy, as opposed to independent parallel conduct. With no direct evidence of conspiracy, Plaintiffs rely on speculative allegations of motive, misleading snippets from government investigations, and purported statistical analyses. Those allegations, however, do not support a plausible inference of conspiracy. Rather, they support the *absence* of one.

2

## QUESTIONS PRESENTED

**1.** Does the alleged agreement among the Panel Banks to submit artificially low estimated rates at which they could hypothetically borrow in the London interbank market, as part of a cooperative process for creating a reference rate, constitute horizontal price fixing under section 1 of the Sherman Act?

**2.** Did private plaintiffs plead antitrust injury where the alleged agreement did not restrain competition in any market?

**3.** Do the complaints allege facts sufficient to support a plausible inference of conspiracy, as opposed to independent or parallel conduct?

**4.** Did the district court act within its discretion in denying plaintiffs further leave to amend after it dismissed their amended complaint?

## STATEMENT OF FACTS

### A. USD LIBOR

During the relevant period, USD LIBOR was a benchmark calculated each business day based on individual submissions from sixteen designated "USD LIBOR Panel" banks selected from among the hundreds of banks participating in the London interbank market. First Amended Bondholders' Complaint ("Bondholders' Compl.") ¶¶ 6-7, JA203-04; Amended Exchange-Based Complaint ("Exch. Compl.") ¶ 6, JA291-92. The Panel Banks each agreed to the procedure set by the BBA for making submissions. Consolidated Amended OTC Complaint

("OTC Compl.") ¶ 48, JA112-13. Each Panel Bank reported to Thomson Reuters daily at 11:00 a.m. London time its estimate of the rate it believed it would be offered if it borrowed U.S. dollars in a "reasonable" market size for particular maturities (or "tenors") from other banks in the London interbank market. Bondholders' Compl. ¶ 7, JA204-05. The question was a hypothetical; the reports were not of actual transactions in the London interbank market, nor did they reflect whether the submitting bank borrowed or had any interest in actually borrowing from other banks. *Id.*; OTC Compl. ¶ 48, JA112-13.

The agreed procedure for calculating USD LIBOR was that the four highest and four lowest submissions for each of fifteen tenors (overnight, 1-week, 2-week, 1-month, 2-month, and so on) were disregarded, and the remaining eight submissions were averaged. The result was the daily USD LIBOR for each tenor. OTC Compl. ¶¶ 44, 48, JA110, 112-13. Each Panel Bank's individual daily USD LIBOR submissions were made public that same day upon publication of the daily USD LIBORs. Bondholders' Compl. ¶ 7, JA204-05.

USD LIBOR submissions were not market bids or quotes and were not intended to attract or secure business for the submitting Panel Banks. They represented mere estimates by each Panel Bank of the rates it believed it would be offered if it chose to borrow U.S. dollars in the London interbank market. Each Panel Bank was to report its submissions without considering reputation or profit.

4

As Plaintiffs conceded before the district court, "the process of setting LIBOR was never intended to be competitive." Mem. & Order ("*LIBOR I*"), SPA31.

Separate LIBORs were published for currencies other than U.S. dollars (including, Japanese yen, Swiss francs, euros, and British pound sterling), for fifteen tenors within each currency, and different bank panels reported estimated borrowing rates for those currencies. Bondholders' Compl. ¶ 6, JA203-04; OTC Compl. ¶ 44, JA110. Although the complaints refer to other interest rate indices, principally Japanese Yen LIBOR ("Yen LIBOR"), the Euro Interbank Offered Rate ("Euribor"), and the Euroyen Tokyo InterBank Offered Rate ("TIBOR"), Bondholders' Compl. ¶¶ 86, 136, 140, JA245, 265-67, Plaintiffs' claims are based exclusively on their purchase of USD LIBOR-based instruments. Bondholders' Compl. ¶¶ 4, 11, 207, JA202-03, 206, 285. Plaintiffs do not allege that these other indices are determined by the same processes, persons, or bank panels involved in determining USD LIBOR. Bondholders' Compl. ¶ 6, JA203-04; City of Philadelphia Second Amended Complaint ("Phila. Compl.") ¶ 44, JA1407.

## B. The Conspiracy Allegations

Plaintiffs allege that all sixteen USD LIBOR Panel Banks and the BBA conspired to systematically and consistently understate the Panel Banks' estimated USD borrowing costs and lower USD LIBOR over a multiyear period—from August 2007 to December 2010 (the "Relevant Period"). Bondholders' Compl.

5

¶¶ 1, 4, 10, JA200-02, 206. To support their claim, Plaintiffs point to three kinds of circumstantial evidence: (1) purported motives, (2) unrelated findings in government settlements, and (3) various "studies" of movements in USD LIBOR as compared to other indices. Bondholders' Compl., ¶¶ 68-72, JA239-40; Phila. Compl. ¶¶ 94-184, JA1424-57.

### 1. Motive Allegations

The complaints allege two motives for the purported conspiracy to suppress USD LIBOR. First, Plaintiffs assert that, consistently throughout the nearly three-year period of the alleged conspiracy, all sixteen Panel Banks had sizeable and similar positions requiring them to pay interest on USD LIBOR-based financial instruments such that they all financially benefited from a lower USD LIBOR. *E.g.*, Bondholders' Compl. ¶¶ 69, 207, JA239-40, 285; Appellants' Br. 11-12. The only alleged support for that assertion is that Plaintiffs note that two Panel Banks reported that in 2009 (*i.e.*, two years after the start of the alleged Relevant Period), they would receive net interest revenue from a decline in interest rates, and two others reported the same for 2008 and 2009. Bondholders' Compl. ¶ 69, JA239-40.

Second, the complaints allege that each Panel Bank agreed to suppress USD LIBOR because a high USD LIBOR submission would have signaled financial weakness to the market and to the other Panel Banks during the financial crisis. *E.g.*, Bondholders' Compl. ¶ 68, JA238-39; Appellants' Br. 12. No complaint

alleges facts indicating why a Panel Bank would need to cooperate with others to lower its own USD LIBOR submissions or why it would choose to reveal its own financial weakness to its competitors by entering into a conspiracy.

### 2. Government Investigations and Regulatory Settlements

Plaintiffs' complaints rely on ongoing investigations by various government authorities and settlement agreements entered into by certain Defendants. *E.g.*, Bondholders' Compl. ¶¶ 125, 129, 132-34, JA263, 264, 265. Six Panel Banks have entered into settlement agreements with U.S. and foreign authorities related to investigations concerning USD LIBOR and other indices.[3] Three Panel Banks' settlements were available to the district court prior to its dismissal of Plaintiffs' antitrust claims; the others were announced subsequently. *E.g.*, Barclays DOJ Statement of Facts ("Barclays DOJ SOF") ¶ 1, JA431 (June 26, 2012).

The settlement agreements were the culmination of years of government investigations, including the review of millions of documents and audio communications. They chiefly describe attempts by individual traders at certain

---

[3] The six settling Panel Banks have agreed not to deny the facts as described in the settlement agreements with the U.S. Department of Justice ("DOJ"), but they did *not* agree to any legal conclusions made therein and are not bound by them. Nor did they agree to any legal conclusions made by the U.S. Commodity Futures Trading Commission ("CFTC") and admitted facts in their CFTC settlements only to the extent those same facts were admitted in their respective DOJ settlements. Nothing in their settlements with the U.K. Financial Conduct Authority constitutes an admission of fact or agreement to any legal conclusions made therein.

Panel Banks to move submissions (often with respect to benchmarks other than USD LIBOR) upward or downward to obtain cash and trading advantages.[4]

The settlements of some Panel Banks also refer to instances where they *unilaterally* made lower USD LIBOR submissions for reputational reasons.[5]  None of the settlements describes any coordination or conspiracy with other Panel Banks to suppress USD LIBOR.

---

[4] *See* Barclays DOJ Statement of Facts ¶¶ 11, 20-21, JA435, 439; UBS DOJ Statement of Facts ("UBS DOJ SOF") ¶¶ 77, 83, 88 (Dec. 18, 2012), *available at* http://www.justice.gov/iso/opa/resources/6942012121911725320624.pdf; RBS DOJ Statement of Facts ("RBS DOJ SOF") ¶¶ 14, 19 (Feb. 5, 2013), *available at* http://www.justice.gov/iso/opa/resources/2820132613127414481.pdf; Rabobank DOJ Statement of Facts ("Rabobank DOJ SOF") ¶ 15 (Oct. 29, 2013), *available at* http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/11/06/statement_of_facts.pdf; Lloyds DOJ Statement of Facts ("Lloyds DOJ SOF") ¶ 14 (July 28, 2014), *available at* http://lib.law.virginia.edu/Garrett/prosecution_agreements/sites/default/files/pdf/lloyds_banking.pdf; Deutsche Bank DOJ Statement of Facts ("Deutsche Bank DOJ SOF") ¶ 16 (Apr. 23, 2015), http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/04/23/db_statement_of_facts.pdf.

[5] There is accordingly no basis for Plaintiffs' contention that certain Defendants have "admitted," in settlements, to a motive to collude, Appellants' Br. 12.  *See* Barclays DOJ SOF ¶ 40, JA447-48; Barclays CFTC Order at 4, 19-20, JA 458, 473-74; UBS DOJ SOF ¶¶ 115-119; Lloyds FCA Final Notice ¶¶ 4.51-4.59, *available at* http://www.fca.org.uk/static/documents/final-notices/lloyds-bank-of-scotland.pdf.  Indeed, there are no allegations at all of persistent suppression to disguise true borrowing costs in the settlements involving Rabobank, RBS and Deutsche Bank.

8

### 3. Statistical Analyses

Finally, Plaintiffs' complaints rely on several statistical analyses in purported expert reports to argue that USD LIBOR was lower than it should have been during the Relevant Period. For example, Plaintiffs point to studies of various alleged proxies for USD LIBOR, such as the Eurodollar Deposit Rate,[6] which they allege have historically been correlated with USD LIBOR, yet diverged from USD LIBOR during the Relevant Period. Bondholders' Compl. ¶¶ 36, 39-44, JA211-13. Plaintiffs further allege that USD LIBOR submissions of at least some Panel Banks were "bunched" around certain quotes, *id.* ¶¶ 88-97, JA246-51; and that USD LIBOR submissions increased following an article printed in *The Wall Street Journal* questioning the accuracy of USD LIBOR, *id.* ¶¶ 105-09, JA254-56.

With one exception, the studies cited by Plaintiffs address whether USD LIBOR was allegedly lower than it theoretically should have been, rather than whether the variation of USD LIBOR from other proxy rates was attributable to a conspiracy. Plaintiffs cite to one published, independent study (the "Metz Study"), which they claim suggests that allegedly low USD LIBOR resulted from concerted action. *E.g.*, Bondholders' Compl. ¶¶ 101-04, JA252-54. The Metz Study analyzes the degree to which Panel Banks' USD LIBOR submissions were similar

---

[6] Eurodollars are "U.S. dollars deposited in commercial banks outside the United States." *LIBOR I*, SPA10.

or different from each other on a given day, with greater similarity among different Panel Banks' submissions allegedly indicating collusion and greater variation allegedly indicating the absence thereof. The authors' data show a sudden *increase* and overall upward trend in the variation of submissions immediately when the alleged Relevant Period begins, indicating, if anything, the absence of collusion under Plaintiffs' own theory. Ex. C to Decl. of Robert F. Wise, Jr., JA411-14.

## SUMMARY OF ARGUMENT

Plaintiffs' antitrust theory fails for three independent reasons. First, Plaintiffs mischaracterize the Panel Banks' alleged agreement to misreport their estimated borrowing rates as *per se* "horizontal price fixing." It is not. Horizontal price fixing occurs when buyers or sellers that should *compete* on price agree not to, such that a court can conclude that the effects are plainly *anticompetitive*. USD LIBOR is not a market price, and unlike in the cases relied on by Plaintiffs, the alleged agreement did not displace competition that would or could have occurred among the Panel Banks, much less plainly so. USD LIBOR is not, and has never been, determined by actual competitive transactions in any market, and the estimates reported are not competitive quotes or bids for actual loan transactions. Plaintiffs do not allege a restraint of trade in the London interbank loan market, or in the markets for financial products referencing USD LIBOR, *i.e.*, those in which Plaintiffs claim to have transacted. Regardless of the particular value at which

10

USD LIBOR was set, participants in those markets continued to compete as they always had, over interest rates and other terms.

Second, and as recognized by the district court, Plaintiffs have not alleged antitrust injury. Because Plaintiffs have not alleged an agreement that restrains competition, they have not alleged horizontal price fixing, or any restraint of trade at all. With no restraint of trade, Plaintiffs have no antitrust injury because antitrust injury is harm that flows from the kind of conduct the antitrust laws were designed to remedy. If, as Plaintiffs allege, the Panel Banks misreported, the essence of the wrong might be deception, but not price fixing—a restraint of competition among defendants that otherwise would have existed. An alleged breach of an obligation to report estimates accurately, if true, may entail legal consequences, but does not support an antitrust claim.

Third, Plaintiffs failed to allege facts sufficient to raise a plausible inference of conspiracy, an alternate ground for affirmance that was raised, but not reached, below. Plaintiffs do not allege any direct evidence of a conspiracy, such as meetings or communications among the Panel Banks at which an agreement to suppress reported USD LIBOR was reached, much less the dates or terms of any such agreements. Instead, they rely exclusively on purported circumstantial evidence, none of which renders conspiracy a plausible inference. Indeed, the evidence strongly suggests the *absence* of a conspiracy. After years of government

11

investigations both in the United States and abroad, and widely publicized, factually detailed regulatory settlements by a half dozen Panel Banks regarding LIBOR-related conduct, *not one* government agency has even hinted at the existence of the conspiracy to suppress USD LIBOR that Plaintiffs allege.

## ARGUMENT

## I. PLAINTIFFS FAIL TO ALLEGE A RESTRAINT OF TRADE AND ANTITRUST INJURY

### A. Plaintiffs Fail to Allege a Restraint of Trade

Plaintiffs rest their argument on an erroneous premise:  that the alleged agreement to suppress USD LIBOR was horizontal price fixing, as that term has been defined and interpreted by courts.  Horizontal price fixing occurs when buyers or sellers that compete on price agree not to do so.  Prices (or components of prices) that would otherwise *vary through competition* become fixed by agreement.  The essence of "price fixing" is restraint of *competition*.  *See Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 345 (1982) ("The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition." (quoting *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927))); *United States v. Joint-Traffic Ass'n*, 171 U.S. 505, 565 (1898) (price-fixing agreement violates Sherman Act because "[t]he natural, direct, and necessary effect of . . . the agreement is to prevent any competition whatever between the parties to it for the whole time of its existence").

12

USD LIBOR is not a market price.  It is not bought or sold by anyone, it is *not competed over*, and it is always fixed for any given day once it has been set, because by necessity it must be the same for all.  It is the product of a cooperative process, not the result of competition among participants.  *LIBOR I*, SPA30-31.[7]  Notwithstanding Plaintiffs' repeated attempts to brand the alleged conduct as "horizontal price fixing" (a label Plaintiffs invoke dozens of times), the alleged agreement lacks the essential ingredient of horizontal price fixing—or indeed *any* antitrust violation—a restraint on competition.  *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 495 (1940) ("[T]his Court has never applied the Sherman Act in any case . . . unless the Court was of opinion that there was some form of restraint upon commercial competition in the marketing of goods or services . . . .").[8]

---

[7] Indeed, the irony of Plaintiffs' allegations is that they are more accurately described as allegations that the Panel Banks undermined the *cooperative* USD LIBOR-setting process by behaving like *competitors*, each independently driving its USD LIBOR submissions lower so as not to appear less healthy than its peers.

[8] *See also United States v. Apple Inc.*, Nos. 13-3741-cv, 133748-cv, 13-3783-cv, 13-3857-cv, 13-3864-cv, 13-3867-cv, 2015 WL 3953243, at *25 (2d Cir. June 30, 2015) ("'The true test of legality' under § 1 of the Sherman Act 'is whether the restraint imposed . . . is such as may suppress or even destroy competition.'" (emphasis omitted) (quoting *Bd. of Trade of City of Chi. v. United States*, 246 U.S. 231, 238 (1918)).

**1.** **The Alleged Agreement Did Not Restrain Competition in the USD LIBOR-Setting Process or the Market for USD LIBOR-Based Financial Instruments**

The alleged agreement to make false submissions could not have restrained competition in the USD LIBOR-setting process because, as the Plaintiffs "rightly acknowledged" at oral argument below, "the process of setting LIBOR was never intended to be competitive." *LIBOR I*, SPA31.[9] Rather, "it was a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs to the BBA each day to facilitate the BBA's calculation of an interest rate index." *Id.*; *accord 7 W. 57th St. Realty Co. v. Citigroup, Inc.*, No. 13 Civ. 981 (PGG), 2015 WL 1514539, at *19 (S.D.N.Y. Mar. 31, 2015); *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GDB), 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014).

Plaintiffs do not challenge the USD LIBOR-setting process itself. That process necessarily entails agreement by each Panel Bank to the USD LIBOR-setting procedures. The Panel Banks agree to take part in a process that selects certain banks, and not others, as Panel Banks; that sets the time of day submissions are made; and that adopts a formula for determining USD LIBOR from the

---

[9] *See also DuPont Glore Forgan Inc. v. AT&T Co.*, 437 F. Supp. 1104, 1130 (S.D.N.Y. 1977) (alleged agreement to maintain uniform rate structure charged to customers did not restrain competition because "even in the absence of the alleged agreement there was no competition among the defendants to be restrained"), *aff'd*, 578 F.2d 1367 (2d Cir. 1978).

14

submissions (*i.e.*, eliminating the top four and bottom four submissions and averaging the remainder). Bondholders' Compl. ¶ 7, JA204-05. Each of these agreements affects the value of USD LIBOR and could be said to "fix" USD LIBOR no less than the alleged agreement to suppress USD LIBOR; yet, Plaintiffs do not challenge the USD LIBOR procedural agreements as "horizontal price fixing." Other than that it was undisclosed, the alleged agreement they do challenge, effectively adding to the agreed procedure a consistent deflator, is no different in competitive effect.

Nor do Plaintiffs explain how the alleged agreement could have restrained trade outside the USD LIBOR-setting process. Plaintiffs argue that misstating USD LIBOR fixed the prices of USD LIBOR-based financial instruments. But that contention ignores the simple rule that prices are "fixed" in the antitrust sense only when competitors agree to compete less (or to stop competing altogether) over some factor affecting price. *See* pp. 12-14 *supra*. The complaints allege nothing of the kind.

The complaints do not allege, for example, that USD LIBOR levels had any impact on the ability of sellers of USD LIBOR-based financial instruments to compete over interest rates or any other terms. Regardless of USD LIBOR's level, nothing in the alleged agreement prevented market participants from competing over the terms of financial products. Indeed, the complaints allege that market

participants "commonly set the interest rate on floating-rate notes . . . as a spread against LIBOR." *LIBOR I*, SPA8 (quoting OTC Compl. ¶ 44, JA110-11). In other words, the competition in USD LIBOR-based instruments is over the "spread," which is the variable on USD LIBOR-based instruments. Buyers and sellers of USD LIBOR-based financial instruments were free to set the price of those instruments "at any level above or below LIBOR," "and thus defendants' alleged conspiracy to fix LIBOR did not constrain the free and competitive bargaining of actors in the market for LIBOR-based financial instruments." *LIBOR I*, SPA46.

Nor do the complaints allege that the Panel Banks prevented anyone from selecting *other* interest rate benchmarks altogether. Nothing in the alleged agreements excluded "competing" benchmarks, like the U.S. Treasury bill rate or the Prime Rate. Borrowers remained free to issue interest-bearing instruments pegged to these or other benchmarks, none of which the purported agreements to suppress USD LIBOR are alleged to have affected. In short, Plaintiffs fail to allege that the Panel Banks restricted the manner in which they offered or priced their products in the market for USD LIBOR-based financial instruments—or any other financial products.

Plaintiffs appear at several points to argue harm to competition by "proxy." Appellants' Br. 8-9, 46, 49-50, 52. That is, they suggest that USD LIBOR was a "proxy" for competition in the London interbank market, a market in which

16

Plaintiffs concede they did not participate, and was supposed to import that competition into the markets for financial products referenced to USD LIBOR in which they did. The argument is specious. Plaintiffs' claim is that the Panel Banks did not follow the rules in making their USD LIBOR submissions, a process they conceded below was not competitive. USD LIBOR was therefore not a product of, or a "proxy" for, competition. It was only a reference index based on a formula using estimates of rates on hypothetical transactions. The alleged wrong was not a restraint on competition in the London interbank market carried through to, and affecting competition in, another market, but something quite different, a supposed conspiracy to misreport. *See LIBOR I*, SPA41 ("[T]he fact remains that competition in the interbank lending market and in the market for LIBOR-based financial instruments proceeded unimpaired. If LIBOR no longer painted an accurate picture of the interbank lending market, the injury plaintiffs suffered derived from misrepresentation, not from harm to competition.").

Basically, Plaintiffs' claim is that market participants were *misled* because the Panel Banks allegedly misstated the rates at which they believed they could borrow. But whether Defendants' USD LIBOR submissions accurately reflected their subjective beliefs about the rates at which they could borrow is irrelevant to an antitrust claim so long as the alleged misrepresentations did not restrain *competition*. *See LIBOR I*, SPA34 (Plaintiffs' theory is one "of misrepresentation,

17

and possibly of fraud, but not of failure to compete."); *see also Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 873 (6th Cir. 2012) ("'Dishonestly citing'—better known as misrepresentation—is not an antitrust claim."). The Sherman Act is, after all, "not a code of . . . ethics or methodology," *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989), and may not be used to "transform cases involving business behavior that is [allegedly] improper for various [other] reasons . . . into treble-damages antitrust cases" where "the competitive process itself does not suffer harm." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("[T]he federal antitrust laws . . . do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'" (quoting *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945)).

### 2. Because There Was No Restraint of Competition, Plaintiffs Cannot Satisfy the Strict Requirements for Pleading Horizontal Price Fixing

To establish that Defendants engaged in horizontal price fixing, Plaintiffs must demonstrate that the challenged practice is "plainly anticompetitive." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *see also, e.g.*, *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2nd Cir. 1999) (anticompetitive effect of alleged conduct was "not obvious"); *cf. Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 759 (1999) ("[A]ny

anticompetitive effects of given restraints are far from intuitively obvious . . . .”).
The “mere allegation” that a practice falls into a per se category “does not suffice.”
*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284,
298 (1985).

Here, Plaintiffs fail to allege *any* anticompetitive impact from the type of
conduct alleged here, let alone a “plain” or “obvious” one. *Dagher*, 547 U.S. at 5.
Indeed, far from finding that any anticompetitive effect of the sort of conduct
alleged here is plain or obvious, the only four courts that have considered similar
facts have found no anticompetitive effect whatsoever. *See* Part I.B *infra*.[10]
Indeed, Plaintiffs have not identified a *single case* in which a court found
horizontal price fixing in the context of a similar reference benchmark used in
connection with financial instruments.[11] Instead, the cases Plaintiffs rely on fall

---

[10] The court below noted in dicta that Plaintiffs’ allegations “might suggest
that defendants fixed prices” but “do not suggest that the [alleged] harm plaintiffs
suffered resulted from any anticompetitive aspect of defendants’ conduct.” *LIBOR
I*, SPA31. In other words, the court was at most referring to “price fixing in the
literal sense . . . not price fixing in the antitrust sense.” *Dagher*, 547 U.S. at 6.
Because USD LIBOR is not fixed through competition, Plaintiffs have not alleged
harm from anticompetitive conduct. *LIBOR I*, SPA30-31.

[11] This alone weighs heavily against Plaintiffs’ assertion that the conduct
should be deemed horizontal price fixing. *See, e.g.*, *Leegin Creative Leather
Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (*per se* violations restricted
to circumstances where courts “have had considerable experience with the type of
restraint at issue”); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d
290, 316 (2d Cir. 2008) (“Per se treatment is not appropriate . . . where the
(….continued)

19

into categories of conduct that are fundamentally different from what Plaintiffs allege here.

### a) Benchmark Cases

Antitrust violations based on purported benchmark or index manipulation have invariably involved agreements that plainly displaced competition that otherwise would have existed. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), the primary Supreme Court case on which Plaintiffs rely, is illustrative: As Plaintiffs observe, Appellants' Br. 30-31, *Socony-Vacuum* involved an agreement among major oil companies to manipulate a benchmark used to set wholesale gasoline prices. But that is where the purported similarity to this case ends. The benchmark in *Socony-Vacuum* was the competitively-determined average price paid in the "spot" markets for gasoline. *See id.* at 216. The

_____

(continued….)

economic and competitive effects of the challenged practice are unclear."); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012) ("It is relevant that we have never seen or heard of an antitrust case quite like this . . . It is a bad idea to subject a novel way of doing business . . . to per se treatment under antitrust law."); *California ex rel. Harris v. Safeway, Inc.,* 651 F.3d 1118, 1135, n.14 (9th Cir. 2011) (en banc) (unique qualities of alleged restraint "separate[] it from a category of restraints with which we are sufficiently experienced to condemn without inquiry into actual competitive harms"); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 297 (S.D.N.Y. 1998) (where allegations "involve[d] novel business practices and relationships that have not been addressed by the courts in an antitrust context, they preclude the application of per se analysis"); *DuPont*, 437 F. Supp. at 1128-29 (alleged conspiracy was "unlike the typical price fixing conspiracy in several important respects and should not be subject to the per se rule").

defendants violated the antitrust laws by subverting that competitive process. Specifically, defendants were alleged to have conspired to purchase gasoline "in excess of the amounts which defendants would have purchased but for those programs" and to restrict market supply, all to artificially raise the market price of gasoline. *Id.* at 167-68. The defendants' conspiracy to distort competition in the spot market was what "fixed" the wholesale price.

The same is true of *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000), and *In re Foreign Exchange Benchmark Rates Antitrust Litigation (FOREX)*, Nos. 13 Civ 7789(LGS), 13 Civ. 7953(LGS), 14 Civ. 1364(LGS), 2015 WL 363894 (S.D.N.Y. Jan. 28, 2015), two other cases on which Plaintiffs rely. Like *Socony-Vacuum*, both cases involved manipulation of a benchmark price through transactions in the competitive market on which that benchmark was based. In *Knevelbaard*, the defendants depressed an index-based minimum milk price by agreeing to rig bids in the *competitive market* for bulk cheese. 232 F.3d at 984 (defendants allegedly "did not compete" but rather "collusively manipulate[ed] [bulk cheese] prices").[12] And in *FOREX*, the court emphasized that the benchmark

---

[12] Plaintiffs try to bolster their reliance on *Knevelbaard* by mischaracterizing the *Knevelbaard* court's statement, in dicta, that the "antitrust injury analysis should be no different than if the cheese makers had conspired to report a fictitious" price to the index. Appellants' Br. 52 (quoting 232 F.2d at 990). That comment, however, responded to the defendants' argument that "the chain of causation" linking their collusive bidding in the cheese market to the milk price was "too

(….continued)

21

was set by reference to "actual market prices" in competitive foreign currency exchange markets. *FOREX*, 2015 WL 363894, at *2. Both Judge Gardephe and Judge Schofield distinguished *FOREX* from *LIBOR* on precisely this ground. *See 7 W. 57th St.*, 2015 WL 1514539, at *20 n.7 ("The *FOREX* court found that because the process for setting the foreign exchange 'Fix' involved actual market transactions, it differed from the cooperative LIBOR-setting process in a crucial way. This conclusion, if anything, supports Judge Buchwald's reasoning."); *FOREX*, 2015 WL 363894, at *11 (distinguishing *LIBOR I* because "LIBOR-setting process was a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs . . . to facilitate the . . . calculation of an interest rate index," whereas "[t]he [foreign exchange] Fix, by contrast, is set by actual transactions in a market where Defendants are supposed to be perpetually competing by offering independently determined bid-ask spreads" (internal quotation marks and citation omitted)).

*Woods Exploration & Producing Co. v. ALCOA*, 438 F.2d 1286 (5th Cir. 1971), which Plaintiffs contend is "directly on point," Appellants' Br. 53, is similarly distinguishable. It addressed an agreement among natural gas producers

(continued….)

tenuous to support recovery." *See* 232 F.3d at 989-90. It did not address whether reporting a fictitious price alone could establish a restraint of trade, an issue not before the court.

to submit low forecasts of market demand to a state regulator to lower the regulatory ceiling for natural gas production, which was based on the submitted forecasts.  *Id.* at 1289.  Unlike here, the alleged conspiracy did not merely allegedly mislead market participants, but, by lowering the regulatory quota for natural gas production, eliminated producers' ability to compete by increasing production.  Moreover, because the defendants were already producing less than their own quota prior to the conspiracy, the effect of the conspiracy was only to reduce *their competitors'* production, thus hindering only their competitors' ability to compete in the market.  *See id.* at 1292-93.  "Competition over the extraction of natural gas" was thus "at the heart of the dispute."  *Id.* at 1289.

*In re Rail Freight Fuel Surcharge Antitrust Litigation* is to the same effect. 587 F. Supp. 2d 27 (D.D.C. 2008).  There, railroads allegedly conspired to remove fuel costs from an index to impose a uniform fuel surcharge program.  *Id.* at 30. The court noted that the publication of the index was not sufficient by itself to establish price fixing.  *Id.* at 35 ("Defendants are correct, of course, that meeting together at the AAR and publication of a cost escalation index like the AIILF may not, by themselves, show that defendants conspired to restrain trade.").  It held that the alteration of the index gave rise to an antitrust claim only when combined with the alleged agreement to impose a uniform, supracompetitive fuel surcharge

(which was classic price fixing) and thereby force market participants to pay

higher rates. *Id.* at 35. No such agreement is alleged here.[13]

Every benchmark or index case that Plaintiffs invoke shares the one thing

missing from their complaints: a plausible allegation of conduct that actually

displaced competition. Whether that competition was in a market underlying the

---

[13] The same reasoning distinguishes other cases cited by Plaintiffs involving the use of agreements to subvert competition. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 681-83 (1978) (agreement not to engage in competitive bidding suppressed competition); *Sugar Inst. v. United States*, 297 U.S. 553, 597-602 (1936) (trade association members agreed to sell sugar at prices announced in advance rather than through market forces); *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 402, 404 (1921) (association agreed to "suppress competition by restricting production" of lumber to "keep[] the supply low and the prices high"); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 319, 323 (2d Cir. 2010) (joint venture participants agreed, among other things, to maintain "artificially high and non-competitive" prices for internet music rather than compete over those prices); *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 107 n.12 (2d Cir. 2007) (alleged agreement to charge same fee for IPOs rather than compete over such fees appeared to constitute horizontal price fixing); *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 626-27 (7th Cir. 2003) (joint venture controlled output rather than competing over output); *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 477-78 (7th Cir. 2002) (company entered sham transactions that should have been competitively negotiated to raise price of copper futures and thereby benefit from short positions); *Todd v. Exxon Corp.*, 275 F.3d 191, 195-98 (2d Cir. 2001) (agreement among competitors to share employee salary information found unlawful under rule of reason because it diminished competition over salaries); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 269-70 (D. Conn. 2003) (producers purchased butter at an artificially high price rather than through competition in order to increase milk prices); *cf. Major League Baseball*, 542 F.3d at 309, 318-34 (exclusive licensing and profit sharing arrangements were subject to and lawful under rule of reason).

benchmark—as in *Socony-Vacuum*, *Knevelbaard*, and *FOREX*—or in a market that the defendants allegedly rigged using an index—as in *Woods Exploration* and *Rail Freight*—the principle is the same:  courts have never found horizontal price fixing, or indeed any form of restraint of trade, based on a naked allegation of an agreement to produce an inaccurate benchmark; rather, some restraint on competition is always required.

### b)    Base or List Price Cases

Plaintiffs cite several cases involving agreements to set base or list prices. But those cases, unlike this one, involved agreements *not to compete* with respect to an aspect of price over which competition should and would have existed but for the challenged agreement.  For example, in *Plymouth Dealers' Ass'n of North California v. United States*, 279 F.2d 128, 132 (9th Cir. 1960), auto dealerships were alleged to have conspired to raise list prices on their cars.  The dealerships, however, should have been *competing* over the list prices they quoted and therefore committed an antitrust violation when they instead *agreed* on those list prices.  *See id.* ("[The fixed list price] was an agreed starting point; it had been agreed upon between competitors.").  Far from supporting Plaintiffs' claims, all of the base or list price cases cited by Plaintiffs are similarly distinguishable as involving

competitors that agreed not to compete where they otherwise would have.[14]  Here, as Plaintiffs conceded below, the Panel Banks never competed, and were not supposed to compete, in making their USD LIBOR submissions.

### c)  Component Price Cases

That USD LIBOR is not and cannot be subject to competition similarly distinguishes Plaintiffs' "component price" cases (*i.e.*, cases in which the alleged conspiracy involved only a part of, rather than the entire, price of a product), all of which involve conspiracies to manipulate price components over which defendants would have otherwise competed.  For example, in *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 644-45 (1980), the defendants violated the antitrust laws by

---

[14] *See Maricopa Cnty.*, 457 U.S. at 341-42 (doctors that should have been competing over doctor fees agreed to fix maximum doctor fees); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 776-78 (1975) (lawyers that should have been competing over fees agreed to minimum fee schedule); *United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485, 487 (1950) (board adopted standard rates of commissions for its members rather than competing over commission rates); *FTC v. Pac. States Paper Trade Ass'n*, 273 U.S. 52, 59-60 (1927) (association distributed uniform list prices to members rather than competing over list prices); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362-63 (3d Cir. 2004) (glass manufacturers should have been competing over list prices of flat glass and automotive replacement glass); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (manufacturers of high fructose corn syrup should have been competing over list prices); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 378 (S.D.N.Y. 1996) (defendants fixed list prices of diamonds that they otherwise would have competed over); *cf. Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 583 (1925) (association's dissemination of information was *not* an antitrust violation because it did not "restrain the freedom of action of those who buy and sell").

agreeing to fix a price component—trade credit—instead of competing over it. *See id.* ("[P]rior to the agreement wholesalers *had competed with each other* with respect to trade credit, and the credit terms for individual retailers had varied substantially. After entering into the agreement, respondents uniformly refused to extend any credit at all." (emphasis added) (footnote omitted)).[15]

Here, USD LIBOR panel banks had not "competed with each other with respect to" USD LIBOR prior to the alleged agreement, nor could they have. Plaintiffs do not allege that any competitively determined aspect of USD LIBOR-based transactions was fixed. Accordingly, they cannot point to any manner in which the alleged agreement to lower USD LIBOR submissions restricted competition, whether over a price component or otherwise.

### d) Exclusion Cases

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1998), and other "exclusion" cases similarly involved agreements to restrict competition. In

---

[15] *See also In re Yarn Processing Patent Validity Litig.*, 541 F.2d 1127, 1136-37 (5th Cir. 1976) (agreement to fix component of price over which defendants would otherwise compete: "A patentee may usually exact whatever royalty it wishes. But, Leesona and Permatwist elected to take a one third reduction in their royalty income."); *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481, 2015 WL 1378946, at *10, 14 (S.D.N.Y. Mar. 26, 2015) (traders in aluminum market agreed not to compete over and restrict each of their warehouse operations and thereby "substituted supply and demand based-pricing with pricing driven by" the traders' agreements); *Nw. Fruit Co. v. A. Levy & J. Zentner Co.*, 665 F. Supp. 869, 872 (E.D. Cal. 1986) (fixing "cooling and palletizing" charge in cantaloupe sales reduced competition over the charge).

*Allied Tube*, steel conduit producers that were members of a fire protection association manipulated the National Electric Code by collectively agreeing to exclude polyvinyl chloride ("PVC") conduits from the Code, thereby eliminating competition between the steel conduit producers and PVC conduit producers by shutting the latter out of the market. *Id.* at 496. In short, "the restraint of trade on which liability was predicated was the Association's exclusion of [the PVC producer]'s product from the Code." *Id.* at 500. [16]

Here, by contrast, Plaintiffs do not allege that anyone was excluded or otherwise restricted from the market for USD LIBOR-based or any other financial instruments because of the alleged suppression of USD LIBOR. Plaintiffs' argument that antitrust law condemns the misuse of trade associations "to accomplish an anticompetitive end," Appellants' Br. 44; *see id.* at 42-46, is

---

[16] *See also Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) (trade association members "harm[ed] their employers' competitors through manipulation of [the trade association's] codes"); *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 927-29 (7th Cir. 1995) (soybean regulation required investors with certain positions in soybeans to reduce their positions); *Nat'l Macaroni Mfrs. Ass'n v. FTC*, 345 F.2d 421, 423 (7th Cir. 1965) (macaroni manufacturers association resolution required use of a certain amount of durum wheat, which depressed the price of durum wheat and prevented price from being competitively established); *cf. FTC v. Cement Inst.*, 333 U.S. 683, 720-26, 725-26 (1948) (trade association agreement to sell cement through a "point system" that led to identical prices being charged throughout the United States rather than through market competition constituted an unfair method of competition under section 5 of the FTC Act and unlawful price discrimination under the Robinson-Patman Act).

unavailing, because here the alleged misuse did not "accomplish an anticompetitive end."[17]

***

In sum, Plaintiffs fail to identify any case finding *per se* horizontal price fixing on similar facts, with no restraint of trade, much less one with obviously anticompetitive effects. None of the complaints suggests that the alleged conspiracy in any way limited market participants who used USD LIBOR as a reference rate from negotiating and obtaining competitive offers regarding the spread above or below USD LIBOR or the overall interest rate, or even in choosing another reference rate entirely. The publication of an inaccurate rather than an accurate USD LIBOR therefore did not restrain competition in any market. In short, two hallmarks of horizontal price fixing—an agreement to restrain *competition* over a *price*—are absent here because USD LIBOR itself is not a price that is competed over, nor does its value as fixed on any given day restrain price competition in any market in which it is used.

---

[17] Similarly, certain *amici* rely on *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965). *E.g.*, American Antitrust Institute Br. 2. *Walker Process* held that liability for monopolization might be found under section 2 of the Sherman Act because the respondent's fraud on the Patent Office *restrained competition* by improperly granting the respondent a monopoly that it would not otherwise have had. 382 U.S. at 177-78. Indeed, the court remanded the case so that the trial court could properly consider, among other things, respondent's "ability to lessen or destroy competition." *Id.*

29

### B.    Plaintiffs Did Not Suffer Antitrust Injury

Because Plaintiffs cannot show that the conduct alleged here restrained competition in any market, Plaintiffs did not suffer antitrust injury.  And, absent a showing of antitrust injury, a private plaintiff lacks standing to bring an antitrust claim.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (same).

"[A]ntitrust injury" refers to injury "attributable to an anti-competitive aspect of the practice under scrutiny."  *Atl. Richfield Co. v. USA Petroleum Co. (ARCO)*, 495 U.S. 328, 334 (1990).  Specifically, Plaintiffs must demonstrate that their loss "stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *Id.* at 344 (emphasis in original); *see also Paycom*, 467 F.3d at 290.  This requirement applies equally to all antitrust plaintiffs, including those that purport to allege *per se* violations of the antitrust laws.  *ARCO*, 495 U.S. at 341-42 (rejecting "respondent's suggestion that no antitrust injury need be shown where a *per se* violation is involved"); *Paycom*, 467 F.3d at 290.

As several judges in the Southern District of New York have held, Plaintiffs have not plausibly shown that the alleged wrongful conduct (collusion with respect to USD LIBOR submissions) reduced competition, and therefore they have not pleaded antitrust injury.  *LIBOR I*, SPA26-47; *7 W. 57th St.*, 2015 WL 1514539, at

*14-20; *Laydon*, 2014 WL 1280464, at *7-8; *Mayfield v. British Bankers' Ass'n*, No. 14-cv-4735-LAP, slip op. at 4-5 (S.D.N.Y. July 22, 2014). As explained in Part I.A *supra*, there is no competition in setting USD LIBOR, and "[w]ithout demonstrating that there was competition, a plaintiff cannot show that the defendants' actions have had or will have anticompetitive effects." *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 267 (3d Cir. 1998); *LIBOR I*, SPA31 (subversion of a "cooperative process" does not harm competition). To the extent Plaintiffs can allege any injury related to the USD LIBOR-setting process itself, that injury at most "would have resulted from defendants' misrepresentation, not from harm to competition," and is therefore not cognizable as an antitrust injury. *LIBOR I*, SPA31.

Plaintiffs allege that the Panel Banks compete *outside* of the USD LIBOR-setting arena, in the London interbank lending market and the market for USD LIBOR-based financial instruments. But there is no allegation of reduced competition in those markets from the conduct Plaintiffs allege. They do not allege that the Panel Banks restrained competition in the London interbank lending market, but instead claim only that they misrepresented the rates at which they believed they could borrow if they were to enter that market. *LIBOR I*, SPA33-34.

Nor do Plaintiffs allege antitrust injury in connection with the sale of USD LIBOR-based financial instruments. Plaintiffs allege that the submission of false

31

information to the BBA affected the value of the financial instruments they held,

Bondholders' Compl. ¶ 178-79, JA279, but that allegation does not connect their

injury to any "competition-*reducing*" effect of the Panel Banks' alleged conduct.

*LIBOR I*, SPA27 (quoting *ARCO*, 495 U.S. at 344); *id.* SPA32 ("[P]laintiffs have

not alleged that defendants' alleged fixing of LIBOR caused any harm to

competition between sellers of those instruments or between buyers of those

instruments.").  USD LIBOR, once set, is the same for everyone and not itself a

subject of competition in the market for USD LIBOR referenced instruments—the

only market in which Plaintiffs allege they traded.  Buyers and sellers may

continue to compete for and agree on any price of any financial instrument,

regardless of what USD LIBOR happens to be.  In short, Plaintiffs never

demonstrate that their injury was caused by harm to competition, as is required to

allege antitrust injury.[18]

---

[18] This distinguishes *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982). There, the plaintiff suffered antitrust injury because her injury was allegedly caused by anticompetitive behavior, namely a conspiracy among an insurer and a psychiatric association to exclude psychologists from health insurance plan reimbursements.  *Id.* at 468-69, 483 ("McCready charges Blue Shield with a purposefully *anti-competitive scheme*." (emphasis in original)).  The only question was whether the plaintiff's injury could be traced to that anticompetitive scheme. *See id.* at 483.  Here, by contrast, Plaintiffs have alleged no antitrust injury because they have alleged no restraint on competition at all.

*ARCO* is decisive: it holds that even with a *per se* antitrust violation and an injury to plaintiffs, there is no antitrust injury where the plaintiff's injury does not stem from harm to competition. *ARCO*, 495 U.S. at 342-43. *ARCO* applies *a fortiori* here because Plaintiffs cannot show a restraint on competition *anywhere*, let alone that they suffered injury as a result of competitive harm. That the *ARCO* plaintiff was a competitor who stood to benefit from the alleged conduct of the defendant does not limit *ARCO*'s holding. *All* plaintiffs must demonstrate antitrust injury, which *ARCO* defines as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 334 (citing *Brunswick*, 429 U.S. at 489). *ARCO* announced a general rule: a plaintiff can recover in antitrust "only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Id.* at 344. Where no restraint on competition exists, no antitrust injury can either, regardless of whether the plaintiff was a competitor or customer.[19]

That Plaintiffs' alleged injuries are the result of USD LIBOR being lowered in accordance with what would be expected from "normal competitive conduct,"

---

[19] *See also City of Pittsburgh*, 147 F.3d at 256 ("[W]e do not find the City's status as a consumer to be dispositive. We read [*Brunswick*, 429 U.S. 477] to have broader application . . . . It directs us to look back from the vantage [ ] point of the injury to test the nature of the cause, rather than to presume antitrust injury wherever there is an agreement or merger that results in harm.").

*LIBOR I*, SPA36 (quoting *Brunswick*, 429 U.S. at 487), further illustrates the absence of antitrust injury.[20]  In a traditional antitrust conspiracy, competitors agree to reduce (or eliminate) competitive pressures by fixing prices or output. *LIBOR I*, SPA35-40.  Here, Plaintiffs do not allege that the Panel Banks modified their submissions to reduce competition.  Rather, they allege the Panel Banks subverted a *cooperative* undertaking to make USD LIBOR submissions in "good faith" by instead submitting rates reflecting *competitive* considerations of profit and reputation.  Phila. Compl. ¶ 38, JA1405.  Whatever concerns such conduct may raise under other laws, it causes no injury that "stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *ARCO*, 495 U.S. at 344.[21]

---

[20] Plaintiffs cite the recent decision in *FOREX* as contending that this particular argument from *LIBOR I* "blurs the lines between two separate analytic categories—the sufficiency of a complaint under *Twombly* and antitrust injury." *FOREX*, 2015 WL 363894, at *12.  *FOREX*, however, appears to misread *LIBOR I*. Although Supreme Court precedents preclude finding a plausible antitrust conspiracy when the alleged conduct is at least as consistent with normal competitive behavior as with collusion, *see Twombly*, 550 U.S. at 554, another line of Supreme Court cases precludes finding a plausible antitrust injury where the challenged conduct is of a type that would be equally injurious when done independently, such as misrepresentation, as opposed to injury that results only from collective conduct that restricts competition, *see ARCO*, 495 U.S. at 337-38, 344 (antitrust injury must stem from "competition-*reducing*" behavior).

[21] Plaintiffs are also wrong that the district court's holding dismissing Plaintiffs' claims solely on antitrust injury grounds necessarily bars government antitrust enforcement actions against the Panel Banks relating to alleged LIBOR manipulation.  Unlike private plaintiffs, the government need not prove antitrust injury.  *Compare* 15 U.S.C. § 4, *with* 15 U.S.C. § 15.  The district court's antitrust

(….continued)

Plaintiffs' argument is that, because they held USD LIBOR-based instruments, they suffered antitrust injury if the alleged agreement resulted in a depressed USD LIBOR. But if that were right, *any* collective decision that might lower USD LIBOR—from changes in the way USD LIBOR is calculated to a change in the mix of Panel Banks—would establish an antitrust injury regardless of the nature of the decision or its impact on competition. That is not the law. *See LIBOR I*, SPA33 ("[I]t is not sufficient that plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have."). Absent a showing of anticompetitive conduct, *Brunswick* and *ARCO* foreclose Plaintiffs' suit.

## II. PLAINTIFFS FAIL TO STATE A PLAUSIBLE CONSPIRACY CLAIM

Section 1 of the Sherman Act prohibits only *agreements* to restrain trade. A complaint alleging a section 1 violation must therefore contain "enough factual matter (taken as true) to suggest that an *agreement* was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (emphasis added); *see also Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) ("A

---

(continued….)

ruling also did not address other, non-antitrust claims that the government may assert.

35

plaintiff's job at the pleading stage . . . is to allege enough facts to support the

inference that a conspiracy actually existed."). "[I]t is not enough to make

allegations of an antitrust conspiracy that are consistent with an unlawful

agreement," *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007), and

"neither parallel conduct nor conscious parallelism, taken alone, raise the

necessary implication of conspiracy," *Twombly*, 550 U.S. at 561 n.7.[22]  Although

the district court did not reach the question of whether Plaintiffs have pleaded a

plausible antitrust conspiracy, it was briefed and argued below, and this Court may

affirm the district court's decision on this alternative ground.  *Thyroff v.

Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006).

Plaintiffs do not plausibly allege that the Panel Banks (or the BBA)

conspired to suppress USD LIBOR during the alleged Relevant Period, *see

Twombly*, 550 U.S. at 553-56; *Baltimore*, 709 F.3d at 137-38, let alone that *each*

Panel Bank participated in the alleged multi-year conspiracy, *see In re Travel

Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (affirming

---

[22] Plaintiffs' reliance on *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185, 189-90 (2d Cir. 2012), is misplaced.  *Anderson News* involved significant evidence of actual agreement to engage in the conspiracy alleged, and merely stated that the court need not make a "choice between two plausible inferences" in denying a motion to dismiss.  *Id.* at 185.  It did not purport to (nor could it) alter *Twombly*'s and *Iqbal*'s holding that allegations that are "'merely consistent with'" conspiracy fail to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

dismissal of complaint against defendants AAG and Horizon for failure to "specify how these defendants [were] involved in the alleged conspiracy"); *Hinds Cnty., Miss. v. Wachovia Bank, N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) ("To state a claim against each Defendant, Named Plaintiffs must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." (internal quotation marks omitted)).

This Court's recent decision in *Baltimore* is illustrative. The *Baltimore* Plaintiffs alleged that nearly a dozen of "the world's largest and best-known financial institutions" had "conspired to restrain trade by simultaneously refusing to support the ARS [auction rate securities] auctions they managed." *Id.* 709 F.3d at 131, 133. Although the district court had dismissed on another ground and, as here, had not reached the *Twombly* issue, this Court reviewed plaintiffs' allegations and the surrounding economic circumstances and held that plaintiffs had merely alleged parallel conduct that was "just as much in line" with unilateral conduct and "could just as easily turn out to have been rational business behavior." It held that the allegations were thus insufficient under *Twombly*. *Id.* at 137-40. Plaintiffs' allegations here are even more conclusory and less plausible than those in *Baltimore*.

The implausibility of Plaintiffs' claims has only increased over time. Six Panel Banks have settled with U.S. and foreign government agencies resolving

extensive LIBOR-related investigations, yet not a single settlement supports

Plaintiffs' allegations of a multiyear, sixteen-bank conspiracy to suppress USD

LIBOR.  As the district court recently noted, the "bottom line" is that, despite

several years of investigations by numerous U.S. and foreign government agencies

and settlements with several Panel Banks, there has been "no identification of any

meeting of the panel banks to form a conspiracy to do anything" like what is

alleged in the complaints.  Hr'g Tr. at 30:12-15, *In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, No. 11-MD-2262 (S.D.N.Y. Feb. 5, 2015), ECF No.

1047.  The "more logical motivation" for alleged suppression of USD LIBOR

submissions by Panel Banks is the "preservation of reputation," and a bank with

such a motive—as Plaintiffs allege to be the case here—"is not talking to the other

banks."  *Id.* at 30:15-24; Bondholders' Compl. ¶ 70, JA240.  Because Plaintiffs

have not pleaded facts "rais[ing] a suggestion of a preceding agreement," *Twombly*,

550 U.S. at 557, and indeed the alleged facts *contradict* the existence of such an

agreement, the judgment below should also be affirmed on this alternative

ground.[23]

---

[23] Twenty of the twenty-five actions on appeal are subject to motions to dismiss for lack of personal jurisdiction pending in the district court pursuant to *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), and other controlling precedent, JA1576-78, and in the remaining actions, certain defendants intend to assert personal jurisdiction defenses before the district court at an appropriate time, if necessary. The parties in those actions have entered into a non-waiver agreement
(….continued)

Plaintiffs below relied on these circumstantial allegations they claimed support a plausible inference of conspiracy, as opposed to independent or parallel conduct.  The allegations, separately or in combination, are wholly insufficient to support such an inference under *Twombly*.

## A. Regulatory Settlements and Investigations Not Only Fail to Support But *Undermine* an Inference of Conspiracy

Plaintiffs cited ongoing governmental investigations and settlement agreements with U.S. and foreign authorities (often related in large part to other, non-USD LIBOR indices not at issue here), but those investigations and settlements undermine any inference of a conspiracy to suppress USD LIBOR.  Bondholders' Compl. ¶¶ 121-25, 129, 132-34, JA263-65.

As an initial matter, the existence of pending government investigations is not sufficient to plead an antitrust claim.  *See Twombly v. Bell Atl. Corp*, 425 F.3d 99, 118 n.14 (2d Cir. 2005) (congressional investigation was "irrelevant at the pleading stage" because "[a]n allegation that someone has made a similar

_____

(continued….)

concerning defendants' participation in this appeal.  Certain other defendants dismissed from actions on motions filed before *Daimler* also intend to assert the defense at an appropriate time, if necessary.  Because only some of the defendants on appeal have a jurisdictional defense, this Court is permitted to affirm a Rule 12(b)(6) dismissal as to *all* defendants.  *Stockbridge-Munsee Community v. New York*, 756 F.3d 163, 166 (2d Cir. 2014).

allegation does not, without more, add anything to the complaint's allegations of fact"), *rev'd on other grounds*, 550 U.S. 544 (2007); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) (government investigations may not, standing alone, satisfy an antitrust plaintiff's pleading burden).

Further, the very settlement agreements that Plaintiffs reference provide no allegation, much less evidence, of concerted conduct among Panel Banks to suppress USD LIBOR over a multi-year period or otherwise—despite several years of investigation by multiple U.S. and foreign authorities with access to millions of documents and audio communications. *See Hinds Cnty.*, 790 F. Supp. 2d at 116 ("[H]ad the Antitrust Division possessed evidence sufficient to connect its charged defendants and named co-conspirators to transactions and misdeeds other than those identified . . . it presumably would have done so.").[24]  Since the inception of Plaintiffs' case in 2011, six of the sixteen Panel Banks have entered into settlement agreements with U.S. and foreign authorities in connection with LIBOR-related

---

[24] *Starr*, 592 F.3d 314, and *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 871 F. Supp. 2d 143 (E.D.N.Y. 2012), are not to the contrary.  Those cases hold only that a civil antitrust complaint need not be dismissed merely because the government found no evidence of conspiracy.  *Starr*, 592 F.3d at 325; *DPWN*, 871 F. Supp. 2d at 163-64.  Defendants' argument here is that the facts alleged by Plaintiffs, including the government findings, do not raise an inference of conspiracy, and if anything, taken both individually and together, suggest the absence of one.

investigations.[25]  *None* of the settlement documents supports Plaintiffs' allegations of a conspiracy among any, much less all, Panel Banks to suppress USD LIBOR. Indeed, the settlement documents do not even support an allegation that each Panel Bank suppressed its USD LIBOR submissions.  The settlements identify two types of conduct, both of which are inconsistent with the alleged conspiracy.

*First*, the settlements state that some but not all of the six settling banks made lower USD LIBOR submissions during the Relevant Period "to avoid inaccurate, negative attention" concerning their "financial health."  *E.g.*, Barclays DOJ SOF ¶ 40, JA447-48 ("Barclays managers sought to avoid what they believed would be an inaccurate perception that Barclays was not in good financial shape when compared to its peers.").  The settlements, however, suggest only that when banks did so, they acted *unilaterally*; the settlements do not identify a *single* communication evidencing a conspiracy.[26]

---

[25] Only three of those six settlements were before the district court when it ruled on Plaintiffs' antitrust claim.

[26] *See, e.g.,* Barclays DOJ SOF ¶¶ 34-49, JA445-52 (describing instruction by Barclays management to make lower USD LIBOR submissions); Lloyds CFTC Order, at 14-16 (noting that USD LIBOR submissions did not reflect HBOS' borrowing rates in relevant markets but "instead reflected its desire to avoid being seen as an outlier on the respective LIBOR panels" without reference to interbank communications or agreement to coordinate suppression), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpl eading/enflloydsorderdf072814.pdf; UBS DOJ SOF ¶¶ 100-31 (describing

(….continued)

*Second*, the settlements identify episodic attempts by derivative traders to alter submissions up or down to gain cash and trading advantages on their individual positions. This reported conduct is also fundamentally inconsistent with Plaintiffs' allegations for several reasons. First, it involved *discrete* attempts by traders and managers at certain Panel Banks to move submissions over varying periods of time, not a broad-based conspiracy among all sixteen Panel Banks to persistently maintain USD LIBOR at low levels for several years.[27] Second, it involved efforts to move submissions *up or down* to benefit specific traders' individual positions, which is inconsistent with an alleged conspiracy to consistently keep USD LIBOR artificially *low* over a multi-year period.[28] Finally,

---

(continued….)

unilateral directives to "err on the low side" and make USD LIBOR submissions "in the middle of the pack" of the other Panel Banks).

[27] *See, e.g.*, Lloyds FCA Final Order ¶¶ 4.30-4.35 (describing discrete instances where "[t]raders from time to time took into account their own money market positions when making USD LIBOR submissions"); Barclays DOJ SOF ¶ 11, JA435, (describing discrete instances where "certain Barclays swaps traders requested . . . a particular LIBOR . . . contribution for a particular tenor and currency" ); Rabobank DOJ SOF ¶¶ 16-29 (describing discrete instances where "certain Rabobank swaps traders . . . requested a particular LIBOR . . . contribution for a particular tenor and currency"); UBS DOJ SOF ¶¶ 88-90 (noting only that "on two occasions, UBS U.S. Dollar derivatives traders in Stamford made requests for favorable Dollar LIBOR submissions to the UBS Dollar LIBOR submitters on the derivatives trading desk in Zurich," which were both not accepted by the submitters).

[28] *E.g.*, Barclays DOJ SOF ¶ 11, JA435 (traders "either proposed a particular LIBOR . . . contribution for a particular tenor and currency, or proposed that the
(….continued)

the trader conduct discussed in the settlements generally occurred during a

different time period than the suppression of USD LIBOR alleged by Plaintiffs and

largely involved indices *other than* USD LIBOR, which are not at issue in this

matter.[29]

Courts have rejected similar attempts by plaintiffs to expand discrete

instances of alleged misconduct into evidence of a broad antitrust conspiracy. *E.g.,*

*In re Elevator Antitrust Litig.*, 502 F.3d at 51-52 (plaintiffs did not plausibly plead

a worldwide conspiracy among defendants because "[a]llegations of

---

(continued....)

rate submitter contribute a rate higher, lower, or unchanged for a particular tenor and currency"); Lloyds CFTC Order, at 10 (Lloyds and HBOS USD LIBOR submitters "on occasion took [traders] cash and derivatives trading positions into account when determining their U.S. Dollar LIBOR submissions for their respective banks"); Rabobank DOJ SOF ¶ 15 (traders "either requested a particular LIBOR . . . contribution for a particular tenor and currency, or requested the that the rate submitter contribute a rate higher, lower, or unchanged for a particular tenor and currency"); Deutsche Bank DOJ SOF ¶ 16 (derivatives traders requested USD LIBOR submitters to make submissions that benefited their trading positions "for a particular tenor and currency, or requested that the rate submitter contribute a higher, lower, or unchanged rate for a particular tenor and currency").

[29] *See, e.g.*, Barclays CFTC Order at 7-8, JA461-62, (noting that USD LIBOR trader conduct occurred primarily between mid-2005 through fall 2007); Rabobank DOJ SOF ¶ 16 (finding USD LIBOR trader conduct between September 2005 and December 2008); RBS DOJ SOF ¶ 13 ("certain RBS Yen and Swiss Franc derivatives traders" requested submissions "in order to benefit their derivatives trading positions"); UBS CFTC Order, at 10 (finding that certain UBS derivatives traders submitted Yen LIBOR and Euroyen TIBOR submissions "to benefit UBS's derivative trading positions"), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpl eading/enfubsorder121912.pdf.

anticompetitive wrongdoing in Europe—absent any evidence of linkage between

such foreign conduct and conduct here—is merely to suggest . . . that if it

happened there, it could have happened here" (internal quotations omitted)); *In re*

*Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2011 U.S. Dist. LEXIS

101763, at *38-39 (N.D. Cal. Aug. 3, 2011) (discrete instances of misconduct were

"far cry" from establishing broad-based price-fixing conspiracy).  It is particularly

inappropriate to do so here where the very government documents on which

Plaintiffs base their allegations provide no evidence of the conspiracy to suppress

USD LIBOR that Plaintiffs allege occurred.[30]  The lack of such evidence further

undercuts any inference of such an agreement or conspiracy to suppress USD

LIBOR.

### B.    Plaintiffs' Motive Allegations Do Not Support an Inference of Conspiracy

Plaintiffs asserted that the Panel Banks had an incentive to suppress their

USD LIBOR submissions (1) "to portray themselves as economically healthier

than they actually were" in the wake of the financial crisis; and (2) "to pay lower

interest rates on LIBOR-based financial instruments that Defendants sold to

---

[30] *FOREX* is plainly distinguishable.  That court found "direct evidence akin to the recorded phone call in which two competitors agreed to fix prices at a certain level."  2015 WL 363894, at *6 (internal quotation marks omitted).  Here, the regulatory investigations and settlement agreements entered into by Defendants do not reveal any evidence of the alleged conspiracy to suppress USD LIBOR.

investors."  Bondholders' Compl. ¶ 4, JA202-03.  But neither alleged motive supports an inference of concerted action; to the contrary, they *undermine* any such inference.  *See Baltimore*, 709 F.3d at 138-39 (dismissing a section 1 claim for, *inter alia*, failure to plausibly allege a common motive to conspire among the defendants).

By pleading a desire to portray economic health during the financial crisis, Plaintiffs expressly concede the type of "independent responses to common stimuli" and "mere interdependence unaided by an advance understanding among the parties" that defeat a claim of conspiracy.  *Twombly*, 550 U.S. at 556 n.4.  The basic premise of Plaintiffs' theory is that each Panel Bank would have *individually* responded to the economic crisis by understating its estimated borrowing rates "to ensure it was not the 'odd man out.'"  *See* Bondholders' Compl. ¶ 68, JA238-39.  If, as Plaintiffs allege, each Panel Bank was individually incentivized to keep its USD LIBOR submissions low and close to the daily publicized submissions of other Panel Banks so as not to appear an outlier, any statistical patterns suggesting artificially low or "bunched" USD LIBOR submissions would be consistent with the very unilateral, self-interested motive that Plaintiffs allege.  Bondholders' Compl. ¶ 88-90, JA246-47.  Thus, far from pleading actions "taken contrary to [defendants'] self-interest unless pursued as part of a collective plan," "market phenomena that cannot be explained rationally except as the product of concerted

45

action," or other so-called "plus factors" suggesting an inference of concerted action, Plaintiffs themselves allege an "obvious alternative explanation" for defendants' conduct. *Twombly*, 550 U.S. at 567.[31]

The alleged conspiracy contradicts Plaintiffs' motive theory. If, as Plaintiffs allege, a Panel Bank perceived that it was financially weak and wanted to keep that hidden by understating its estimated borrowing rates to avoid being the "odd man out," Bondholders' Compl. ¶ 68, JA238-39, it would not have revealed the very thing it wished to conceal by soliciting the participation of other banks in a conspiracy. As the district court below put it, a bank with a motive to protect its reputation "is not talking to the other banks." Hr'g Tr. at 30:12-25, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262 (S.D.N.Y. Feb. 5, 2015), ECF No. 1047; *see also Baltimore*, 709 F.3d at 138 ("Defendants' alleged actions—their *en masse* flight from a collapsing market in which they had

---

[31] In addition, while the Amended Complaints allege that "at least some" Panel Banks had financial difficulties during the relevant period (*see, e.g.*, Bondholders' Compl. ¶ 112, JA258), they do not—and cannot—allege that all Panel Banks did. Some Panel Banks, for example, had an AAA credit rating during the relevant time period. Plaintiffs offer no plausible theory why banks not alleged to have been facing risk or liquidity problems would have had an incentive to participate in a conspiracy designed to help competitors mask their alleged financial difficulties. *See, e.g.*, *Ambook Enters. v. Time Inc.*, 612 F.2d 604, 616 (2d Cir. 1979) ("[O]ne factor to consider in determining if agreement should be inferred from parallel conduct was whether agreement benefited the alleged conspirators . . . .").

significant downside exposure—made perfect business sense."); *In re Elevator Antitrust Litig.*, 502 F.3d at 51 (rejecting inference of conspiracy based on conduct that was "just as much in line" with conspiracy as "with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" (quoting *Twombly*, 550 U.S. at 554)); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) ("*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior.").[32]

Plaintiffs contend, without alleging any supporting facts, that collusion was "indispensable" to USD LIBOR suppression because, given that USD LIBOR submissions were published daily, a unilateral attempt to lower USD LIBOR submissions would draw "media and financial-market scrutiny." Appellants' Br. 12. To the contrary, the public availability of individual USD LIBOR submissions

---

[32] As Plaintiffs admit, motive is probative of conspiracy when parallel actions "would be inconsistent with self-interest if undertaken unilaterally." Appellants' Br. 12 n.3. Here, unlike a price-fixing case in which collusion is necessary because a unilateral rise in prices would result in a loss of business, suppression of USD LIBOR submissions makes far more sense as a unilateral exercise because a bank wishing to protect its financial reputation would not want to advertise its financial weakness to its competitors.

undercuts any theory of an alleged conspiracy because it allowed Panel Banks to adjust their submissions to stay in line with those of other Panel Banks independently and *without* the need to collude.  At most, Plaintiffs point to discrete instances in which certain Panel Banks obtained information from third-party brokers about expected USD LIBOR submissions by other banks and independently used that information to avoid falling outside what the banks gauged would be the potential range of submissions.  Bondholders' Compl. ¶ 155, JA252-53.  No government agency has alleged, however, that this reported conduct involved a conspiracy with any Panel Bank, and the government settlements show that Panel Banks often had to speculate about other Panel Banks' submissions, further undercutting the plausibility of a conspiracy among Panel Banks.[33]

Plaintiffs' alternative theory—that the Panel Banks had "financial incentives to manipulate [USD] LIBOR" by paying "lower interest rates on [USD] LIBOR-based financial instruments," which they, in turn, "sold to investors during the Class Period"—is equally unavailing.  Bondholders' Compl. ¶¶ 69, 70, JA239-40.  As Judge Buchwald noted, it is "implausible" that the profit motives of sixteen international financial institutions "were uniformly aligned" such that all would

---

[33] *See, e.g.*, Barclays FSA Final Notice ¶ 117, JA525-26  (Barclays submitter "[n]ot really sure why contributors are keeping [USD LIBOR submissions] so low").

benefit from a lower USD LIBOR. *LIBOR III*, 27 F. Supp. 3d 447, 469 (S.D.N.Y. 2014). That would be true even for any given day, and only more so for a three-year period as alleged by Plaintiffs. In view of the number and complexity of USD LIBOR-based instruments and the various, ever-changing positions that Panel Banks maintain with respect to such instruments, it is fanciful to believe that the USD LIBOR exposure of all sixteen Panel Banks converged, let alone consistently over a multi-year period (coinciding with the most severe market disturbances in recent history), and resulted for all of them in a stable, net position always favoring lower USD LIBOR. Moreover, the Panel Banks are in the business of lending large amounts of money, and Plaintiffs contend that the Panel Banks "earned billions of dollars in net interest revenue." Appellants' Br. 11-12; Bondholders' Compl. ¶ 69, JA 239-40. Lower USD LIBOR would reduce the interest payments Panel Banks received from borrowers whose rates incorporated USD LIBOR.

The only allegation that Plaintiffs make to support their theory that the Panel Banks all agreed to suppress USD LIBOR is a reference to public disclosures by four Panel Banks, in which they allegedly stated that they stood to benefit financially from lower "interest rates" in 2008 and 2009. *See* Background Section *supra*. Plaintiffs fail to cite similar information for the other twelve Panel Banks, or any such information for any Panel Bank relating to other portions of the Relevant Period. Further, Plaintiffs improperly attempt to conflate "interest rates"

49

with USD LIBOR.  As confirmed by one of Plaintiffs' own sources, a bank's USD

LIBOR exposure does not necessarily track its exposure to "interest rates" in

general.[34]  Plaintiffs thus fail to allege plausibly that the Panel Banks shared a

common incentive to reduce USD LIBOR throughout the entire Relevant Period,

much less that they engaged in any concerted action to do so.

This is borne out in the settlements.  In context, references to joining the

"pack" in selected emails cited in the settlements do not suggest the existence of a

conspiracy; instead submitters, relying on their own observations of trading

activity and other information obtained from financial data sources (including

other Panel Banks' previous day's LIBOR submissions), could attempt to predict

where other Panel Banks would be the next day.[35]  Remaining "within the pack"

reflected certain Panel Banks' unilateral desire to stay close to other banks'

submissions to avoid appearing more unstable than their peers during a time of

financial crisis.  None of this required or even suggests collusion to suppress USD

LIBOR, nor do the settlement documents identify any communications among any

---

[34] http://www.thesunshinereport.net/marksunshine/?p=36 (any "correlation between LIBOR and the cost of funds of United States banks" would be "coincidental" (cited at OTC Compl. ¶ 50 n.20, JA114)).

[35] *See* Barclays DOJ SOF ¶ 36, JA445-46 ("Barclays Dollar LIBOR submitters . . . submitted rates that they *believed would be consistent* with" USD LIBOR Panel Bank submissions, "or at least, that would not be too far above the *expected* rates of other members of the Contributor Panel.") (emphasis added).

Panel Banks to that end. *See Baltimore*, 709 F.3d at 139 ("Even reading the

complaints in the light most favorable to the Plaintiffs, these statements do not

provide any evidence of *interfirm* communications. In fact, they tend to suggest

the *absence* of such communications—if, for example, Merrill Lynch and Lehman

were talking, the former would not have had to rely on third parties to confirm the

latter's strategy. At most, these conversations suggest a high level of interfirm

*awareness*. Such 'conscious parallelism,' however, is not unlawful in itself."

(emphasis in original)).

Further, the Panel Banks' repeated contact with regulators in connection

with USD LIBOR makes no sense if they were involved in a conspiracy to

suppress USD LIBOR—a point that Plaintiffs implicitly conceded in their own

arguments to the district court below:

> It would not have been sustainable, absent agreement by Defendants, for
> each of them individually to submit artificial LIBOR quotes, *because the
> economic self-interests of panel banks would have motivated them to insist
> on compliance with the panel rules, through persistent and effective
> complaints to the BBA or regulatory authorities*, to maintain their relative
> competitive advantage in signaling creditworthiness through the LIBOR
> submission process.

Bondholder Plaintiffs' Mem. to Court at 22, ECF No. 328 (emphasis added). In

fact, the settlements on which Plaintiffs rely show that Panel Banks *did* persistently

complain to regulators throughout the period in which USD LIBOR was allegedly

suppressed. *See, e.g.*, Barclays DOJ SOF ¶ 42, JA448-49 (Barclays employees

spoke to regulators at the FSA, the Bank of England, and the Federal Reserve, stating that the "LIBOR fixes were too low and did not accurately reflect the market"; Barclays "attempted to find a solution that would allow Barclays to submit honest rates without standing out from other members of the Contributor Panel"). Such behavior is—as Plaintiffs themselves argued—inconsistent with an antitrust conspiracy among the Panel Banks.

### C. The "Studies" Cited by Plaintiffs Do Not Raise an Inference of Conspiracy

Plaintiffs relied on several "studies" that conclude USD LIBOR movements deviated from movements in other, allegedly similar indices during the time period in question. Bondholders' Compl. ¶¶ 71-72, JA240-41. The authors of these studies argue that USD LIBOR was suppressed, but express no opinion as to whether the suppression was parallel or collusive. They do not address—and for the most part do not even purport to address—whether the lower USD LIBOR submissions were the product of collusion. An "allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to maintain a claim under section 1 of the Sherman Act. *Twombly*, 550 U.S. at 556-57; *see also Baltimore*, 709 F.3d at 137 ("First, a bare allegation of parallel conduct is not enough to survive a motion to dismiss . . . . Second, even if a plaintiff alleges additional facts or circumstances—what we have previously called 'plus factors'—these facts must still lead to an inference of conspiracy."). The only study cited by Plaintiffs that

52

purports to examine whether the Panel Banks *conspired* to suppress their USD

LIBOR submissions, and not just whether they *suppressed* them, finds no evidence

of collusion during the Relevant Period.  Metz Study, JA406.

Plaintiffs themselves provide the non-collusive explanation for the

discrepancy between USD LIBOR and other benchmark rates during the period.

They allege that the Panel Banks had an incentive to appear financially healthier

than they were during one of the greatest dislocations in the financial markets in

history.  Bondholders' Compl. ¶ 68, JA238-39.  That motive was alleged to be

common to all of the Panel Banks.  *See id*.  Therefore, if USD LIBOR submissions

by the Panel Banks were across the board "too low" during the Relevant Period, as

Plaintiffs allege, the far more plausible explanation is that they were each

independently reacting to the pressures of the financial crisis, not that they

contacted other Panel Banks to organize a conspiracy, thereby exposing their

compromised situation to their competitors who were in a position to exploit it

against them.

## III.  THE DISTRICT COURT CORRECTLY DENIED LEAVE TO AMEND

The district court's denial of Plaintiffs' motion for leave to amend their

previously amended complaints is reviewed for abuse of discretion.  *Kropelnicki v.*

*Siegel*, 290 F.3d 118, 130 (2d Cir. 2002).  And "it is within the sound discretion of

the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet*

*Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Although Plaintiffs assert that the district court "applied an erroneous legal standard," they recognize that a district court has discretion to "deny amendment for a substantial reason," which is exactly what the district court did here. Appellants' Br. 59-60.

A district court need only articulate a "good reason" for denying leave to amend in order to properly exercise its discretion. *McCarthy*, 482 F.3d at 200. Far from "summarily den[ying] leave," Appellants' Br. 60, Judge Buchwald articulated a constellation of "good reason[s]" for denying leave, including the number of original complaints, the competition for appointment as class counsel, the extensive work by skilled counsel at a number of law firms in drafting the amended complaints, and the *de facto* second amendment of Plaintiffs' complaints to incorporate the Barclays settlements, all of which contributed to "the strongest possible statement of plaintiffs' case based on the collective skills of plaintiffs' counsel." SPA200.

Judge Buchwald relied on all of these reasons, and not simply Plaintiffs' failure to move to replead their antitrust claims pre-dismissal, which distinguishes *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011), where the district court's explanation for denial was merely that the plaintiff did "not explain why she should be granted leave to replead at this stage when she failed to request an

opportunity to replead in the first instance." Here, given the district court's cogent reasons for doing so, it was within its discretion to deny Plaintiffs leave to amend.

Regardless, the district court separately found that Plaintiffs' amendments would be futile—providing an independent ground supporting its denial of leave to amend. In so doing, the district court recognized that Plaintiffs' purported amendments were simply "new ways of packaging previously known facts" and did not alter the fundamental antitrust analysis discussed above. SPA205.

Moreover, Plaintiffs have abandoned in this appeal the arguments made to the district court in their motion for reconsideration. They repeat the same arguments they made in opposition to the Panel Banks' motion to dismiss, which Plaintiffs' proposed amendments do nothing to enhance. *See* Appellants' Br. 61 n.13. Specifically, Plaintiffs point to proposed allegations that "would clarify" (1) that "the Panel Banks were competitors as buyers of U.S. dollar funding," JA586, ¶ 32, (2) "LIBOR's purpose and importance," Appellants' Br. 61 n.13 (citing JA588-590, ¶¶ 37-40), and (3) LIBOR's incorporation into Plaintiffs' transactions, *id.* (citing JA578, ¶ 1). None of these issues needs clarification, as they were argued to and rejected by the district court for having no material bearing on the ultimate question of whether Plaintiffs suffered antitrust injury. SPA204-06. Plaintiffs' proposal to "clarify" their conspiracy allegations, Appellants' Br. 61 n.13 (citing JA649-51), also fails because they allege no new evidence suggesting

an agreement to suppress USD LIBOR.  The proposed amendments' futility

therefore provides an independent reason for affirming the district court's denial of

leave.  *See Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993)

("Where it appears that granting leave to amend is unlikely to be productive,

however, it is not an abuse of discretion to deny leave to amend.").

## CONCLUSION

The judgments below dismissing Plaintiffs' antitrust claims should be

affirmed.

Respectfully submitted,

/s/ Robert F. Wise, Jr.

Robert F. Wise, Jr.
Arthur J. Burke
Paul S. Mishkin
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Fax: (212) 450-4800
robert.wise@davispolk.com
arthur.burke@davispolk.com
paul.mishkin@davispolk.com

*Attorneys for Defendants-Appellees
Bank of America Corporation, Bank
of America, N.A., and Merrill Lynch,
Pierce, Fenner & Smith, Inc. (f/k/a
Banc of America Securities LLC)*

/s/ Daryl A. Libow

Daryl A. Libow
Christopher M. Viapiano
SULLIVAN & CROMWELL LLP
1700 New York Avenue
Washington, D.C. 20006
Telephone: (202) 956-7500
Fax: (202) 956-6973
libowd@sullcrom.com
viapianoc@sullcrom.com

*Attorneys for Defendant-Appellee The
Bank of Tokyo-Mitsubishi UFJ, Ltd.*

/s/ David H. Braff
David H. Braff
Yvonne S. Quinn
Jeffrey T. Scott
Matthew J. Porpora
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
braffd@sullcrom.com
quinny@sullcrom.com
scottj@sullcrom.com
porporam@sullcrom.com

/s/ Jonathan D. Schiller
Jonathan D. Schiller
Leigh M. Nathanson
BOIES, SCHILLER & FLEXNER
LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
jschiller@bsfllp.com
lnathanson@bsfllp.com

Michael Brille
5301 Wisconsin Avenue N.W.
Washington, D.C. 20015
Telephone: (202) 237-2727
mbrille@bsfllp.com

*Attorneys for Defendants-Appellees*
*Barclays Bank PLC, Barclays plc, and*
*Barclays Capital Inc.*

/s/ Andrew A. Ruffino
Andrew A. Ruffino
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
aruffino@cov.com

Alan M. Wiseman
One City Center
850 Tenth Street, N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
awiseman@cov.com

*Attorneys for Defendants-Appellees*
*Citibank, N.A., Citigroup Inc., Citigroup*
*Funding, Inc., Citigroup Global Markets*
*Inc., Citigroup Global Markets Limited,*
*Citi Swapco Inc., and Citigroup*
*Financial Products, Inc.*

/s/ David R. Gelfand

David R. Gelfand
Sean M. Murphy
MILBANK TWEED HADLEY &
McCLOY LLP
28 Liberty Street
New York, New York 10005
Telephone: (212) 530-5000
dgelfand@milbank.com
smurphy@milbank.com

*Attorneys for Defendant-Appellee*
*Coöperatieve Centrale Raiffeisen-*
*Boerenleenbank B.A.*

/s/ Herbert S. Washer

Herbert S. Washer
Elai Katz
Joel Kurtzberg
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com

*Attorneys for Defendants-Appellees*
*Credit Suisse Group AG, Credit Suisse*
*International, Credit Suisse AG, Credit*
*Suisse Securities (USA) LLC, and Credit*
*Suisse (USA), Inc.*

/s/ Moses Silverman
Moses Silverman
Andrew C. Finch
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Fax: (212) 757-3900
msilverman@paulweiss.com
afinch@paulweiss.com

*Attorneys for Defendants-Appellees
Deutsche Bank AG and Deutsche
Bank Securities Inc.*

/s/ Donald R. Littlefield
Donald R. Littlefield
Jack D. Ballard
BALLARD & LITTLEFIELD, LLP
3700 Buffalo Speedway, Suite 250
Houston, Texas 77098
Telephone: (713) 403-6400
Fax: (713) 403-6410
dlittlefield@ballardlittlefield.com
jballard@ballardlittlefield.com
mrodriguez@ballardlittlefield.com

*Attorneys for Defendants-Appellees
HSBC Holdings plc and HSBC Bank
plc* in *City of Houston v. Bank of
America Corp., et al.*, S.D.N.Y. Case
No. 1:13-cv-05616

/s/ Ed DeYoung
Ed DeYoung
Gregory T. Casamento
LOCKE LORD LLP
3 World Financial Center
New York, New York 10281
Telephone: (212) 812-8325
Fax: (212) 812-8385
edeyoung@lockelord.com
gcasamento@lockelord.com

Roger B. Cowie
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8614
Fax: (214) 740-8800
rcowie@lockelord.com

J. Matthew Goodin
Julie C. Webb
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 443-700
jmgoodin@lockelord.com
jwebb@lockelord.com

*Attorneys for Defendants-Appellees
HSBC Holdings plc, HSBC Bank plc,
HSBC Securities (USA) Inc., HSBC Bank
USA, N.A., HSBC USA, Inc., and HSBC
Finance Corporation* (except with
regard to *City of Houston v. Bank of
America Corp., et al.*, S.D.N.Y. Case
No. 1:13-cv-05616)

/s/ Thomas C. Rice
Thomas C. Rice
Paul C. Gluckow
Shannon P. Torres
SIMPSON THACHER &
BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Fax: (212) 455-2502
trice@stblaw.com
pgluckow@stblaw.com
storres@stblaw.com
omason@stblaw.com

*Attorneys for Defendants-Appellees
JPMorgan Chase & Co. JPMorgan
Chase Bank, N.A., J.P. Morgan
Securities LLC (f/k/a J.P. Morgan
Securities Inc.), and J.P. Morgan
Dublin plc (f/k/a JPMorgan Bank
Dublin plc) (f/k/a Bear Stearns Bank
plc)*

/s/ Andrew W. Stern
Alan M. Unger
Andrew W. Stern
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Fax: (212) 839-5599
aunger@sidley.com
astern@sidley.com

*Attorneys for Defendant-Appellee The
Norinchukin Bank*

/s/ Marc J. Gottridge
Marc J. Gottridge
Lisa J. Fried
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
marc.gottridge@hoganlovells.com
lisa.fried@hoganlovells.com

Neal Kumar Katyal
HOGAN LOVELLS US LLP
555 13th Street NW
Washington, D.C. 20004
Telephone: (202) 637-5600
neal.katyal@hoganlovells.com

*Attorneys for Defendants-Appellees
Lloyds Banking Group plc, Lloyds Bank
plc (f/k/a Lloyds TSB Bank plc), and
HBOS plc*

/s/ Christopher M. Paparella
Christopher M. Paparella
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Fax: (212) 422-4726
Chris.paparella@hugheshubbard.com

*Attorneys for Defendants-Appellees*
*Portigon AG (f/k/a WestLB AG) and*
*Westdeutsche ImmobilienBank AG*


/s/ Christian T. Kemnitz
Christian T. Kemnitz
KATTEN MUCHIN ROSENMAN
LLP
525 West Monroe Street
Chicago, Illinois 60661
(312) 902-5200
christian.kemnitz@kattenlaw.com

*Attorneys for Defendants-Appellees*
*Royal Bank of Canada*

/s/ Fraser L. Hunter, Jr.
Fraser L. Hunter, Jr.
David S. Lesser
Alan E. Schoenfeld
Jamie S. Dycus
WILMER CUTLER PICKERING
HALE AND DORR LLP
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Fax: (212) 230-8888
fraser.hunter@wilmerhale.com
david.lesser@wilmerhale.com
alan.schoenfeld@wilmerhale.com
jamie.dycus@wilmerhale.com

*Attorneys for Defendants-Appellees The*
*Royal Bank of Scotland Group plc and*
*The Royal Bank of Scotland plc except*
*as to Prudential Investment Portfolios 2*

/s/ Robert G. Houck

Robert G. Houck
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 878-8000
Fax: (212) 878-8375
robert.houck@cliffordchance.com

*Attorneys for Defendants-Appellees
The Royal Bank of Scotland Group
plc, The Royal Bank of Scotland plc,
and RBS Securities Inc. (f/k/a
Greenwich Capital Markets Inc.)
except as to Yale University and the
Federal Home Loan Mortgage
Corporation*

/s/ Steven Wolowitz

Steven Wolowitz
Henninger S. Bullock
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 506-2500
swolowitz@mayerbrown.com
hbullock@mayerbrown.com

*Attorneys for Defendant-Appellee
Société Générale*

63

/s/ Peter Sullivan
Peter Sullivan
Lawrence J. Zweifach
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
psullivan@gibsondunn.com
lzweifach@gibsondunn.com

Joel Sanders
555 Mission Street, Suite 3000
San Francisco, CA 94105
Tel: (415) 393-8200
jsanders@gibsondunn.com

Thomas G. Hungar
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Telephone: (202) 955-8500
thungar@gibsondunn.com

GIBSON, DUNN & CRUTCHER LLP

*Attorneys for Defendants-Appellees
UBS AG, UBS Securities LLC, and
UBS Limited*

/s/ Richard D. Owens
Richard D. Owens
Jeff G. Hammel
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
richard.owens@lw.com
jeff.hammel@lw.com

*Attorneys for Defendants-Appellees
British Bankers' Association, BBA
Enterprises Ltd., and BBA LIBOR Ltd.*

64

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certify that:

1.     This brief complies with the type-volume limitation of Federal Rule of
Appellate Procedure 32(a)(7)(B) because exclusive of the exempted portions it
contains 13,933 words as counted by the word-processing program used to prepare
the brief; and

2.     The brief complies with the typeface requirements of Federal Rule of
Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of
Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office
Word 2010 in a proportionately spaced typeface: Times New Roman, font size 14.

Dated: July 17, 2015                              /s/ Robert F. Wise
                                                  Robert F. Wise