# 13-3565-cv(L)

**13-3636-cv(CON), 15-432-cv(CON), 15-441-cv(CON), 15-454-cv(CON), 15-477-cv(CON), 15-494-cv(CON), 15-498-cv(CON), 15-524-cv(CON), 15-537-cv(CON), 15-547-cv(CON), 15-551-cv(CON), 15-611-cv(CON), 15-620-cv(CON), 15-627-cv(CON), 15-733-cv(CON), 15-744-cv(CON), 15-778-cv(CON), 15-825-cv(CON), 15-830-cv(CON)**

IN THE

## United States Court of Appeals

**FOR THE SECOND CIRCUIT**

———————

ELLEN GELBOIM, on behalf of herself and all others similarly situated

*(For Continuation of Caption See Inside Cover)*

————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 11 md 2262 (NRB)

## BRIEF FOR THE SECURITIES AND FINANCIAL MARKETS ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES, SUPPORTING AFFIRMANCE

JON R. ROELLKE
MICHAEL L. WHITLOCK
GREGORY F. WELLS
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5754

*Attorneys for Amicus Curiae*

IRA D. HAMMERMAN
KEVIN M. CARROLL
SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION
1101 New York Avenue, N.W.
Washington, D.C. 20005
(202) 962-7300

*Of Counsel*

LINDA ZACHER, SCHWAB SHORT-TERM BOND MARKET FUND, SCHWAB TOTAL BOND MARKET FUND, SCHWAB U.S. DOLLAR LIQUID ASSETS FUND, SCHWAB MONEY MARKET FUND, SCHWAB VALUE ADVANTAGE MONEY FUND, SCHWAB RETIREMENT ADVANTAGE MONEY FUND, SCHWAB INVESTOR MONEY FUND, SCHWAB CASH RESERVES, SCHWAB ADVISOR CASH RESERVES, CHARLES SCHWAB BANK, N.A., CHARLES SCHWAB & CO., INC., CHARLES SCHWAB CORPORATION, SCHWAB YIELDPLUS FUND, SCHWAB YIELDPLUS FUND LIQUIDATION TRUST, 33-35 GREEN POND ROAD ASSOCIATES, LLC, on behalf of itself and all others similarly situated, FTC FUTURES FUND PCC LTD, on behalf of themselves and all others similarly situated, FTC FUTURES FUND SICAV, on behalf of themselves and all others similarly situated, METZLER INVESTMENT GMBH, on behalf of itself and all others similarly situated, 303030 TRADING LLC, ATLANTIC TRADING USA, LLC, GARY FRANCIS, NATHANIEL HAYNES, COURTYARD AT AMWELL II, LLC, GREENWICH COMMONS II, LLC, JILL COURT ASSOCIATES II, LLC, MAIDENCREEK VENTURES II LP, RARITAN COMMONS, LLC, LAWRENCE W. GARDNER, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, MAYOR AND CITY COUNCIL OF BALTIMORE, CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, on behalf of itself and all others similarly situated, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, GUARANTY BANK & TRUST COMPANY, Individually and on behalf of all others similarly situated, NATIONAL CREDIT UNION ADMINISTRATION BOARD, AS LIQUIDATING AGENT OF U.S. CENTRAL FEDERAL CREDIT UNION, WESTERN CORPORATE FEDERAL CREDIT UNION, MEMBERS UNITED CORPORATE FEDERAL CREDIT UNION, SOUTHWEST CORPORATE FEDERAL CREDIT UNION, AND CONSTITUTION CORPORATE FEDERAL CREDIT UNION, CITY OF PHILADELPHIA, PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY, DARBY FINANCIAL PRODUCTS, CAPITAL VENTURES INTERNATIONAL, SALIX CAPITAL US INC., PRUDENTIAL INVESTMENT PORTFOLIOS 2, FKA DRYDEN CORE INVESTMENT FUND, on behalf of PRUDENTIAL CORE SHORT-TERM BOND FUND, PRUDENTIAL CORE TAXABLE MONEY MARKET FUND, CITY OF RIVERSIDE, RIVERSIDE PUBLIC FINANCING AUTHORITY, EAST BAY MUNICIPAL UTILITY DISTRICT, COUNTY OF SAN MATEO, SAN MATEO COUNTY JOINT POWERS FINANCING AUTHORITY, CITY OF RICHMOND, RICHMOND JOINT POWERS FINANCING AUTHORITY, SUCCESSOR AGENCY TO THE RICHMOND COMMUNITY REDEVELOPMENT AGENCY, COUNTY OF SAN DIEGO, COUNTY OF SONOMA, DAVID E. SUNDSTROM, IN HIS OFFICIAL CAPACITY AS TREASURER OF THE COUNTY OF SONOMA for and on behalf of THE SONOMA COUNTY TREASURY POOL INVESTMENT, REGENTS OF THE UNIVERSITY OF CALIFORNIA, SAN DIEGO ASSOCIATION OF GOVERNMENTS, COUNTY OF SACRAMENTO, THE COUNTY OF MENDOCINO, CITY OF HOUSTON, BAY AREA TOLL AUTHORITY, JOSEPH AMABILE, LOUIE AMABILE, individually & on behalf of LUE TRADING, INC., NORMAN BYSTER, MICHAEL CAHILL, RICHARD DEOGRACIAS, individually on behalf of RCD TRADING,

INC., MARC FEDERIGHI, individually on behalf of MCO TRADING, SCOTT FEDERIGHI, individually on behalf of KATSCO, INC., ROBERT FURLONG, individually on behalf of XCOP, INC., DAVID COUGH, BRIAN HAGGERTY, individually on behalf of BJH FUTURES, INC., DAVID KLUSENDORF, RONALD KRUG, CHRISTOPHER LANG, JOHN MONCKTON, PHILIP OLSON, BRETT PANKAU, DAVID VECCHIONE, individually on behalf of VECCHIONE & ASSOCIATES, RANDALL WILLIAMS, JOHN HENDERSON, 303 PROPRIETARY TRADING LLC, MARGERY TELLER, NICHOLAS PESA, EDUARDO RESTANI, VITO SPILLONE, PRUDENTIAL INVESTMENT PORTFOLIOS 2, FKA DRYDEN CORE INVESTMENT FUND, on behalf of PRUDENTIAL CORE SHORT-TERM BOND FUND, PRUDENTIAL CORE TAXABLE MONEY MARKET FUND, SALIX CAPITAL US INC., DARBY FINANCIAL PRODUCTS, CAPITAL VENTURES INTERNATIONAL, CITY OF PHILADELPHIA, PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY, FTC FUTURES FUND PCC LTD. on behalf of themselves and all others similarly situated, FTC FUTURES FUND SICAV, on behalf of themselves and all others similarly situated, METZLER INVESTMENT GMBH, on behalf of itself and all others similarly situated, 303030 TRADING LLC, ATLANTIC TRADING USA, LLC, GARY FRANCIS, NATHANIEL HAYNES, CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, on behalf of itself and all others similarly situated, MAYOR AND CITY COUNCIL OF BALTIMORE, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, REGENTS OF THE UNIVERSITY OF CALIFORNIA, EAST BAY MUNICIPAL UTILITY DISTRICT, SAN DIEGO ASSOCIATION OF GOVERNMENTS, CITY OF RICHMOND, RICHMOND JOINT POWERS FINANCING AUTHORITY, SUCCESSOR AGENCY TO THE RICHMOND COMMUNITY REDEVELOPMENT AGENCY, CITY OF RIVERSIDE, RIVERSIDE PUBLIC FINANCING AUTHORITY, COUNTY OF SACRAMENTO, COUNTY OF SAN DIEGO, COUNTY OF SAN MATEO, COUNTY OF SONOMA, DAVID E. SUNDSTROM, IN HIS OFFICIAL CAPACITY AS TREASURER OF THE COUNTY OF SONOMA FOR AND ON BEHALF OF SONOMA COUNTY TREASURY POOL INVESTMENT, CITY OF HOUSTON,

*Plaintiffs-Appellants,*

FTC CAPITAL GMBH, on behalf of themselves and all others similarly situated, FTC FUTURES FUND PCC LTD, on behalf of themselves and all others similarly situated, FTC FUTURES FUND SICAV, on behalf of themselves and all others similarly situated, CARPENTERS PENSION FUND OF WEST VIRGINIA, CITY OF DANIA BEACH POLICE & FIREFIGHTERS' RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated, RAVAN INVESTMENTS, LLC, MAYOR AND CITY COUNCIL OF BALTIMORE, RICHARD HERSHEY, JEFFREY LAYDON, on behalf of himself and all others similarly situated, METZLER INVESTMENT GMBH, on behalf of itself and all others similarly situated, ROBERTO E. CALLE GRACEY, CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, on behalf of itself and all others similarly situated, AVP PROPERTIES, LLC, 303030 TRADING LLC, ATLANTIC TRADING USA, LLC, COMMUNITY BANK & TRUST, BERKSHIRE BANK, individually

and on behalf of all others similarly situated, 33-35 GREEN POND ROAD ASSOCIATES, LLC, on behalf of itself and all others similarly situated, ELIZABETH LIEBERMAN, on behalf of themselves and all others similarly situated, TODD AUGENBAUM, on behalf of themselves and all others similarly situated, GARY FRANCIS, NATHANIEL HAYNES, COURTYARD AT AMWELL II, LLC, GREENWICH COMMONS II, LLC, JILL COURT ASSOCIATES II, LLC, MAIDENCREEK VENTURES II LP, RARITAN COMMONS, LLC, LAWRENCE W. GARDNER, on behalf of themselves and all others similarly situated, ANNIE BELL ADAMS, on behalf of herself and all others similarly situated, DENNIS PAUL FOBES, on behalf of himself and all others similarly situated, LEIGH E. FOBES, on behalf of herself and all others similarly situated, MARGARET LAMBERT, on behalf of herself and all others similarly situated, BETTY L. GUNTER, on behalf of herself and all others similarly situated, GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO, CARL A. PAYNE, individually, and on behalf of other members of the general public similarly situated, KENNETH W. COKER, individually, and on behalf of other members of the general public similarly situated, CITY OF RIVERSIDE, RIVERSIDE PUBLIC FINANCING AUTHORITY, EAST BAY MUNICIPAL UTILITY DISTRICT, COUNTY OF SAN MATEO, SAN MATEO COUNTY JOINT POWERS FINANCING AUTHORITY, CITY OF RICHMOND, RICHMOND JOINT POWERS FINANCING AUTHORITY, SUCCESSOR AGENCY TO THE RICHMOND COMMUNITY REDEVELOPMENT AGENCY, COUNTY OF SAN DIEGO, GUARANTY BANK & TRUST COMPANY, individually and on behalf of all others similarly situated, HEATHER M. EARLE, on behalf of themselves and all others similarly situated, HENRYK MALINOWSKI, on behalf of themselves and all others similarly situated, LINDA CARR, on behalf of themselves and all others similarly situated, ERIC FRIEDMAN, on behalf of themselves and all others similarly situated, COUNTY OF RIVERSIDE, JERRY WEGLARZ, NATHAN WEGLARZ, on behalf of plaintiffs and a class, DIRECTORS FINANCIAL GROUP, individually and on behalf of all others similarly situated, SEIU PENSION PLANS MASTER TRUST, individually and on behalf of all others similarly situated, HIGHLANDER REALTY, LLC, JEFFREY D. BUCKLEY, FEDERAL HOME LOAN MORTGAGE CORPORATION, COUNTY OF SONOMA, DAVID E. SUNDSTROM, IN HIS OFFICIAL CAPACITY AS TREASURER OF THE COUNTY OF SONOMA FOR AND ON BEHALF OF THE SONOMA COUNTY TREASURY POOL INVESTMENT, REGENTS OF THE UNIVERSITY OF CALIFORNIA, SAN DIEGO ASSOCIATION OF GOVERNMENTS, CEMA JOINT VENTURE, COUNTY OF SACRAMENTO, CITY OF PHILADELPHIA, PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY, PRINCIPAL FUNDS, INC., PFI BOND & MORTGAGE SECURITIES FUND, PFI BOND MARKET INDEX FUND, PFI CORE PLUS BOND I FUND, PFI DIVERSIFIED REAL ASSET FUND, PFI EQUITY INCOME FUND, PFI GLOBAL DIVERSIFIED INCOME FUND, PFI GOVERNMENT & HIGH QUALITY BOND FUND, PFI HIGH YIELD FUND, PFI HIGH YIELD FUND I, PFI INCOME FUND, PFI INFLATION PROTECTION FUND, PFI SHORT-TERM INCOME FUND, PFI MONEY MARKET FUND, PFI PREFERRED SECURITIES FUND, PRINCIPAL VARIABLE CONTRACTS FUNDS, INC., PVC ASSET ALLOCATION ACCOUNT, PVC MONEY MARKET ACCOUNT, PVC BALANCED ACCOUNT, PVC BOND & MORTGAGE SECURITIES ACCOUNT, PVC EQUITY INCOME ACCOUNT, PVC GOVERNMENT & HIGH QUALITY BOND ACCOUNT, PVC INCOME ACCOUNT, PVC SHORT-TERM INCOME ACCOUNT, PRINCIPAL FINANCIAL GROUP, INC., PRINCIPAL

FINANCIAL SERVICES, INC., PRINCIPAL LIFE INSURANCE COMPANY, PRINCIPAL CAPITAL INTEREST ONLY I, LLC, PRINCIPAL COMMERCIAL FUNDING, LLC, PRINCIPAL COMMERCIAL FUNDING II, LLC, PRINCIPAL REAL ESTATE INVESTORS, LLC, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, SALIX CAPITAL LTD.,

*Plaintiffs,*

–against–

BANK OF AMERICA CORPORATION, BARCLAYS BANK PLC., CITIBANK NA, CREDIT SUISSE GROUP AG, DEUTSCHE BANK AG, HSBC HOLDINGS PLC., J.P. MORGAN CHASE & CO., NORINCHUKIN BANK, UBS AG, WESTLB AG, RABOBANK GROUP, DOES 1-10, HBOS PLC, BANK OF TOKYO-MITSUBISHI UFJ, LTD, ROYAL BANK OF CANADA, SOCIETE GENERALE, DEUTSCHE BANK FINANCIAL LLC, DEUTSCHE BANK SECURITIES INC., BANK OF AMERICA, N.A., NATIONAL ASSOCIATION, JPMORGAN CHASE & CO., HSBC BANK PLC, WESTDEUTSCHE IMMOBILIENBANK AG, CITIGROUP INC., COOPERATIEVE CENTRALE RAIFFEISENBOERENLEENBANK B.A., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, JPMORGAN CHASE BANK, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLS, HSBC HOLDING PLC, LLOYDS BANKING GROUP PLS, JPMORGAN CHASE BANK N.A., CITIGROUP, INC., CITIBANK N.A., BANK OF TOKYO-MITSUBISHI UFJ, LTD., COOPERATIVE CENTRALE-RAIFFEISENBOERNLEENBANK B.A., JPMORGAN CHASE BANK N.A., ROYAL BANK OF SCOTLAND, PLC, STEPHANIE NAGEL, BRITISH BANKERS' ASSOCIATION, BBA ENTERPRISES, LTD, BBA LIBOR, LTD, PORTIGON AG, JOHN DOES #1-#5, LLOYDS TSB BANK PLC, NATIONAL COLLEGIATE TRUST, CHASE BANK USA, N.A., CREDIT SUISSE GROUP, AG, CITIBANK, N.A., UBS SECURITIES LLC, J.P. MORGAN CLEARING CORP., BANK OF AMERICA SECURITIES LLC, BANK OF TOKYO-MITSUBISHI UFJ, JPMORGAN & CO., BANK OF AMERICA N.A., CENTRALE RAIFFEISEN-BERENLEENBANK B.A., UBS AG, ROYAL BANK OF SCOTLAND GROUP PLC, SOCIETE GENERAL, ROYAL BANK OF CANADA, BANK OF NOVA SCOTIA, BANK OF TOKYO MITSUBISHI UFJ LTD., CHASE BANK USA, NA, ROYAL BANK OF SCOTLAND, JPMORGAN CHASE BANK NATIONAL ASSOCIATION, ROYAL BANK OF SCOTLAND GROUP PLC.,

*Defendants-Appellees,*

LLOYDS BANKING GROUP PLC, CREDIT AGRICOLE, S.A., ROYAL BANK OF SCOTLAND GROUP PLC, CREDIT SUISSE GROUP, NA, BARCLAYS CAPITAL INC., BARCLAYS U.S. FUNDING LLC, CREDIT SUISSE SECURITIES (USA) LLC, BARCLAYS PLC, CITIZENS BANK OF MASSACHUSETTS, AGENT OF RBS CITIZENS BANK, NA, RBS CITIZENS, N.A., FKA CITIZENS BANK OF MASSACHUSETTS, RBS CITIZENS, N.A., INCORRECTLY SUED AS THE CHARTER ONE BANK NA, BNP PARIBAS S.A.,

SUMITOMO MITSUI BANKING CORP., CITIGROUP GLOBAL MARKETS INC., HSBC SECURITIES (USA) INC.,

*Defendants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 29(c) and 26.1(a), counsel for amicus curiae states as follows:

The Securities Industry and Financial Markets Association ("SIFMA") is a non-profit organization and has no parent corporation. No publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF AMICUS CURIAE ..................................................................1

SUMMARY OF ARGUMENT ..................................................................3

ARGUMENT ..................................................................8

I.     LIBOR IS THE PRODUCT OF A VOLUNTARY, COOPERATIVE, AND NONCOMPETITIVE PROCESS THAT ENHANCES EFFICIENCY IN UNDERLYING FINANCIAL MARKETS......................8

II.    VOLUNTARY PARTICIPATION IN A NONCOMPETITIVE BENCHMARK OR OTHER STANDARD SETTING PROCESS THAT IS INDEPENDENT OF THE COMPETITION IN THE MARKET IN WHICH SUCH STANDARDS MAY BE USED IS NOT A RESTRAINT OF TRADE AND DOES NOT GIVE RISE TO ANY ANTITRUST INJURY ................................................12

       A.    Plaintiffs Do Not Allege a Restraint of Trade. ....................................12

       B.    Plaintiffs Have Failed to Allege Antitrust Injury. ...............................14

III.   VOLUNTARY PARTICIPATION IN A NONCOMPETITIVE BENCHMARK OR OTHER STANDARD SETTING PROCESS SHOULD NOT GIVE RISE TO AN ANTITRUST CONSPIRACY CLAIM BASED SOLELY ON THE ALLEGATION THAT SOME PARTICIPANTS DID NOT COMPLY WITH THE STANDARD SETTING RULES .....................................................16

IV.   OVERRULING THE DISTRICT COURT'S OPINION WILL CREATE A CHILLING EFFECT ON EFFICIENCY-ENHANCING BENCHMARK AND OTHER STANDARD SETTING AGREEMENTS .....................................................20

CONCLUSION .......................................................25

CERTIFICATE OF COMPLIANCE ……………………………………………….26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) ...................................................................15, 16

*Asahi Glass Co. v. Pentech Pharms., Inc.*,
289 F. Supp. 2d 986 (N.D. Ill. 2003) ................................17

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)..................................................................6, 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................passim

*Broad. Music Inc. v. CBS, Inc.*,
441 U.S. 1 (1979)...................................................................12

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993).................................................................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977).................................................................14

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
790 F. Supp. 2d 106 (S.D.N.Y. 2011) ................................18

*In re Elevator Antitrust Litig.*,
2006 U.S. Dist. LEXIS 34517 at *30-31 (S.D.N.Y. May 30, 2006)............19, 20

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007) ................................17

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
2015 WL 363894 (S.D.N.Y. Jan. 28, 2015) .......................15

*In re Parcel Tanker Shipping Servs. Antitrust Litig.*,
541 F. Supp. 2d 487 (D. Conn. 2008)................................17

*In re Se. Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008)............................17

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) ...............................................................20

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
   232 F.3d 979 (9th Cir. 2000) ...............................................................15

*LaFlamme v. Societe Air France*,
   702 F. Supp. 2d 136 (E.D.N.Y. 2010) .................................................20

*Maple Flooring Mfrs. Ass'n v. United States*,
   268 U.S. 563 (1925)...............................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)...............................................................................20

*Mayor and City Council of Baltimore v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) .................................................................22

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984)...............................................................................21

*Twombly v. Bell Atl. Corp.*,
   425 F.3d 99 (2d Cir. 2005) ...................................................................18

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)...............................................................................15

*United States v. Trenton Potteries Co.*,
   273 U.S. 392 (1927)...............................................................................13

*Verizon Commc'ns Inc. v. Law Office of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)..........................................................................20, 21

*Williams v. Citigroup, Inc.*,
   2009 U.S. Dist. LEXIS 105864 at *10 (S.D.N.Y. Nov. 2, 2009) ........19

STATUTES & RULES

Fed. R. App. P. 29(c)(5)............................................................................1

iv

OTHER AUTHORITIES

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 1433a (3d ed. 2010) ...............................................................................................19

Business Review Letter from U.S. Dept. of Justice, Antitrust Division, to American Peanut Shellers Association (Feb. 2, 2006) ......................................11

David Enrich, *Banks Warned Not to Leave Libor*, Wall St. J., Feb. 13, 2013 ........24

Jacob Gyntelberg & Philip Woolridge, *Interbank Rate Fixings During the Recent Turmoil, BIS Q. Rev. (Mar. 2008)* ............................................................11

*Manual for Complex Litigation* (Fourth) § 30 (2004) ...........................................22

*Market Agreed Coupon Contract for Interest Rate Swaps*, SIFMA Asset Management Group (Apr. 23, 2013), https://www.sifma.org/services/standard-forms-and documentation/swaps/swaps_mac-terms..............................................................2

Joseph L. Motes, III, Comment, *A Primer on the Trade and Regulation of Derivative Instruments*, 49 SMU L. Rev., 579, 593-598 (1996).........................9

Roberta Romano, *A Thumbnail Sketch of Derivative Securities and their Regulation*, 55 Md. L. Rev. 1, 46-55 (1996) .......................................................9

SIFMA, http://www.sifma.org .................................................................................1

*The TBA Market*, SIFMA (2015), http://www.sifma.org/workarea/linkit.aspx?linkidentifier=id&itemid=237 75&libID-7941.....................................................................................................2

Tommy Stubbington, *More Banks Leave Euribor Panel*, Wall St. J., Jan. 4, 2013.......................................................................................................................24

William H. Wagener, Note, *Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation*, 78 N.Y.U. L. Rev. 1887, 1898-99 (2003).................................................................................................22

Milson C. Yu, *Libor Integrity and Holistic Domestic Enforcement*, 98 Cornell L. Rev. 1271, 1277 (2013)...................................................................11

# INTEREST OF AMICUS CURIAE

The Securities Industry and Financial Markets Association ("SIFMA") is the voice of the United States securities industry, representing the broker-dealers, banks and asset managers whose more than 885,000 employees provide access to the capital markets, raising over $2.4 trillion for businesses and municipalities in the United States, serving retail clients with over $16 trillion in assets and managing more than $62 trillion in assets for individual and institutional clients including mutual funds and retirement plans.  SIFMA, with offices in New York and Washington, D.C., is the United States regional member of the Global Financial Markets Association.  *See* SIFMA, http://www.sifma.org.[1]

SIFMA considers cooperative data gathering, benchmarking, and standard setting activities a core securities industry and financial markets interest and is routinely involved in developing and administering several such programs to enhance the efficiency, liquidity, transparency, and stability of various financial

---

[1]  Jon R. Roellke, a partner in the law firm of Morgan, Lewis & Bockius, LLP and among the authors of this amicus brief, has served as SIFMA's antitrust counsel for over ten years, advising on numerous voluntary and cooperative market initiatives in which SIFMA has been engaged.  Several SIFMA members are Defendants-Appellees ("Defendants") in this case or in other litigation involving financial benchmarks.  Other SIFMA members are Plaintiffs-Appellants ("Plaintiffs") in this case or in the related cases that are consolidated before the District Court, or are members of the putative class that Plaintiffs seek to represent. No counsel for any party authored this brief in whole or in part or made a monetary contribution for its preparation or submission.  Pursuant to Fed. R. App. P. 29(c)(5), this brief is filed on consent of all parties.

markets.[2]  Like the LIBOR benchmark setting process involved in this case, many

of these programs were "never intended to be competitive" (SPA 31), and the

benchmarks, market guidelines, and contract structures they produce are not "set

through competition."  SPA 39.  Rather, such programs are developed and

administered wholly independent of the competition that occurs in the financial

markets they serve.  These programs do not restrain competition, but instead

benefit all financial market participants and the United States economy as a whole.

SIFMA does not condone any conduct inconsistent with its benchmarking

and standard setting policies and practices but believes that allegations of such

conduct should be addressed within the construct of applicable legal principles.

SIFMA's interest in this case is to ensure that the antitrust laws – and the

concomitant burdens of extensive discovery, treble damages remedies, and joint

---

[2]  SIFMA's cooperative programs include its *Uniform Practices for the Clearance and Settlement of Mortgage-Backed Securities and Other Related Securities* which establishes, among other things, market-practice "Good Delivery Guidelines" for the To Be Announced (TBA) market to facilitate the forward trading of mortgage backed securities issued by Fannie Mae, Freddie Mac, and Ginnie Mae.  Another example is the Market Agreed Coupon interest rate swap contract structure that SIFMA jointly developed with the International Swaps and Derivatives Association to offer investors and market participants with pre-defined, market-agreed terms to promote liquidity and enhance transparency in interest rate swaps. *See The TBA Market*, SIFMA (2015), http://www.sifma.org/workarea/linkit.aspx?linkidentifier=id&itemid=23775&libID -7941; *Market Agreed Coupon Contract for Interest Rate Swaps*, SIFMA Asset Management Group (Apr. 23, 2013), https://www.sifma.org/services/standard-forms-and-documentation/swaps/swaps_mac-terms.

and several liability they entail – are not expanded or applied in such a way that could potentially undermine its benchmarking and other standard setting programs by discouraging industry participation and chilling the market innovations and efficiency enhancements those programs achieve. To that end, SIFMA believes that the District Court's ruling should be affirmed as fully consistent with existing law that limits antitrust causes of action arising from benchmarking and other standard setting programs to alleged conduct that has a demonstrable competition-reducing effect.

## SUMMARY OF ARGUMENT

SIFMA's mission is to support and enhance the efficiency and reliability of securities and financial markets. It pursues that mission by, among other things, developing and administering various standard setting and benchmarking programs that promote market innovation, liquidity, and transparency. Those programs (like LIBOR) are effective only if members, voluntarily and without remuneration, actively participate in them. A ruling that expands the scope of potential antitrust liability associated with participating in what are otherwise noncompetitive programs essential to promoting and achieving market efficiencies would no doubt chill the willingness of industry participants to contribute to them. This consideration is important to trade groups in all industries and one that SIFMA believes has not been adequately addressed in any other brief filed in this appeal.

- 3 -

Plaintiffs acknowledge the procompetitive benefits derived from such cooperative pursuits[3] and do not challenge the British Bankers Association's ("BBA") similar efforts to establish and administer the LIBOR-setting process. Instead, their antitrust complaints are based exclusively on allegations that the participants in that process did not adhere to the BBA's LIBOR-setting guidelines.[4] Regardless of whether these alleged guideline departures give rise to some other causes of action, they do not, and should not, give rise to antitrust claims for several reasons.

First, consistent with the District Court's ruling, agreements reached in the context of cooperative and noncompetitive benchmarking or other standard setting processes that are independent of the competition that occurs in the markets those standards serve do not give rise to antitrust liability in the absence of an alleged injury arising from anticompetitive conduct in the underlying market. Here, Plaintiffs do not allege any reduction in competition in a downstream market in which participants may have used the LIBOR benchmark.

---

[3] *See* Appellant Br. 7. ("[H]onest benchmark rates facilitate price discovery, allowing lenders and borrowers to avoid the cost of researching borrowing costs themselves. Moreover, moving daily indexes like LIBOR allow parties to enter into floating-rate transactions without having to conduct seriatim negotiations over whether rates have changed.").

[4] As Plaintiffs acknowledge, the "essence" of their complaints "is that the banks secretly conspired to violate these rules and manipulate LIBOR ." Appellant Br. 9.

Because the challenged conduct occurred in the *setting* of LIBOR – a collaborative rather than competitive "arena in which defendants never did and never were intended to compete" – any alleged agreement as to the setting could not, and did not, displace any competition that would have otherwise occurred. SPA 33. The setting of LIBOR simply has no impact on the competitive choices available to investors. Like any other industry-accepted standardized contract term that facilitates, rather than restrains, robust competition, LIBOR is not a variable over which competitors vie for investor contracts. Instead, it serves only to settle contracts that were entered into after an intensely competitive process in unrestrained markets, often months or even years prior to the setting. Changing the standardized value of LIBOR does not reduce that competition, and Plaintiffs do not allege otherwise. Thus, any injury experienced by Plaintiffs who used LIBOR in their transactions in downstream markets did not and could not arise from any "*anticompetitive* aspect of defendants' conduct." SPA 31 (emphasis added).

For that reason, the District Court correctly ruled that Plaintiffs did not sufficiently plead an antitrust injury. The conduct Plaintiffs challenge occurred as part of a noncompetitive and cooperative process that set a financial benchmark, as opposed to conduct restraining competition in a market in which products are actually bought or sold based on competitive variables that are entirely independent of the process through which LIBOR is set. As such, there was no

"competition-reducing" aspect of Defendants' alleged behavior upon which to base any asserted antitrust injury.[5]

Second, although not addressed by the District Court, its ruling should be affirmed for the separate and independent reason that there are no allegations sufficient to establish that Defendants agreed to falsely suppress their LIBOR submissions in contravention of the BBA's guidelines. Absent such allegations, voluntary participants in a noncompetitive program that promotes well-functioning and efficient financial markets should not be exposed to the debilitating burdens of antitrust litigation based solely on allegations that some of them may have failed to follow the program's guidelines. To hold otherwise would impose inordinate and uncertain antitrust risk for anyone considering voluntary participation in efficiency-enhancing cooperative programs, thereby chilling the very kind of procompetitive conduct the antitrust laws seek to promote.

To be clear, the issue is not whether alleged conduct inconsistent with trade association benchmark and standard setting policies and practices should be categorically immune from legal challenge. Rather, it is whether an alleged departure from a trade group's rules that govern a cooperative standard setting

---

[5] SIFMA is agnostic as to whether this result is premised on the conclusion that there was no restraint of trade or no antitrust injury. In this case, the two concepts go hand-in-hand. *See infra* § II. Where there is no competitive restraint, there can be no antitrust injury. *See Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 339 (1990).

process gives rise to potential antitrust liability without (a) any demonstrable, or even plausible, competition-reducing effects; or (b) any allegations sufficient to show that program participants agreed to an unlawful market restraint. Under existing law, which this Court should confirm and apply, the answer is no.

Third, as noted, SIFMA believes that a contrary ruling would have a substantial chilling effect on voluntary participation in legitimate, efficiency-enhancing benchmark and other standard setting programs, as well as the willingness of trade associations like SIFMA to organize and manage them. Voluntary industry participation is essential to the success of such programs and the market innovations and efficiencies they achieve. This economic reality is ignored by the Plaintiffs and the academic and other *amicus curiae* who have submitted briefs in support of them. SIFMA respectfully submits that the outcome of this appeal should not discourage such voluntary participation by extending the existing scope of potential antitrust liability to condemn cooperative benchmark and other standard setting activity in the absence of facts or allegations sufficient to demonstrate any competitive harm or unlawful collusion. We believe that the District Court's decision dismissing Plaintiffs' antitrust claims should be affirmed accordingly.

**ARGUMENT**

## I. LIBOR IS THE PRODUCT OF A VOLUNTARY, COOPERATIVE, AND NONCOMPETITIVE PROCESS THAT ENHANCES EFFICIENCY IN UNDERLYING FINANCIAL MARKETS.

LIBOR is determined through a voluntary, cooperative, and noncompetitive standard setting process. Noncompetitive standard setting agreements that are independent of the competition that occurs in the markets they serve and which have no competition-reducing effects should not give rise to antitrust liability. SPA 30-31.

In order to understand why the setting of LIBOR is a cooperative process with no competition-reducing effects, it is useful to consider how LIBOR fits into the markets for interest rate swaps and other LIBOR-related financial instruments. We explain this process through a simple swap known as a "plain vanilla" interest rate swap.

In a "plain vanilla" swap, Party A agrees to pay Party B a fixed rate of interest based on a fixed principal amount (called the notional value) on specific dates for a specified period of time. In exchange, Party B agrees to make payments based on a floating interest rate to Party A on the same notional value on the same specified dates for the same specified time period. The specified payment dates are called settlement or reset dates, and the time periods between are called settlement periods. Such payments are usually made on an annual, quarterly, or

monthly basis. *See, e.g.*, Joseph L. Motes, III, Comment, *A Primer on the Trade and Regulation of Derivative Instruments*, 49 SMU L. Rev., 579, 593-598 (1996); Roberta Romano, *A Thumbnail Sketch of Derivative Securities and their Regulation*, 55 Md. L. Rev. 1, 46-55 (1996).

At the time a party seeks to enter a swap, it faces a plethora of competitive choices as it considers potential counterparties and intermediaries from among dozens of large investment and commercial banks which act as market makers for these swaps and other products. Those banks compete fiercely to attract investors to enter into swaps with them instead of their competitors, on a variety of factors that include how well they understand the investor's interest rate hedging requirements, how well they can meet those requirements (i.e., how much liquidity they can offer an investor and at what interest rates), the amount of any fees or premiums they may charge for access to their liquidity, and how well they perform on the contracts they enter. *See* Romano, *supra* at 46-55. This process is the essence of competition: firms lowering prices or improving quality to attract customers away from other businesses.

Plaintiffs do not contend that the alleged conspiracy had any competition-reducing effect on any of these variables that impact investor choices. Indeed, once a party chooses to enter into a swap, it is bound to make or receive payments according to the swap's contractual terms. At that point, a party to a swap faces no

- 9 -

more competitive choices: it cannot choose a different counterparty, a different fixed rate, or a different floating rate.

Because one of the parties to a "plain vanilla" swap has agreed to make payments based on a floating rate, settling such contracts requires a benchmark by which that floating rate will be measured. Having that benchmark is what makes competition in the markets more efficient. It allows an investor to consider the other competitive variables described above in making a choice as to which bank it will contract with. Even an inaccurately reported LIBOR rate does not affect that competition because the rate itself is not a competitive variable. At most, it is merely a tool to settle a contract the investor has already decided to enter. So even an allegedly "false" or "incorrect" benchmark at the time of settlement has no impact on competition.[6]

LIBOR, the benchmark at issue in this case, is the most common benchmark used to measure floating interest rates. And for good reason. Prior to the use of LIBOR as an interest rate benchmark, banks used other benchmarks, especially

---

[6] In their brief supporting Plaintiffs, *Amici* Financial Markets Law Professors present a background on interest rate swaps and why parties may enter into them. However, *amici* fail to note the point at which competition actually occurs in the markets for those agreements or the factors that discipline such competition, all of which make clear that the LIBOR-setting process has no competition-reducing effect (and Plaintiffs here allege no such effects). *See* Br. for *Amici Curiae* Financial Markets Law Professors in Support of Plaintiffs-Appellants. at 2-12, No. 363.

those propagated by central banks, such as the Federal Reserve "Prime" rate or Treasury notes. Jacob Gyntelberg & Philip Woolridge, *Interbank Rate Fixings During the Recent Turmoil*, BIS Q. Rev., Mar. 2008, at 59-60. During the 1970s however, economic instability caused concern about the stability and predictability of a central bank benchmark for interest rates. *Id*. at 60. Financial institutions created LIBOR to make this process more efficient by providing a uniform benchmark that market participants could use for different types of financial products. *See* Milson C. Yu, *Libor Integrity and Holistic Domestic Enforcement*, 98 Cornell L. Rev. 1271, 1277 (2013); *see also* Gyntelberg & Woolridge, *supra*, at 60. This standard setting innovation plainly enhanced liquidity and transparency to the benefit of investors and there are no allegations in this case that suggest otherwise.

What Plaintiffs and their *amicus curiae* supporters ignore is that creating such improved benchmarks requires the cooperation of firms that otherwise compete with each other, as well as a trade association or other organization that is willing and able to organize and manage the benchmarking process. This collaborative process can and does create well-recognized procompetitive effects. *See, e.g*., Business Review Letter from U.S. Dept. of Justice, Antitrust Division, to American Peanut Shellers Association (Feb. 2, 2006) ("Collaborative standard setting can produce many procompetitive benefits."). Even Plaintiffs acknowledge

this. Appellant Br. 7-8 (discussing procompetitive benefits of cooperative

benchmarks).

## II. VOLUNTARY PARTICIPATION IN A NONCOMPETITIVE BENCHMARK OR OTHER STANDARD SETTING PROCESS THAT IS INDEPENDENT OF THE COMPETITION IN THE MARKETS IN WHICH SUCH STANDARDS MAY BE USED IS NOT A RESTRAINT OF TRADE AND DOES NOT GIVE RISE TO ANY ANTITRUST INJURY.

### A. Plaintiffs Do Not Allege a Restraint of Trade.

While Plaintiffs acknowledge the procompetitive benefits of cooperative

benchmark and standard setting processes, they advocate subjecting them to a

novel antitrust standard that would threaten those same benefits. Plaintiffs contend

that Defendants have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, which

prohibits any contract, combination, or conspiracy in the restraint of trade or

commerce amongst the states. But it is fundamental that if there is no restraint of

trade, then there is no violation of the Sherman Act.

While Plaintiffs repeatedly refer to the Defendants' cooperative creation of

an interest rate benchmark as "price fixing" condemned as *per se* unlawful under

the antitrust laws, LIBOR and other similar voluntary benchmarks are not a price

and not the product of any competitive process. *See Broad. Music Inc. v. CBS,

Inc.*, 441 U.S. 1, 8 (1979) (the per se rule "is a valid and useful tool of antitrust

policy and enforcement.… But easy labels do not always supply ready answers.").

- 12 -

The District Court correctly found that there was no price fixing conspiracy because the LIBOR setting process was meant to be cooperative, not competitive. SPA 31. "The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition." *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397 (1927).

Defendants' LIBOR submissions did not compete with one another. LIBOR, which is in essence a noncompetitive and standardized contract term, is not itself a product that was bought, sold, or traded. Simply put, the mere submission of rates to the BBA is not an activity that involves buying, selling, or any competition at all. "Rather, it was a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs to the BBA each day to facilitate the BBA's calculation of an interest rate index." SPA 31.

Plaintiffs thus cannot adequately plead a restraint of trade because Defendants did not compete with each other in the setting of the benchmark. In addition, as set forth more fully below, Plaintiffs fail to show that the alleged setting of LIBOR had any competition-reducing effects in the downstream markets in which LIBOR was used. Where there is no competition, there is no antitrust violation. The District Court's decision should be affirmed accordingly.

**B. Plaintiffs Have Failed to Allege Antitrust Injury.**

Even assuming that LIBOR was inaccurately set in some way, Plaintiffs cannot show antitrust injury because that setting had no competition-reducing effect in the markets in which LIBOR was used. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the *anticompetitive* effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis added). A plaintiff can only recover damages for an antitrust violation where the loss derives from a competition-reducing aspect of the defendant's behavior. SPA 27 (citing *Atl. Richfield Co.*, 495 U.S. at 344).

Plaintiffs do not assert that the LIBOR rate setting process itself was anticompetitive. SPA 30-31. Nor do Plaintiffs allege any structural defect in LIBOR by which any of the Defendants improved their position relative to their competitors or otherwise restrained competition in the financial markets. SPA 39-40. Thus, to the extent that Plaintiffs allege any injury, it is not antitrust injury. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (antitrust laws do not "purport to afford remedies for all torts committed by or against persons engaged in interstate commerce") (internal citations omitted).

- 14 -

Plaintiffs cite several cases, which they claim involve alleged manipulation of indices set by standard setting organizations, to support their claim that they suffered antitrust injury. But these cases are all well off-point. Unlike this case, they involved alleged conspiracies *to eliminate competition between firms that would have existed absent the alleged agreements*. *See, e.g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) (defendants conspired to manipulate wholesale gasoline benchmark price through conspiracy to artificially restrict competitive market supply of gasoline); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) (defendants rigged bids in competitive bulk cheese market in an attempt to depress milk prices); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2015 WL 363894 (S.D.N.Y. Jan. 28, 2015) (defendants allegedly rigged bids in competitive currency exchange markets where alleged conspirators and Plaintiffs both participated).

Plaintiffs also argue that another case, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), stands for the proposition that when a trade association's "safeguards are circumvented in order to accomplish an anticompetitive end, antitrust law condemns the conduct as such." Appellant Br. 43-44. But, unlike this case, the *Allied Tube* defendants – manufacturers of steel electric conduit – were alleged to have *directly restrained trade* through a scheme

- 15 -

to exclude potentially competitive plastic conduit from the market where competition should have occurred. *Allied Tube*, 486 U.S. at 492.[7]

None of these cases, and in fact, no authority, support the proposition that an injury that does not result from some reduction in competition amounts to antitrust injury sufficient to support a private claim under Section 1 of the Sherman Act. The District Court's decision correctly recognized as much and should be affirmed on this independent basis.

## III. VOLUNTARY PARTICIPATION IN A NONCOMPETITIVE BENCHMARK OR OTHER STANDARD SETTING PROCESS SHOULD NOT GIVE RISE TO AN ANTITRUST CONSPIRACY CLAIM BASED SOLELY ON THE ALLEGATION THAT SOME PARTICIPANTS DID NOT COMPLY WITH THE STANDARD SETTING RULES.

Although not addressed by the District Court, Plaintiffs also fail to adequately plead their conspiracy claims. In essence, they want this Court to sustain conclusory allegations that Defendants agreed to falsely suppress their borrowing costs in violation of the BBA's rules based nearly entirely on the fact

---

[7] The Defendants' brief addresses in more detail the reasons why the trade association cases the Plaintiffs rely on are inapposite. Def. Br. 16-21. Rather than restate that analysis, suffice it to say that SIFMA concurs with it. SIFMA notes further that those cases establish what are now well-settled antitrust principles that have served as the guideposts for the proper functioning and conduct of trade association activities consistent with procompetitive and efficiency-enhancing objectives. Plaintiffs here, however, would have this Court expand this well-settled law in a way that would materially change, and potentially undermine, many such activities. *See infra*, § IV.

that all of the Defendants voluntarily participated in the BBA's LIBOR program.

That is not the law and it should not be so extended.

The Supreme Court, in *Bell Atlantic Corp. v. Twombly*, held that Federal

Rule of Civil Procedure 8(a)'s pleading standard requires plaintiffs to plead

"enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544,

570 (2007). The logic of *Twombly* is simple. *Twombly* requires pleading facts

showing the who, what, when, and where of the alleged conspiracy. *Id.* at 564

n.10; *see also In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 942 (E.D. Tenn.

2008) (under *Twombly*, complaint must detail the "who, what, when, and where").

Under this standard, the complaint must detail "specific actions by a particular

defendant at a particular time." *In re Parcel Tanker Shipping Servs. Antitrust

Litig.*, 541 F. Supp. 2d 487, 491 (D. Conn. 2008).[8]

In this case, Plaintiffs do not allege any direct evidence that any Defendant

agreed with any other Defendant to suppress and misreport their expected

---

[8] *See also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007)
(holding that general allegations "without any specification of any particular
activities by any particular defendant … do[] not supply facts adequate to show
illegality" (internal quotation marks and citation omitted)). Further, "neither
parallel conduct nor conscious parallelism, taken alone, raise the necessary
implication of conspiracy." *Twombly*, 550 U.S. at 561 n.7; *Asahi Glass Co. v.
Pentech Pharms., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003) (Posner, J. sitting
by designation) ("[S]ome threshold of plausibility must be crossed at the outset
before a patent antitrust case should be permitted to go into its inevitably costly
and protracted discovery phase").

borrowing costs in contravention of the BBA's rules. Instead, Plaintiffs assert that there should be a cognizable *inference* of such a conspiracy on two grounds. First, Plaintiffs allege that ongoing government investigations and settlement agreements related to some Defendants are adequate to sufficiently plead their sweeping antitrust conspiracy claim as to all Defendants. This does not satisfy *Twombly*. *See Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 118 n.14 (2d Cir. 2005) (holding that congressional investigation is not sufficient to plead an antitrust claim because "[a]n allegation that someone had made a similar allegation does not, without more, add anything to the complaint's allegations of fact"), *rev'd on other grounds*, 550 U.S. 544; *see also Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011) (holding that the existence of government investigations, by itself, does not satisfy plaintiffs' pleading obligations). This principle is particularly apt where, as here, none of the six panel banks' regulatory settlements included allegations of a conspiracy among *any*, let alone *all*, Defendants to suppress the LIBOR index.

Second, Plaintiffs allege that the weak economic market in 2008 gave all Defendants an incentive to break the BBA's rules and misreport their expected borrowing costs "to portray themselves as economically healthier than they actually were" and "pay lower interest rates on USD LIBOR-based financial instruments that Defendants sold to investors." OTC Compl. ¶ 5. But this, or any

- 18 -

other, alleged motive is not sufficient to sustain even the possible inference that a

market participant entered into an unlawful agreement. *Williams v. Citigroup, Inc.*,

2009 U.S. Dist. LEXIS 105864, at *10 (S.D.N.Y. Nov. 2, 2009), *aff'd in part and*

*vacated in part on other grounds*, 659 F.3d 208 (2d Cir. 2011); Phillip E. Areeda &

Herbert Hovenkamp, *Antitrust Law*, ¶ 1433a, at 259 (3d ed. 2010).  This is

particularly true where, as here, the alleged motive is fully consistent with

independent, unilateral conduct.   Any bank that, as alleged, underreported its

expected borrowing costs to signal its economic health was doing nothing more

than serving its own independent self-interest.  Under existing and well-settled law,

conduct consistent with a defendant's unilateral and independent self-interest (even

if it occurred as alleged) does not give rise to a cognizable inference of conspiracy.

As the District Court opined, any alleged misreporting of LIBOR tenors was

financially rational for the contributor panel banks to independently pursue.

Accordingly, the alleged "collusion … would not have allowed [the defendants] to

do anything that they could not have done otherwise."  SPA 37.

It thus seems clear that the only basis upon which Plaintiffs sued all of the

banks that served on the USD LIBOR panel is the mere fact that they participated

in the BBA's LIBOR-setting process.  But the mere participation in trade

association activity is not a sufficient predicate for alleging an antitrust violation.

*Twombly*, 550 U.S. 544, 567 n.12 (2007); *In re Elevator Antitrust Litig*., 2006 U.S.

- 19 -

Dist. LEXIS 34517 at *30-31 (S.D.N.Y. May 30, 2006) (mere participation in "trade, industry, or social functions together is clearly insufficient to state a claim" alleging a price fixing conspiracy), *aff'd* 502 F.3d 47 (2d Cir. 2007); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910-911 (6th Cir. 2009) (defendants' alleged participation in trade association activities does not support an inference of conspiracy because it is "more likely explained by their lawful, free-market behavior"); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) ("[P]articipation in a trade association alone does not give rise to a plausible inference of illegal agreement."). SIFMA and other trade organizations involved in standard setting processes have a substantial interest in ensuring that these well-settled antitrust conspiracy pleading requirements are not rendered meaningless by sustaining Plaintiffs' antitrust claims under the facts alleged in this case.

## IV. OVERRULING THE DISTRICT COURT'S OPINION WILL CREATE A CHILLING EFFECT ON EFFICIENCY-ENHANCING BENCHMARK AND OTHER STANDARD SETTING AGREEMENTS.

The Supreme Court has cautioned that courts should be cognizant of the chilling effect that potential antitrust liability can have on permissible, procompetitive conduct. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[M]istaken inferences in cases such as this one are *especially costly*, because they *chill the very conduct the antitrust laws are designed to protect*.")(emphases added); *Verizon Commc'ns Inc. v. Law Office of*

- 20 -

*Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (same); *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 763 (1984) ("Permitting an agreement [in violation of Section 1] to be inferred merely from the existence of complaints … could deter or penalize perfectly legitimate conduct."). Further, the Supreme Court has long established that expanding the parameters of potential antitrust liability will chill benign and procompetitive conduct. *See Twombly*, 550 U.S. at 554 (rejecting a Section 1 complaint which alleged conduct "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market").

Benchmark and other standard setting agreements and voluntary information reporting in financial markets are a critical component of stable, transparent, liquid, and efficient markets. As Plaintiffs acknowledge, such processes "serve legitimate purposes by improving market transparency and efficient pricing" and "facilitate price discovery." Appellant Br. 7; *see e.g.*, *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 584 (1925) (in finding no evidence of an agreement to restrain trade by a manufacturing group, that, "[p]ersons who … report market prices[] are not engaged in unlawful conspiracies in restraint of trade merely because the ultimate result of their efforts may be to stabilize prices or limit production through a better understanding of economic laws and a more general ability to conform to them, for the simple reason that the Sherman Law neither

- 21 -

repeals economic laws nor prohibits the gathering and dissemination of information").

For several reasons, SIFMA believes that reversal of the District Court would erroneously expand the scope of potential antitrust liability and expose trade association members who participate in these cooperative processes to the substantial burdens of antitrust litigation, which the Supreme Court has emphasized should not be lightly imposed. *Twombly*, 550 U.S. at 558 ("it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery … but quite another to forget that proceeding to antitrust discovery can be expensive.").[9]

First, we are not aware of any case in which a court has found price fixing or any other restraint of trade based on a plaintiff's allegation of a supposed agreement to produce an inaccurate benchmark developed through a

---

[9] This Circuit has also recognized the expensive costs of antitrust litigation in holding plaintiffs to the exacting pleading standards of *Twombly*. *See, e.g.*, *Mayor and City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) (in affirming the District Court's dismissal of a Sherman Act claim based on parallel conduct, stating that "we risk propelling defendants into expensive antitrust discovery on the basis of acts that could just as easily turn out to have been rational business behavior as they could a proscribed antitrust conspiracy."); *see also* William H. Wagener, Note, *Modeling the Effect of One-Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation*, 78 N.Y.U. L. Rev. 1887, 1898-99 (2003) (discussing the high costs of discovery in antitrust cases); *Manual for Complex Litigation* (Fourth) § 30 (2004) (describing the extensive scope of discovery in antitrust cases).

noncompetitive cooperative standard setting process. An expansion of antitrust liability to standard setting agreements which may produce what could be alleged to be inaccurate benchmarks would only serve to chill industry participation in the development of such standards.

Indeed, Plaintiffs and their supporting *amicus curiae* pay no attention to the numerous factors a trade group and its volunteer members must consider in reaching decisions about how to structure and administer standardized benchmarks or other contractual terms, any one of which could materially change the resulting standard or benchmark and give a litigant a reason to assert that it was somehow inaccurate. This includes deciding which institutions should be included in the benchmark setting panel, how information will be collected from those institutions, when it will be collected, how it will be compiled by the administrator, and how the benchmark will be calculated. Industry participants should not be subject to antitrust liability based on claims that a benchmark set through a noncompetitive and cooperative process was inaccurately reported because of some alleged flaw in, or departure from, the agreed-upon standard setting process.

Second, the law does not currently permit private litigants to prosecute antitrust claims without sufficiently demonstrating that their alleged injuries resulted from diminished competition. Any contrary ruling in this case would expose voluntary participants in cooperative and noncompetitive standard setting

- 23 -

programs to antitrust claims without any alleged injury from a restraint on competition in the underlying markets that those standard setting programs serve. SPA 39-40.

Third, the law does not currently permit litigants to prosecute antitrust conspiracy claims based solely on the fact that an industry member participated in a cooperative standard setting program in which some other participants allegedly broke the standard setting rules. Sustaining Plaintiffs' conspiracy claims in this case without more would expose those involved in such processes to the threat of treble damages and joint and several liability in the absence of any alleged facts sufficient to show that a particular participant was a party to an illegal agreement.[10]

In sum, we submit that departing from well-settled law to expand the scope of potential antitrust liability by sustaining Plaintiffs' allegations in this case could significantly undermine the efficiency-enhancing aspects of cooperative benchmark and other standard setting programs, such as those in which SIFMA is involved, by discouraging the essential voluntary involvement of market participants. The District Court's decision should be affirmed.

---

[10] We have already seen the beginnings of a chill on involvement in various benchmarks, based on the initiation of various LIBOR and other financial benchmark litigation alone, and we expect involvement to slow to an absolute minimum if this Court overrules the District Court below. Several banks have left various LIBOR panels, concerned about pending litigation. *See e.g.,* Tommy Stubbington, *More Banks Leave Euribor Panel*, Wall St. J., Jan. 4, 2013; David Enrich, *Banks Warned Not to Leave Libor*, Wall St. J., Feb. 13, 2013.

## CONCLUSION

For the reasons set forth above, SIFMA as *Amicus Curiae* respectfully

submits that this Court should affirm the ruling of the District Court below.

s/ Jon R. Roellke

Jon R. Roellke
Michael L. Whitlock
Gregory F. Wells
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., N.W.
Washington, DC 20004
Telephone: (202) 739-5754
Fax: (202) 739-3001
jon.roellke@morganlewis.com
michael.whitlock@morganlewis.com
gregory.wells@morganlewis.com

Attorneys for Amicus Curiae
Securities Industry and
Financial Markets Association

July 24, 2015

- 25 -

# CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certify that:

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because exclusive of the exempted portions it contains 5,775 words as counted by the word-processing program used to prepare the brief; and

2.      The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2007 in a proportionately spaced typeface:  Times New Roman, font size 14.


Dated:  July 24, 2015                              /s/ Jon R. Roellke_____
                                                                Jon R. Roellke