# 13-3565-cv(L)

**13-3636-cv(CON), 15-432-cv(CON), 15-441-cv(CON), 15-454-cv(CON), 15-477-cv(CON), 15-494-cv(CON), 15-498-cv(CON), 15-524-cv(CON), 15-537-cv(CON), 15-547-cv(CON), 15-551-cv(CON), 15-611-cv(CON), 15-620-cv(CON), 15-627-cv(CON), 15-733-cv(CON), 15-744-cv(CON), 15-778-cv(CON), 15-825-cv(CON), 15-830-cv(CON)**

IN THE

# United States Court of Appeals

*for the*

# Second Circuit

―――――――――――

ELLEN GELBOIM, on behalf of herself and all others similarly situated,
(*Caption continued on inside covers*)

―――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

―――――――――――

**BRIEF FOR *AMICI CURIAE* ANTITRUST SCHOLARS KEITH N. HYLTON, MICHAEL JACOBS, GEOFFREY A. MANNE, JUSTIN McCRARY, AND WILLIAM J. MURPHY IN SUPPORT OF DEFENDANTS-APPELLEES**

―――――――――――

DONALD I. BAKER
W. TODD MILLER
LUCY S. CLIPPINGER
BAKER & MILLER PLLC
2401 Pennsylvania Ave. N.W., Suite 300
Washington, DC 20037
(202) 663-7820

*Attorneys for Amici Curiae
Antitrust Scholars*

Market Fund, Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, Schwab Advisor Cash Reserves, Charles Schwab Bank, N.A., Charles Schwab & Co., Inc., Charles Schwab Corporation, Schwab YieldPlus Fund, Schwab YieldPlus Fund Liquidation Trust, 33-35 Green Pond Road Associates, LLC, on behalf of itself and all others similarly situated, FTC Futures Fund PCC Ltd, on behalf of themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves and all others similarly situated, Metzler Investment GmbH, on behalf of itself and all others similarly situated, 303030 Trading LLC, Atlantic Trading USA, LLC, Gary Francis, Nathaniel Haynes, Courtyard at Amwell II, LLC, Greenwich Commons II, LLC, Jill Court Associates II, LLC, Maidencreek Ventures II LP, Raritan Commons, LLC, Lawrence W. Gardner, on behalf of themselves and all others similarly situated, Mayor and City Council of Baltimore, City of New Britain Firefighters' and Police Benefit Fund, on behalf of itself and all others similarly situated, Texas Competitive Electric Holdings Company LLC, Guaranty Bank & Trust Company, Individually and on behalf of all others similarly situated, National Credit Union Administration Board, as Liquidating Agent of U.S. Central Federal Credit Union, Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, Darby Financial Products, Capital Ventures International, Salix Capital US Inc., Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable Money Market Fund, City of Riverside, Riverside Public Financing Authority, East Bay Municipal Utility District, County of San Mateo, San Mateo County Joint Powers Financing Authority, City of Richmond, Richmond Joint Powers Financing Authority, Successor Agency to the Richmond Community Redevelopment Agency, County of San Diego, County of Sonoma, David E. Sundstrom, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, Regents of the University of California, San Diego Association of Governments, County of Sacramento, The County of Mendocino, City of Houston, Bay Area Toll Authority, Joseph Amabile, Louie Amabile, individually & on behalf of Lue Trading, Inc., Norman Byster, Michael Cahill, Richard Deogracias, individually on behalf of RCD Trading, Inc., Marc Federighi, individually on behalf of MCO Trading, Scott Federighi, individually on behalf of Katsco, Inc., Robert Furlong, individually on behalf of XCOP, Inc., David Cough, Brian Haggerty, individually on behalf of BJH Futures, Inc., David Klusendorf, Ronald Krug, Christopher Lang, John Monckton, Philip Olson, Brett Pankau, David Vecchione, individually on behalf of Vecchione & Associates, Randall Williams, John Henderson, 303 Proprietary Trading LLC, Margery Teller, Nicholas Pesa, Eduardo Restani, Vito Spillone, Prudential Investment Portfolios 2, FKA Dryden Core Investment Fund, on behalf of Prudential Core Short-Term Bond Fund, Prudential Core Taxable Money Market Fund, Salix Capital US Inc., Darby Financial Products, Capital Ventures International, City of Philadelphia, Pennsylvania Intergovernmental Cooperation Authority, FTC Futures Fund PCC Ltd. on behalf of themselves and all others similarly situated, FTC Futures Fund SICAV, on behalf of themselves and all others similarly situated, Metzler Investment GmbH, on behalf of itself and all others similarly situated, 303030 Trading LLC, Atlantic Trading USA, LLC, Gary Francis, Nathaniel Haynes, City of New Britain Firefighters' and

POLICE BENEFIT FUND, on behalf of itself and all others similarly situated, MAYOR AND CITY COUNCIL OF BALTIMORE, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, REGENTS OF THE UNIVERSITY OF CALIFORNIA, EAST BAY MUNICIPAL UTILITY DISTRICT, SAN DIEGO ASSOCIATION OF GOVERNMENTS, CITY OF RICHMOND, RICHMOND JOINT POWERS FINANCING AUTHORITY, Successor Agency to the RICHMOND COMMUNITY REDEVELOPMENT AGENCY, CITY OF RIVERSIDE, RIVERSIDE PUBLIC FINANCING AUTHORITY, COUNTY OF SACRAMENTO, COUNTY OF SAN DIEGO, COUNTY OF SAN MATEO, COUNTY OF SONOMA, DAVID E. SUNDSTROM, in his official capacity as Treasurer of the county of Sonoma for and on behalf of SONOMA COUNTY TREASURY POOL INVESTMENT, CITY OF HOUSTON,

*Plaintiffs-Appellants,*

FTC CAPITAL GMBH, on behalf of themselves and all others similarly situated, FTC FUTURES FUND PCC LTD, on behalf of themselves and all others similarly situated, FTC FUTURES FUND SICAV, on behalf of themselves and all others similarly situated, CARPENTERS PENSION FUND OF WEST VIRGINIA, CITY OF DANIA BEACH POLICE & FIREFIGHTERS' RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated, RAVAN INVESTMENTS, LLC, MAYOR AND CITY COUNCIL OF BALTIMORE, RICHARD HERSHEY, JEFFREY LAYDON, on behalf of himself and all others similarly situated, METZLER INVESTMENT GMBH, on behalf of itself and all others similarly situated, ROBERTO E. CALLE GRACEY, CITY OF NEW BRITAIN FIREFIGHTERS' AND POLICE BENEFIT FUND, on behalf of itself and all others similarly situated, AVP PROPERTIES, LLC, 303030 TRADING LLC, ATLANTIC TRADING USA, LLC, COMMUNITY BANK & TRUST, BERKSHIRE BANK, Individually and on Behalf of All Others Similarly Situated, 33-35 GREEN POND ROAD ASSOCIATES, LLC, on behalf of itself and all others similarly situated, ELIZABETH LIEBERMAN, on behalf of themselves and all other similarly situated, TODD AUGENBAUM, on behalf of themselves and all others similarly situated, GARY FRANCIS, NATHANIEL HAYNES, COURTYARD AT AMWELL II, LLC, GREENWICH COMMONS II, LLC, JILL COURT ASSOCIATES II, LLC, MAIDENCREEK VENTURES II LP, RARITAN COMMONS, LLC, LAWRENCE W. GARDNER, on behalf of themselves and all others similarly situated, ANNIE BELL ADAMS, on behalf of herself and all others similarly situated, DENNIS PAUL FOBES, on behalf of himself and all others similarly situated, LEIGH E. FOBES, on behalf of herself and all others similarly situated, MARGARET LAMBERT, on behalf of herself and all others similarly situated, BETTY L. GUNTER, on behalf of herself and all others similarly situated, GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO, CARL A. PAYNE, individually, and on behalf of other members of the general public similarly situated, KENNETH W. COKER, individually, and on behalf of other members of the general public similarly situated, CITY OF RIVERSIDE, RIVERSIDE PUBLIC FINANCING AUTHORITY, EAST BAY MUNICIPAL UTILITY DISTRICT, COUNTY OF SAN MATEO, SAN MATEO COUNTY JOINT POWERS FINANCING AUTHORITY, CITY OF RICHMOND, RICHMOND JOINT POWERS FINANCING AUTHORITY, Successor Agency to the Richmond Community Redevelopment Agency, COUNTY OF SAN DIEGO, GUARANTY BANK & TRUST COMPANY, Individually and on behalf of all others similarly situated, HEATHER M. EARLE, on behalf of themselves and all others similarly situated, HENRYK MALINOWSKI, on behalf of themselves and all others similarly situated, LINDA CARR, on behalf of themselves and all others similarly situated, ERIC FRIEDMAN, on behalf of themselves and all others similarly situated, COUNTY OF RIVERSIDE, JERRY WEGLARZ, NATHAN WEGLARZ, on behalf of plaintiffs and a class, DIRECTORS FINANCIAL GROUP, individually and on behalf of all others similarly situated, SEIU

PENSION PLANS MASTER TRUST, individually and on behalf of all others similarly situated, HIGHLANDER REALTY, LLC, JEFFREY D. BUCKLEY, FEDERAL HOME LOAN MORTGAGE CORPORATION, COUNTY OF SONOMA, DAVID E. SUNDSTROM, in his official capacity as Treasurer of the county of Sonoma for and on behalf of the Sonoma County Treasury Pool Investment, REGENTS OF THE UNIVERSITY OF CALIFORNIA, SAN DIEGO ASSOCIATION OF GOVERNMENTS, CEMA JOINT VENTURE, COUNTY OF SACRAMENTO, CITY OF PHILADELPHIA, PENNSYLVANIA INTERGOVERNMENTAL COOPERATION AUTHORITY, PRINCIPAL FUNDS, INC., PFI BOND & MORTGAGE SECURITIES FUND, PFI BOND MARKET INDEX FUND, PFI CORE PLUS BOND I FUND, PFI DIVERSIFIED REAL ASSET FUND, PFI EQUITY INCOME FUND, PFI GLOBAL DIVERSIFIED INCOME FUND, PFI GOVERNMENT & HIGH QUALITY BOND FUND, PFI HIGH YIELD FUND, PFI HIGH YIELD FUND I, PFI INCOME FUND, PFI INFLATION PROTECTION FUND, PFI SHORT-TERM INCOME FUND, PFI MONEY MARKET FUND, PFI PREFERRED SECURITIES FUND, PRINCIPAL VARIABLE CONTRACTS FUNDS, INC., PVC ASSET ALLOCATION ACCOUNT, PVC MONEY MARKET ACCOUNT, PVC BALANCED ACCOUNT, PVC BOND & MORTGAGE SECURITIES ACCOUNT, PVC EQUITY INCOME ACCOUNT, PVC GOVERNMENT & HIGH QUALITY BOND ACCOUNT, PVC INCOME ACCOUNT, PVC SHORT-TERM INCOME ACCOUNT, PRINCIPAL FINANCIAL GROUP, INC., PRINCIPAL FINANCIAL SERVICES, INC., PRINCIPAL LIFE INSURANCE COMPANY, PRINCIPAL CAPITAL INTEREST ONLY I, LLC, PRINCIPAL COMMERCIAL FUNDING, LLC, PRINCIPAL COMMERCIAL FUNDING II, LLC, PRINCIPAL REAL ESTATE INVESTORS, LLC, TEXAS COMPETITIVE ELECTRIC HOLDINGS COMPANY LLC, SALIX CAPITAL LTD.,

*Plaintiffs,*

—against—

BANK OF AMERICA CORPORATION, BARCLAYS BANK PLC., CITIBANK NA, CREDIT SUISSE GROUP AG, DEUTSCHE BANK AG, HSBC HOLDINGS PLC., J.P. MORGAN CHASE & CO., NORINCHUKIN BANK, UBS AG, WESTLB AG, RABOBANK GROUP, DOES 1-10, HBOS PLC, BANK OF TOKYO-MITSUBISHI UFJ, LTD, ROYAL BANK OF CANADA, SOCIETE GENERALE, DEUTSCHE BANK FINANCIAL LLC, DEUTSCHE BANK SECURITIES INC., BANK OF AMERICA, N.A., NATIONAL ASSOCIATION, JPMORGAN CHASE & CO., HSBC BANK PLC, WESTDEUTSCHE IMMOBILIENBANK AG, CITIGROUP INC, COOPERATIVE CENTRALE RAIFFEISENBOERENLEENBANK B.A., JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, JPMORGAN CHASE BANK, BARCLAYS BANK PLC, LLOYDS BANKING GROUP PLS, HSBC HOLDING PLC, LLOYDS BANKING GROUP PLS, JPMORGAN CHASE BANK N.A., CITIGROUP, INC., CITIBANK N.A., BANK OF TOKYO-MITSUBISHI UFJ, LTD., COOPERATIVE CENTRALE-RAIFFEISEN- BOERNLEENBANK B.A., JPMORGAN CHASE BANK N.A., ROYAL BANK OF SCOTLAND, PLC, STEPHANIE NAGEL, BRITISH BANKERS' ASSOCIATION, BBA ENTERPRISES, LTD, BBA LIBOR, LTD, PORTIGON AG, JOHN DOES #1-#5, LLOYDS TSB BANK PLC, NATIONAL COLLEGIATE TRUST, CHASE BANK USA, N.A., CREDIT SUISSE GROUP, AG, CITIBANK, N.A., UBS SECURITIES LLC, J.P. MORGAN CLEARING CORP., BANK OF AMERICA SECURITIES LLC, BANK OF TOKYO-MITSUBISHI UFJ, JPMORGAN & CO., BANK OF AMERICA N.A., CENTRALE RAIFFEISEN-BERENLEENBANK B.A., UBS AG, ROYAL BANK OF SCOTLAND GROUP PLC, SOCIETE GENERAL, ROYAL BANK OF CANADA, BANK OF NOVA SCOTIA, BANK OF TOKYO MITSUBISHI UFJ LTD., CHASE BANK USA, NA, ROYAL BANK OF

SCOTLAND, JPMORGAN CHASE BANK NATIONAL ASSOCIATION, ROYAL BANK OF SCOTLAND GROUP PLC.,

*Defendants-Appellees,*

LLOYDS BANKING GROUP PLC, CREDIT ARGICOLE, S.A., ROYAL BANK OF SCOTLAND GROUP PLC, CREDIT SUISSE GROUP, NA, BARCLAYS CAPITAL INC., BARCLAYS U.S. FUNDING LLC, CREDIT SUISSE SECURITIES (USA) LLC, BARCLAYS PLC, CITIZENS BANK OF MASSACHUSETTS, agent of RBS Citizens Bank, NA, RBS CITIZENS, N.A., FKA CITIZENS BANK OF MASSACHUSETTS, RBS CITIZENS, N.A., incorrectly sued as the Charter One Bank NA, BNP PARIBAS S.A, SUMITOMO MITSUI BANKING CORP., CITIGROUP GLOBAL MARKETS INC., HSBC SECURITIES (USA) INC.,

*Defendants.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF AMICI CURIAE ............................................................1

ARGUMENT ....................................................................................4

I.      PLAINTIFFS FAIL TO ALLEGE ANTITRUST INJURY, WHICH IS NECESSARY EVEN IN A *PER SE* CASE. ...................4

II.     THIS IS NOT A *PER SE* PRICE-FIXING CASE. ............................8

     *A.*    The Category of Cases to which *Per Se* Analysis Should be Applied is Narrow..................................................................8

     B.    LIBOR Setting is not *Per Se* "Price Fixing." .....................9

     C.    Cooperative Benchmark Setting Should Not be Analyzed under the *Per Se* Framework...........................................13

     D.    There is No Allegation of Price-Fixing in the Markets in which Plaintiffs Transacted. ....................................15

CONCLUSION ...............................................................................16

# TABLE OF AUTHORITIES

*Arizona v. Maricopa Cnty. Med. Soc.*,
  457 U.S. 332 (1982) ........................................................................... 7

*Atlantic Richfield Co. v. USA Petroleum Co.* ("*ARCO*"),
  495 U.S. 328 (1990) ................................................................... passim

*Bogan v. Hodgkins*,
  166 F.3d 509 (2d Cir. 1999) ............................................................. 14

*Broadcast Music, Inc. v. Columbia Broadcast Sys., Inc.*,
  441 U.S. 1 (1979) ...................................................................... passim

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) .......................................................................... 14

*Continental Television v. GTE Sylvania*,
  433 U.S. 36 (1977) ...................................................................... 8, 11

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ........................................................................... 6

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. at 441(1990) ................................................................. 10, 13

*Gatt Commc'ns Inc. v. PMC Assocs*,
  711 F.3d 68 (2d Cir. 2013) ............................................................... 5

*In re LIBOR-Based Fin. Instruments Antitrust Litigation*,
  935 F. Supp. 2d 666 (S.D.N.Y. 2013) ........................................ passim

*In re Sulfuric Acid Antitrust Litigation*,
  703 F.3d 1004 (7th Cir. 2012) .................................................... passim

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ...................................................................... 8, 14

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) .............................................................. 14

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla*,
    468 U.S. 85 (1984)......................................................................... 9, 11, 12

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*,
    472 U.S. 284 (1985)........................................................................ 9, 12

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128 (1998)......................................................................... 6, 9

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006)................................................................ 4

*Sanderson v. Culligan Int'l Co.*,
    415 F.3d 620 (7th Cir. 2005) ............................................................. 6, 7

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997).............................................................................. 8

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006).............................................................................. 14

*United States v. Am. Airlines, Inc.*,
    753 F.2d 1114 (5th Cir. 1984) ............................................................ 6

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)......................................................................... 12, 13

*United States v. Trenton Potteries Co.*,
    273 U.S. 392 (1927)........................................................................... 7

## INTEREST OF AMICI CURIAE[1]

*Amici Curiae* are law professors and scholars at U.S. law schools and research centers who specialize in antitrust law and policy.[2] *Amici* agree with and support the decision below dismissing Plaintiffs' claims under Section 1 of the Sherman Act arising from Defendants' alleged collusion in the setting of the London Interbank Offered Rate (LIBOR), a global interest rate benchmark. *Amici* agree with Judge Buchwald that Plaintiffs have failed to allege injury attributable to any anticompetitive aspect or effect of Defendants' alleged conspiracy to suppress LIBOR. Moreover, *amici* believe that Plaintiffs' argument that Defendants' alleged conduct constitutes "horizontal price-fixing" subject to the *per se* rule should be rejected, as the LIBOR-setting process is unusual and complicated so that the Plaintiffs should not be permitted to sidestep a rigorous analysis of its operation and economic impact.[3]

---

[1] All parties have consented to the filing of this brief.

[2] The name and affiliations (for information purposes only) of *amici* are included in an addendum to this brief.

[3] No counsel for any party authored this brief in whole or in part, and no person or entity made a monetary contribution intended to fund the brief's preparation or submission.

## FACTUAL STATEMENT

As the District Court makes clear in its opinion and the Plaintiffs make equally clear in their complaints, the LIBOR system is complicated and contains many moving parts. The USD LIBOR process at issue in this case begins with 16 banks selected by the British Bankers' Association (BBA) being asked a hypothetical question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" *In re: LIBOR-Based Financial Instruments Antitrust Litigation,* 935 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) ("*LIBOR I*"). Each bank answers separately for each LIBOR maturity inquired about (e.g., 3 or 6 months). Thomson Reuters (as BBA's agent) then calculates and distributes by about 11:30 am the new LIBOR fix for each maturity. It does so by discarding the high four and the low four estimates and calculating the arithmetic mean of the middle two quartiles. *Id.* In addition to the new LIBOR fix for the day, Thomson Reuters publishes each of the 16 banks' responses to the hypothetical question. *Id.* at 679. As the District Court explained, "LIBOR is 'the primary benchmark for short term interest rates globally.'" *Id.* (quoting OTC Am. Compl., ¶ 44).

Since 2012, both U.S. and foreign enforcement agencies have investigated alleged manipulation of the LIBOR setting process by participating panel

members.[4]   No regulator has found that panel banks colluded to persistently suppress LIBOR. [5]   Nevertheless, the Plaintiffs' complaints in the current cases allege that all panel members agreed to systematically lower their LIBOR submissions to appear financially healthy during the financial crisis and in order to lower their own borrowing costs.

---

[4] *LIBOR I* at 681.  Judge Buchwald explained, "Although plaintiffs were not able to incorporate information from these settlements into their amended complaints, they have submitted to the Court, in the course of opposing defendants' motions to dismiss, settlement documents issued by the Criminal Division of the Department of Justice the Commodities Futures Trading Commission (the "CFTC"), and the United Kingdom Financial Services Authority (the "FSA"). See DOJ Statement; CFTC Settlement Order (June 27, 2012) [hereinafter CFTC Order], Ex.4, Scherrer Decl.; FSA Final Notice (June 27, 2012), Ex.5, Scherrer Decl. [hereinafter FSA Notice]...." *Id.*

[5] *LIBOR I* at 681.  "The agencies documented instances in which Barclays' LIBOR submitters had accommodated requests from traders for an artificially high LIBOR quote as well as instances where the LIBOR submitters had accommodated request for an artificially low LIBOR quote. See, e.g., id. at 7-11.  In addition to this manipulation to benefit daily trading positions, leading to either an artificially high or artificially low LIBOR quotes, the agencies found that from 'late August 2007 through early 2009,' Barclays's LIBOR submitters, '[p]ursuant to a directive by certain members of Barclays' senior management,' consistently submitted artificially low LIBOR quotes 'in order to manage what [Barclays] believed were inaccurate and negative public and media perceptions that Barclays had a liquidity problem.'" (quoting CFTC Order at  3).  *Id.*

## ARGUMENT

## I.  PLAINTIFFS FAIL TO ALLEGE ANTITRUST INJURY, WHICH IS NECESSARY EVEN IN A *PER SE* CASE.

Antitrust injury must be established for the Plaintiff to state a claim for damages.  *LIBOR I*, 935 F. Supp. 2d at 687 ("Critically, even when a plaintiff can successfully allege a *per se* violation of section 1 of the Sherman Act, such as horizontal price fixing, the plaintiff will not have standing under section 4 of the Clayton Act unless he can separately demonstrate antitrust injury.").  Even assuming, *arguendo,* that prices for LIBOR-based financial instruments were manipulated, that does not suggest that Plaintiffs have suffered an antitrust injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290-91 (2d Cir. 2006).  We disagree with the contention that "[t]he kind of injury that plaintiffs allege – that they are customers who were hurt because suppliers who are supposed to be competitors colluded to help themselves and hurt their customers – is exactly the kind of injury that the antitrust laws are intended to prevent."[6]  Not all conduct that causes a plaintiff to overpay, and to suffer an injury, constitutes antitrust injury.

---

[6] Brief for *Amici Curiae* Financial Markets Law Professors in Support of Plaintiffs-Appellees at 18-19.

To the contrary, it is well established that all antitrust plaintiffs, including those that allege *per se* violations, must prove that their injuries stem from a "competition-reducing aspect or effect" of the defendants' behavior. *Atlantic Richfield Co. v. USA Petroleum Co.* ("*ARCO*"), 495 U.S. 328, 344 (1990); *see also Gatt Commc'ns Inc. v. PMC Assocs*, 711 F.3d 68, 76 (2d Cir. 2013) ("It is not enough for the actual injury to be causally linked to the asserted violation."). Thus, in dismissing Plaintiffs' antitrust claim, Judge Buchwald correctly held that "it is not sufficient that plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive." *LIBOR I*, 935 F. Supp. 2d at 689.

Indeed, conduct giving rise to many causes of action—such as fraud, breach of contract and manipulation, among others—may cause a plaintiff to pay a higher price than he or she would have absent the defendant's conduct. In those cases, a plaintiff's economic injury plainly does not result from suppression of competition; such conduct is, in fact, typically "consistent with normal commercial incentives facing defendants." *Id.* at 690 ("Even if such independent misreporting would have been fraudulent, it would not have been anticompetitive, and indeed would have been consistent with normal commercial incentives facing defendants."); *see also ARCO*, 495 U.S. at 344 ("Pro-competitive or efficiency-enhancing aspects of practices that nominally violate the antitrust laws may cause serious harm to

5

individuals, but this kind of harm is the essence of competition and should play no role in the definition of antitrust damages.") (brackets and citation omitted).

Similarly, here, as Judge Buchwald stated below, "Plaintiffs' theory is that defendants competed normally in the interbank loan market and then agreed to lie about the interest rates they were paying in that market when they were called upon to truthfully report their expected borrowing costs to the BBA. This theory is one of misrepresentation, and possibly of fraud, but not of failure to compete." *LIBOR I*, 935 F. Supp. 2d at 689. As antitrust laws are not intended to redress dishonesty, allegations of misrepresentation are not in themselves sufficient to support a claim of harm to competition. *Id.*; *see also NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 137 (1998) (cautioning against "transform[ing] cases involving business behavior that is improper for various reasons . . . into treble-damages antitrust cases"); *Copperweld Corp. v. Independence Tube Corp.* 467 U.S. 752, 777 (1984) (referring to "private state tort suits masquerading as antitrust actions"); *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623-24 (7th Cir. 2005) (holding that "false statements about a rival's goods" are not actionable under antitrust laws because they do not "drive up prices by curtailing output"); *United States v. Am. Airlines, Inc.*, 753 F.2d 1114, 1119 (5th Cir. 1984) ("[T]he Sherman Act does not reach practices only unfair, impolite, or unethical.").

Moreover, merely labeling conduct as "price fixing," as Plaintiffs do here, does not make it so, nor does it relieve Plaintiffs of their obligation to demonstrate that the alleged conduct had the effect of reducing the output of a product or financial instrument or reducing price competition among the providers of those financial products. *See ARCO*, 495 U.S. at 344 (holding that even in cases involving allegations of horizontal price fixing, "plaintiffs were still required to show that the conspiracy caused them an injury for which the antitrust laws provide relief") (emphasis, quotation marks and citation omitted); *Sanderson*, 415 F.3d at 623 ("Antitrust law condemns practices that drive up prices by curtailing output.") (citations omitted). Indeed, true "horizontal price fixing" schemes are categorized as "illegal *per se*" precisely because the "aim and result of [traditional] price-fixing agreement[s], if effective, is the elimination of one form of competition." *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 345 (1982) (quoting *United States v. Trenton Potteries Co.*, 273 U.S. 392, 398 (1927)); *see also Broadcast Music, Inc. v. Columbia Broadcast Sys., Inc.*, 441 U.S. 1, 19-20 (1979) (*per se* illegal price-fixing "facially appears to be one that would always or almost always tend to restrict competition and decrease output"). Absent allegations that Defendants' conduct resulted in a reduction in supply of LIBOR-based financial products or that the Defendants conspired not to compete on the prices that they charged or paid for these products, Plaintiffs cannot demonstrate

injury flowing from a "competition-reducing aspect or effect" of Defendants' alleged conspiracy. *ARCO*, 495 U.S. at 344.

## II.    THIS IS NOT A *PER SE* PRICE-FIXING CASE.

Even if Plaintiffs had adequately alleged antitrust injury, the allegations in their complaints fail to set out a *per se* price-fixing case. *Per se* treatment is reserved for the most classic forms of price-fixing. This litigation is far from that type of case.

### A. THE CATEGORY OF CASES TO WHICH *PER SE* ANALYSIS SHOULD BE APPLIED IS NARROW.

In their complaints, Plaintiffs allege only a *per se* Section 1 violation. By characterizing the alleged conduct as "price-fixing," Plaintiffs seek to avoid the burden of demonstrating actual harm to competition. This Court should not endorse Plaintiffs' characterization of the alleged conduct, which is novel in antitrust jurisprudence, as *per se* price-fixing because to do so runs counter to rigorous antitrust analysis and precedent. It also runs counter to the longstanding judicial trend that has reduced reliance on *per se* categorization. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 886 (2007); *State Oil Co. v. Khan*, 522 U.S. 3 (1997); *Continental Television v. GTE Sylvania*, 433 U.S. 36 (1977).

Judge Posner articulated the problem with applying the *per se* rule in any but the most simple and straight forward cases in *In re Sulfuric Acid Antitrust Litigation*, 703 F.3d 1004 (7th Cir. 2012). Under the *per se* rule, Plaintiffs need show only that competitors "fixed" prices and that they were damaged without regard to the actual consequences of the conduct. *Id.* at 1007. As the Supreme Court has warned, although the *per se* rule "is a valid and useful tool of antitrust policy and enforcement," it still "does not denigrate the *per se* approach to suggest care in [its] application." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 298 (1985). This is especially true in a case where some degree of cooperation is required to make a challenged (but nevertheless permissible) joint activity work. *See Broadcast Music, Inc.,* 441 U.S. 1; *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla*, 468 U.S. 85 (1984). Moreover, applying the *per se* rule to cases such as this one that present new and judicially untested conduct risks turning alleged business misconduct, which might violate other statutes or common law rights, "into treble-damages antitrust cases . . . even where the competitive process itself does not suffer harm." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998).

## B. LIBOR SETTING IS NOT *PER SE* "PRICE FIXING."

The setting of the LIBOR benchmark does not fall under the narrow category of activity that courts have labeled as "horizontal price-fixing" prohibited

9

by the Sherman Act.  *See Broadcast Music, Inc.*, 441 U.S. at 8 (labeling an activity as "price fixing" means it falls within the category of *per se* violations of the Sherman Act).

As the District Court described below, "LIBOR is a benchmark interest rate disseminated by the British Bankers' Association," based on the hypothetical interest rate submissions of a panel of banks.  *LIBOR I*, 935 F. Supp. 2d at 678. "[I]t was a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs to the BBA each day to facilitate the BBA's calculation of an interest rate index."  *LIBOR I*, 935 F. Supp. 2d at 688. This type of collaborative activity to generate valuable information that no one member could unilaterally generate is, in fact, potentially procompetitive.  In fact, Plaintiffs do not challenge the cooperative activity, just the way it was done: "Plaintiffs were not (and are not) attacking the LIBOR-setting process itself but rather its anticompetitive manipulation . . . ."  Joint Brief for Plaintiffs-Appellants at 20.  But to allege that there was some collective manipulation of the rate sometimes does not turn a necessarily cooperative operation into a simple *per se* price fixing conspiracy.

Because applying the per se rule to particular conducts risks sweeping potentially pro-competitive activity within a general condemnation and may prohibit a defendant from justifying its conduct, the Supreme Court has

emphasized that the *per se* rule is a "demanding standard" and made clear that any "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Continental T.V., Inc. v. GTE Sylvania Inc.* 433 U.S. 36 at 50, 58-59 (1977). *Per se* condemnation is justified only "after considerable experience with certain business relationships." *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 441, 432-33 (1990). The Court has cautioned against placing an alleged restraint into a *per se* illegal category too quickly without a preliminary assessment of its likely competitive effects and the plausible justifications for its use. In *Broadcast Music, Inc. v. CBS*, the Court observed that "easy labels do not always supply ready answers," that a literal approach in applying the *per se* rule is "overly simplistic and often overbroad," and that characterizing challenged conduct as falling within a category of restraint that is *per se* unlawful will not always "be a simple matter." 441 U.S. at 8-9. The Court refused to apply the *per se* rule when, on clear examination, it was apparent that horizontal restraints on price competition were essential if the joint blanket license was to be available at all. *Id.* at 19-23.

In *NCAA v. Board of Regents*, the Supreme Court went one step further, saying that, although the Court had had substantial judicial experience with horizontal output limitations, application of the *per se* rule was inappropriate because the case "involve[d] an industry in which horizontal restraints on

11

competition are essential if the product is to be available at all." 468 U.S. at 100-01.[7] It is notable that both *Sulfuric Acid* and *NCAA* involved restraints that were more susceptible to *per se* analysis than the alleged restraint at issue here, as both of those cases involved clear horizontal conspiracies to restrain supply, thereby reducing competition. But in both cases, it was determined that the *per se* rule should not be used. *NCAA,* 468 U.S. at 114; *Sulfuric Acid,* 703 F.3d at 1011. Here, it is not at all apparent that the alleged conspiracy restrained or reduced competition. This factor, combined with the need for cooperative activity among the Defendants for the LIBOR system to work, makes this case even more ill-suited to *per se* treatment than those cases.

It is informative to contrast the current case with the leading "benchmark manipulation" case on which the Plaintiffs necessarily have to try to rely. In *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 (1940), the Defendants were competitors in two related markets: the "spot market" in which they were competing purchasers, and the much larger "wholesale" market in which they were competing sellers. Because the "spot market" prices were used as price indexes in

---

[7] In the same vein, the Supreme Court held in *Northwest Wholesale Stationers, Inc.,* 472 U.S. at 297 n.7, that even where the challenged conduct of a cooperative association was allegedly motivated by a desire to put a competitor at a "competitive disadvantage" and was "not substantially related to the efficiency-enhancing or procompetitive purposes that otherwise justify the cooperative's practices . . . ," it still should not be subject to the *per se* rule against boycotts.

the "wholesale" contracts, the Defendants colluded to buy gasoline that they did not need on the "spot market"; each Defendant was assigned a "dancing partner" (i.e., an independent refinery) whose "distress gasoline" the Defendant was obliged to buy up to keep the "spot market" prices up. This was a well-organized and orchestrated operation which continued for a number of years.

Here, by contrast, there is no similar continuing agreement on prices to be paid for loans, nor any understanding on the quantity of loans to be sought by the 16 banks on the USD LIBOR panel. *Cf. Superior Court Trial Lawyers Ass'n*, 493 U.S. at 422-23 (constriction of supply is the "essence of 'price-fixing'"). Moreover, unlike the Defendants in *Socony Vacuum,* the Defendants here have many competitors in the markets for LIBOR-designated derivatives and loans; and there is no allegation of any agreement or understanding among them to deal only in LIBOR-indexed products. Finally, and very significantly, no legitimate cooperation was required among the *Socony Vacuum* defendants in their "spot market" activities, thus decisively distinguishing the case from the LIBOR-nomination process at the heart of the present case.

## C. COOPERATIVE BENCHMARK SETTING SHOULD NOT BE ANALYZED UNDER THE *PER SE* FRAMEWORK.

*Per se* treatment is also inappropriate for this case because benchmark setting through cooperative means is exactly the "novel way of doing business" for

13

which courts avoid the shortcut that *per se* analysis provides. *See Sulfuric Acid*, 703 F.3d at 1011. First, as evidenced by Plaintiffs' own economic analyses, determining the economic impact of LIBOR setting is complex and "not immediately obvious." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (courts "have expressed reluctance to adopt *per se* rules . . . where the economic impact of certain practices is not immediately obvious"); *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 759 (1999) (no *per se* analysis where "any anticompetitive effects of given restraints are far from intuitively obvious"); *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999) (no *per se* analysis where "the Agreement's anticompetitive effect on the market for insurance sales agents is not obvious"). Second, litigation related to the setting of benchmarks (distinguishable from "price-fixing," with which courts have vast experience) tends to be situation-specific and courts do not yet have sufficient experience analyzing LIBOR-like benchmarks to say that the setting of LIBOR is a "restraint[]… that would always or almost always tend to restrict competition and decrease output." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *see also Cal. Dental Ass'n*, 526 U.S. at 779 ("considerable inquiry into market conditions may be required before the application of any so-called *per se* condemnation is justified"); *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 316 (2d Cir. 2008) ("*Per se* treatment is not appropriate . . . where the economic

14

and competitive effects of the challenged practice are unclear.").  Given the complexity and novelty of analyzing the economic impact arising from the collaborative setting of LIBOR, the absence of a body of jurisprudence on benchmark-setting and the ability that *per se* analysis gives Plaintiffs to avoid the burden of proving key elements of a Section I violation, it would be antithetical to the sound and well-developed antitrust jurisprudence to apply a *per se* analysis in this context.

### D. THERE IS NO ALLEGATION OF PRICE-FIXING IN THE MARKETS IN WHICH PLAINTIFFS TRANSACTED.

A benchmark, by definition, is a tool that any set of buyers and sellers can choose to use in transactions between them.  Regardless of whether LIBOR was manipulated, Defendants' alleged conspiracy did not affect the ability of buyers and sellers of financial products (i) to use financial instruments based on other indices or no indices at all, or (ii) to set the prices of LIBOR-based instruments "at any level above or below LIBOR," and thus "did not constrain the free and competitive bargaining of actors in the market for LIBOR-based financial instruments."  *LIBOR I*, 935 F. Supp. 2d at 694.  Indeed, Plaintiffs do not allege in the complaints that any Defendants conspired to fix the price of any particular contract in the market for LIBOR-based financial instruments.

Defendants compete with a wide range of financial intermediaries not involved in the LIBOR-setting process for business using a wide array of instruments that employ LIBOR as a reference point by pricing those instruments higher or lower (depending on whether buying or selling) than their competition. Their customers can compare prices among the firms that make markets in the instruments in which they are interested, they can choose to use another benchmark as the reference rate, and they have available to them other interest rate data that can corroborate their view of interest rate directionality (including Treasury Bills rates, federal funds rates, bank deposit interest rates, market indices and overnight index swap rates, among others). Given that Plaintiffs have failed to allege an agreement to restrain competition in the market in which Plaintiffs allegedly transacted business, *per se* analysis would be wholly inappropriate in this case.

## CONCLUSION

For the foregoing reasons, *amici* respectfully pray that this Court affirm the judgment of the District Court dismissing Plaintiffs' antitrust claim.

Respectfully submitted this 24th day of July, 2015.

Dated: July 24, 2015        Respectfully submitted,


By:  */s/ Lucy S. Clippinger*
     Donald I. Baker
     W. Todd Miller
     Lucy S. Clippinger
BAKER & MILLER PLLC
2401 Pennsylvania Ave. N.W., Suite 300
Washington, DC 20037
(202) 663-7820
dbaker@bakerandmiller.com
tmiller@bakerandmiller.com
lclippinger@bakerandmiller.com

*Attorneys for Amici Curiae*
  *Antitrust Scholars*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rules 29(d) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 3,789 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: July 24, 2015   Respectfully submitted,

        By: */s/ Lucy S. Clippinger*
         Donald I. Baker
         W. Todd Miller
         Lucy S. Clippinger
        BAKER & MILLER PLLC
        2401 Pennsylvania Ave. N.W., Suite 300
        Washington, DC 20037
        (202) 663-7820
        dbaker@bakerandmiller.com
        tmiller@bakerandmiller.com
        lclippinger@bakerandmiller.com

        *Attorneys for Amici Curiae*
         *Antitrust Scholars*

# ADDENDUM

## List of Amici Antitrust Scholars

Keith N. Hylton, Ph.D.
William Fairfield Warren Distinguished Professor
Professor of Law
Boston University School of Law

Michael Jacobs
Distinguished Research Professor of Law
DePaul University College of Law

Geoffrey A. Manne
Executive Director
International Center for Law and Economics

Justin McCrary, Ph.D.
Professor of Law
University of California, Berkeley, School of Law

William J. Murphy
Professor Law
University of New Hampshire School of Law